No. 24-60367

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

TRADER JOE'S COMPANY

*Petitioner/Cross-Respondent*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*

ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR
ENFORCEMENT OF AN ORDER FROM THE
NATIONAL LABOR RELATIONS BOARD

NLRB CASE NOS. 16-CA-291179 AND 16-CA-293143

BRIEF OF PETITIONER/CROSS-RESPONDENT
TRADER JOE'S COMPANY

Arrissa K. Meyer
LITTLER MENDELSON, P.C.
2001 Ross Avenue, Suite 1500
Dallas, TX 75201
Telephone: 214-880-8180
Fax: 214-889-6100
E-mail:  akmeyer@littler.com

*Attorney for Petitioner/Cross-Respondent Trader Joe's Company*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    Petitioner Trader Joe's Company ("Trader Joe's" or the "Company") is a California corporation with its principal place of business in Monrovia, California and is a wholly owned subsidiary of T.A.C.T. Holding, Inc.  T.A.C.T. Holding, Inc. is Trader Joe's parent company, and there is no publicly held corporation that owns 10% or more of Trader Joe's stock.

2.    Littler Mendelson, P.C. is counsel for Trader Joe's.

3.    Arissa Meyer is counsel for Trader Joe's.

4.    Respondent National Labor Relations Board ("NLRB or the "Board") is a federal agency.

5.    Ruth E. Burdick is counsel for the NLRB.

6.    Jared Odessky is counsel for the NLRB.

7.    Milakshmi Rajapakse is counsel for the NLRB.

8.    Jill Groeschel ("Groeschel") is the Charging Party in the case.

*/s/ Arissa K. Meyer*
Arissa K. Meyer

i

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fifth Circuit Rule 28.2.3, Trader Joe's respectfully requests that the Court grant oral argument in this matter, as it will assist the Court in considering the issues raised by Trader Joe's petition.  This case presents significant factual issues whether the Board's Order is either inconsistent with the record evidence or ignores evidence entirely.  This case also presents a question of statutory interpretation concerning whether the Board imposed a damages remedy that exceeds its statutory authority.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

STATEMENT OF ISSUES ...............................................................................1

STATEMENT OF THE CASE ........................................................................2

I.     FACTUAL BACKGROUND .......................................................................2

        A.     Trader Joe's Provides a Unique Shopping Experience. .......................2

        B.     Trader Joe's Maintains Policies Regarding Crew Member
             Conduct. ..........................................................................................3

        C.     In June 2020, Groeschel Raised Concerns Regarding COVID-
             19 Protocols. ....................................................................................4

        D.     Groeschel and Other Crew Members Raised Additional
             Concerns about Trader Joe's COVID-19 Protocols. ...........................7

        E.     Trader Joe's Disciplined Groeschel Following a Customer
             Complaint. ........................................................................................9

        F.     Groeschel Responded to the Written Warning. .................................11

        G.     Groeschel Received a "Does Not Meet Expectations"
             Performance Rating and Filed an NLRB Charge. ..............................12

        H.     Crew Members Submitted Complaints Regarding Groeschel. ..........14

        I.     Hancock Investigated by Conducting a Climate Survey. ..................18

        J.     Trader Joe's Terminated Groeschel's Employment on April 8,
             2022. ..............................................................................................19

II.    PROCEDURAL BACKGROUND ............................................................21

SUMMARY OF ARGUMENT....................................................................22

STANDARD OF REVIEW..........................................................................25

ARGUMENT .............................................................................................26

I.     THE BOARD ERRED IN HOLDING TRADER JOE'S VIOLATED
        SECTION 8(A)(1) BY ISSUING GROESCHEL A WRITTEN
        WARNING. .....................................................................................26

A.    The Board Lacked Substantial Evidence to Find Animus Motivated Groeschel's Written Warning. ...........................................27

    1.    Neither Fuller's Statement, Nor Dayforce Notes Show Animus by Hancock, the Decision-Maker. ..............................27

    2.    Fuller's and Hancock's Emails Do Not Show Animus. ..........29

B.    The Board Disregarded Key Comparator Evidence. .........................31

II.    THE BOARD ERRED IN HOLDING TRADER JOE'S VIOLATED SECTION 8(A)(4) AND (1) BY SUSPENDING AND DISCHARGING GROESCHEL. ....................................................33

A.    There Is No Evidence that Groeschel's Suspension Was Unlawful. ....................................................................33

B.    The Board Erred in Finding Groeschel's Retirement Benefits Conversation Was Concerted Activity. ...............................37

C.    The Board Erred in Concluding Trader Joe's Climate Survey Was Not a Meaningful Investigation. ..................................39

D.    The Board Erred in Finding Trader Joe's Had No Basis for Terminating Groeschel's Employment. ...........................42

III.    THE BOARD'S DAMAGES REMEDY IS UNLAWFUL. .........................44

A.    The NLRA Does Not Authorize Compensatory Damages. ...............45

B.    Despite this Court's Decision, the Board Continues to Award Compensatory Damages Under Thryv. ...............................48

CONCLUSION ..................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphi Inst.*,
    287 NLRB 1073 (1988) ......................................................................38

*Airgas USA, LLC*,
    373 NLRB No. 102 (Sept. 18, 2024) ...........................................48, 49

*Albemarle Paper Co. v. Moody*,
    422 U.S. 405 (1975) .........................................................................46

*In re Am. Oil Co.*,
    189 NLRB 3 (1971) ..........................................................................35

*NLRB v. Arkema, Inc.*,
    710 F.3d 308 (5th Cir. 2013) ............................................................35

*Asarco, Inc. v. NLRB*,
    86 F.3d 1401 (5th Cir. 1996) ............................................................36

*Bellagio, LLC*,
    362 NLRB 1426 (2015) .....................................................................34

*NLRB v. Big Three Indus., Inc.*,
    497 F.2d 43 (5th Cir. 1974) ..............................................................40

*Bruce Packing Co., Inc.*,
    357 NLRB 1084 (2011) .....................................................................29

*Carey Salt Co. v. NLRB*,
    736 F.3d 405 (5th Cir. 2013) ............................................................26

*In re Cone Mills Corp.*,
    168 NLRB 69 (1967) .........................................................................35

*Creative Vision Res., LLC v. NLRB*,
    882 F.3d 510 (5th Cir. 2018) ............................................................26

*Curtis v. Loether*,
    415 U.S. 189 (1974) .........................................................................46

*Electrolux Home Prod. Inc.*,
   368 NLRB No. 34 (Aug. 2, 2019) ....................................................30

*Entergy Miss., Inc. v. NLRB*,
   810 F.3d 287 (5th Cir. 2015) ...........................................................25

*NLRB v. Esco Elevators, Inc.*,
   736 F.2d 295 ....................................................................................40

*Fluor Daniel, Inc.*,
   304 NLRB 970 (1991) .....................................................................33

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002)..........................................................................45

*In-Terminal Services Corp.*,
   309 NLRB 23 (1992) ........................................................................43

*Ex parte Lennon*,
   166 U.S. 548 (1897)..........................................................................46

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024).......................................................................25

*Lord & Taylor v. NLRB*,
   703 F.2d 163 (5th Cir. 1983) ...........................................................30

*NLRB v. McGahey*,
   233 F.2d 406 (5th Cir. 1956) ...........................................................42

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993)..........................................................................45

*Mike Yurosek & Son, Inc.*,
   306 NLRB 1037 (1992) ....................................................................38

*NLRB v. Mini-Togs*,
   980 F.2d 1027 (5th Cir. 1993) ....................................................*passim*

*Montgomery Ward & Co.*,
   156 NLRB 7 (1965) ..........................................................................39

vi

*Northeast Iowa Telephone Co.*,
  346 NLRB 465 (2006) .......................................................................34

*Park 'N Fly, Inc.*,
  349 NLRB 132 (2007) .......................................................................41

*Pioneer Natural Gas Co. v. NLRB*,
  662 F.2d 408 (5th Cir. 1981) ..........................................................38

*Rockwell Mining LLC*,
  367 NLRB No. 39 (Nov. 29, 2018) ..................................................35

*Squires v. Bonser*,
  54 F.3d 168 (3d Cir. 1995) ..............................................................46

*State Farm v. Campbell*,
  538 U.S. 408 (2003).........................................................................45

*Stephens Media Group*,
  371 NLRB No. 11 (2021) .................................................................43

*STP Nuclear Operating Co. v. NLRB*,
  975 F.3d 507 (5th Cir. 2020) ..........................................................26

*Thryv, Inc.*,
  372 NLRB No. 22 (Dec. 13, 2022)............................................*passim*

*Thryv, Inc. v. NLRB*,
  102 F.4th 727 (5th Cir. 2024) ............................................25, 34, 48

*Tomatek, Inc.*,
  333 NLRB 1350 (2001) ....................................................................33

*UAW-CIO v. Russell*,
  356 U.S. 634 (1958).........................................................................46

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951).........................................................................26

*Valmont Indus., Inc. v. NLRB*,
  244 F.3d 454 (5th Cir. 2001) ..........................................................40

*Volvo Group North America, LLC*,
   370 NLRB No. 52 (2020) ...............................................................39, 40

*Washington Fruit & Produce Co.*,
   343 NLRB 1215 (2004) ........................................................................41

*William Beaumont Hospital*,
   363 NLRB No. 162 (2016) ....................................................................43

*Wright Line*,
   251 NLRB 1083 (1980) .................................................26, 31, 34, 43

*Ysleta Del Sur Pueblo v. Texas*,
   142 S. Ct. 1929 (2022) .........................................................................47

**Statutes**

29 U.S.C. § 160(c) ...................................................................................45, 46

29 U.S.C. § 160(e) ...........................................................................................1

29 U.S.C. § 160(f) ....................................................................................1, 25

29 U.S.C. § 187(b) .........................................................................................47

42 U.S.C. § 2000e-5(g)(1) .............................................................................47

Title VII of the Civil Rights Act .....................................................................46

Equal Pay Act.................................................................................................39

Family and Medical Leave Act.......................................................................47

Labor-Management Relations Act ..................................................................47

**Other Authorities**

*Hearing on S. 2926 Before the S. Comm on Educ. & Lab.*, 73d Cong.
   362 (1934) ...........................................................................................48

Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev.
   530, 553 (2016)...................................................................................46

## JURISDICTIONAL STATEMENT

The Board issued its Decision and Order ("Order") on July 9, 2024. Trader Joe's petitioned for this Court's review on July 18, 2024. The Board cross-applied for enforcement on August 6, 2024. This Court has jurisdiction pursuant to Section 10(f) and (e) of the National Labor Relations Act ("NLRA" or the "Act") because the Order is a final order. 29 U.S.C. § 160(e)-(f).

Venue is proper because Trader Joe's resides or transacts business within this judicial circuit, and the unfair labor practices in question are alleged to have occurred within this judicial circuit. 29 U.S.C. § 160(f).

## STATEMENT OF ISSUES

1.    Whether the Board erred in holding Trader Joe's violated Section 8(a)(1) of the Act by issuing Groeschel a written warning.

2.    Whether the Board erred in holding Trader Joe's violated Section 8(a)(4) and (1) by suspending and discharging Groeschel.

3.    Whether Section 10(c) of the NLRA, which authorizes "affirmative action, including reinstatement of employees with or without back pay," permitted the Board to order Trader Joe's to pay damages for "direct or foreseeable pecuniary harms."

# STATEMENT OF THE CASE

## I.     FACTUAL BACKGROUND[1]

### A.     Trader Joe's Provides a Unique Shopping Experience.

Trader Joe's is a national chain of grocery stores, focused on creating a "special environment" for customers where stores feel like their second home. (ROA.25, 422).  This is known as the "Wow" customer experience.  (ROA.33).

Trader Joe's stores are staffed using a nautical theme, with three primary groups of store personnel – Captain, Mates, and Crew.  (ROA.33).  The Captain, or store manager, leads the store.  (ROA. 33).  Mates are the next level of store leadership (comparable to assistant managers).  (ROA.33, 567).  Mates participate in all aspects of store operations, including supervising Crew.  (ROA.33, 468-69). Crew perform a variety of tasks in the store, including, answering customer questions, receiving pallets of product, breaking down pallets, stocking shelves, ushering customers to the register, working the registers, and writing orders for product.  (ROA.34-38, 598-99).

David Fuller ("Fuller") has been the Captain at store #426, located at 2922 S. Shepherd Dr., Houston, Texas 77098, since it opened in 2012.   (ROA.466). Groeschel worked as Crew at store #426 from 2014 through her termination on April

---

[1] On August 28, 2024, the Board filed a certified copy of the Agency Record.  Dkt. 14.  This brief therefore cites the Agency Record using the prefix "ROA" followed by the page number stamped in red in the bottom left corner of the PDFs at docket numbers 17-1 – 17-15 by CM/ECF.

8, 2022.  (ROA.32-33, 534).  Liz Hancock ("Hancock") is the Regional Vice President for the portion of Texas that includes store #426.  (ROA.285-86).

**B.    Trader Joe's Maintains Policies Regarding Crew Member Conduct.**

As described above, "[c]reat[ing] WOW customer experience every day" is a core Company value.  (ROA.1143).  Crew Members know the importance of creating a positive shopping experience by fostering customer happiness and engagement.  (ROA.155).  But the Trader Joe's Crew Handbook also emphasizes the importance Trader Joe's places on the treatment of co-workers.  (ROA.1087).  The "Crew Member Conduct" section lists behaviors that can result in discipline ranging from warnings to immediate termination, depending on the severity of the offense.  *Id*.  The list includes "[f]ailing to treat a customer, crew member, or any other member of the public with courtesy and respect."  *Id*.  Trader Joe's Crew Member Conduct policy further advises Crew that "[n]othing in this list [of prohibited behaviors] is intended to interfere with a crew member's right to discuss terms and conditions of employment, to try and improve these conditions, or to engage in any form of legally protected activity."  (ROA.1088).  Groeschel was aware of the rules of conduct and understood the behavioral expectations for Crew and that she could be subject to disciplinary action for failing to meet them.  (ROA.154).

Trader Joe's also maintains an Open Door Policy, which encourages Crew to

3

discuss with any member of leadership "any suggestions, questions, or problems relating to your job." (ROA.1086). Although the process "may not result in every problem being solved or every question answered to [the Crew Member's] satisfaction," Crew Members are encouraged "to raise issues of concern." *Id.*

### C. In June 2020, Groeschel Raised Concerns Regarding COVID-19 Protocols.

The COVID-19 pandemic was a stressful time to be working in the grocery business. (ROA.53, 243, 424, 569). In early 2020, Trader Joe's began implementing measures to keep its Crew Members and customers safe. (ROA.51-52, 160, 243-44). Among other things, the Company required masks to be worn in store, ceased sampling food for customers, modified shopping hours, applied social distancing stickers to the floor, installed Plexiglas shields at registers, limited the number of customers allowed in the store, and engaged in additional cleaning and sanitizing during the day. (ROA.51-52, 160-61, 476-78). Throughout the pandemic, Trader Joe's followed Centers for Disease Control ("CDC"), state, and local guidelines and mandates, and adjusted its safety protocols continuously to remain in compliance with all applicable standards. (ROA.475, 482). Trader Joe's also allowed Crew Members to take leave if they felt unsafe working before vaccines were widely available. (ROA.51-52, 161).

Trader Joe's implemented a notification process for positive cases of COVID-19, which involved sending Crew Members an email through Dayforce[2] with relevant information, including the positive Crew Member's last day in store. (ROA.57, 161, 289, 425). Mates and Captains also followed-up in huddle meetings. (ROA.57, 425). Groeschel felt Trader Joe's notification process was insufficient. (ROA.161). When the first positive case was reported in store #426, Groeschel took issue with Captain Fuller's notice (ROA.770-72) because it stated the individual's last day worked but did not disclose the individual had shopped in the store as a customer more recently. (ROA.770-72; 55-57). However, this information was shared with Crew Members in huddle meetings. (ROA.58-59). She also had concerns about using Dayforce to communicate. (ROA.56-57). She raised her concerns to a Mate, who told her he would talk to Fuller. (ROA.57).

On June 25, 2020, Groeschel emailed Customer Relations Communications Manager Nicole High expressing concern about how the first positive case was handled. (ROA.1155-59). Groeschel claimed she had been contacted by an anonymous Crew Member who had spoken to Fuller and also believed he had not promptly notified Crew Members about the positive case. *Id*. This Crew Member was Rita Armstrong.[3] (ROA.162).

---

[2] Dayforce is a portal where Crew Members can access schedules, look up paystubs, and request time off, among other things. (ROA.58).

[3] Armstrong asked Groeschel not name her in the letter. (ROA.162, 654).

High forwarded the email to Hancock, who called Groeschel the next day. (ROA.59, 298). They spoke for 20-30 minutes about Groeschel's concerns, Hancock asked Groeschel for her suggestions to improve communications, and Hancock thanked Groeschel for her ideas. (ROA.61). Hancock indicated Trader Joe's would change the wording of its notifications to be clearer. (ROA.299). Groeschel also suggested notifying Crew Members by text message in addition to Dayforce, and Hancock agreed. (ROA.299). Groeschel asked if she would experience any retaliation for expressing her concerns, and Hancock assured her that she would not. (ROA.61, 427).

Hancock then spoke with Fuller about store #426's first positive case. (ROA.300). They decided Fuller would contact Crew Members by phone or text as well as email based on Groeschel's suggestion. (ROA.425-26). Fuller later used this communication method to notify Crew Members about a storm in August 2020, and he thanked Groeschel for the idea. (ROA.1039-40).

Groeschel followed up with Hancock by email on June 30, confirming their discussion. (ROA.1160-62). She also raised a concern about the Company's wellness check questions. *Id*. She closed her email by acknowledging her letter had been "well received and appreciated," and she understood that the Company would "not harass, harm, or penalize [her] for addressing concerns related to speaking out about a COVID-19 positive Crew Member." *Id*. In response, Hancock corrected

Groeschel's misconception about the wellness check, but thanked her for her suggestions and noted it was "good to know how crew members are feeling and what they might find helpful during this unprecedented time." *Id*. Hancock forwarded the email exchange to Fuller and Human Resources Generalist Diane Carroll.

### D. Groeschel and Other Crew Members Raised Additional Concerns about Trader Joe's COVID-19 Protocols.

Groeschel continued to ask questions, make suggestions, and speak up in huddles as the Company's COVID-19 protocols evolved. (ROA.268). On November 12, 2020, Fuller informed Hancock that Groeschel had called the Company's corporate office to clarify Trader Joe's policy on medical exemptions to customer mask requirements. (ROA.1024-25). She was told individual stores had discretion on how best to implement applicable exemptions rules. (ROA.360). Fuller explained store #426's policy to Groeschel, which was to offer masks to customers, but not enforce masking for customers with medical exemptions. (ROA.1024-25). Fuller shared their discussion with Hancock because Groeschel said Crew Members were upset, and he wanted to keep Hancock "in the loop" in case Groeschel contacted her. *Id*.

In January 2021, Fuller notified Hancock that Groeschel might be circulating a petition regarding Mates not getting the same "thank you" pay Crew received during the pandemic. (ROA.1022-23; 489). Groeschel shared her concerns with Fuller, and he heard she was circulating a petition. (ROA.489-90). Hancock

7

encouraged Fuller to "talk things over with Jill" and to explain Mates were appreciated through other forms of compensation. *Id.* There is no evidence Groeschel ever circulated or submitted such a petition. (ROA.357, 491).

Based on the availability of vaccines and updated guidance, Trader Joe's began removing the Plexiglas shields in stores. (ROA.336, 436-37). On July 15, 2021, after Trader Joe's removed Plexiglas shields in store #426, Fuller notified Hancock she might receive a letter or call from Crew Members or Groeschel because Groeschel was "very vocal about the plexi being removed this morning." (ROA.1020-21). Despite being told removing the Plexiglas was consistent with current guidance, Groeschel commented the decision was made by "suits in a comfortable office" who did not know what it was like to work in a store. *Id.* Fuller told Hancock about the conversation, so she would not be "blindsided" if Groeschel called her. (ROA.1020-21).

On July 27, 2021, Fuller notified Hancock by email that Groeschel had "pushed back very hard about Trader Joe's doesn't care about us again." (ROA.1011-12). He believed the issue was the Plexiglas shields, so he drove to other local grocery stores to see if they still had Plexiglas shields up. *Id.* He asked Hancock to reinstall the Plexiglas at store #426, believing it would make his Crew feel better. *Id.* However, consistent with the available guidance at the time, Hancock informed Fuller that Trader Joe's would not be reinstalling Plexiglas. (ROA.336,

8

340, 436).

COVID-19 remained a common topic of discussion. (ROA.249-50). Approximately six or seven other Crew Members from store #426 contacted Hancock with concerns and differing opinions on the Company's mask policy. (ROA.428-29, 446, 539). Likewise, Fuller estimated "probably everyone on the crew at some point" raised concerns about masks. (ROA.492). Crew Bernard Preston raised concerns about the masks Trader Joe's initially provided and the Plexiglas shields being removed. (ROA.266-67, 493, 540). Crew Scott Hamilton raised issues with customers licking their fingers and touching produce or plastic bags. (ROA.493, 539). Crew Janet Benton raised concerns about people not wearing masks properly, and she asked for more distance at the registers when Trader Joe's removed the social distancing stickers from the floor. (ROA.245, 493-94). Crew Xavier Holloman had similar concerns about social distancing. (ROA.496). None of these Crew Members were disciplined, given a poor review, or terminated after raising concerns. (ROA.540-42).

### E.    Trader Joe's Disciplined Groeschel Following a Customer Complaint.

On October 12, 2021, Mate Shawn Forozan passed the registers, and Groeschel asked him if she could leave early. (ROA.90, 573, 576-77). Forozan told her that she could leave, but it would be considered an attendance infraction, consistent with Company policy. (ROA.90, 573). Groeschel then turned around,

started walking off, and said, "well then, why don't you fire me?" (ROA.573).[4] Groeschel started serving another customer, so Forozan did not speak with her about the incident at that time. (ROA.574).

On October 14, 2021, Captain Fuller and Mate Ellen Castillo met with Groeschel about her treatment of Mates and Crew Members. (ROA.95-96). Specifically, Groeschel failed to do her COVID-19 wellness check at the beginning of her shift on October 13 and was disrespectful to Mate Jeff Jelinek when he tried to administer it. (ROA.553-54, 1063-64). Fuller also spoke to her about her behavior during daily huddle meetings—specifically, that she was the last to attend and the first to leave. (ROA.554-55).

On the same day, a customer submitted a complaint, reporting that a female Crew Member had "verbally attack[ed] your crew manager and shouted: then fire me over and over!" *Id.* Hancock asked Fuller to investigate. (ROA.1032, 430). When Fuller asked the Mates about the incident, Forozan confirmed it and that the Crew Member involved was Groeschel. (ROA.1898). Forozan then noted the interaction in Dayforce and provided a statement. (ROA.1063-66, 778, 574).

On October 19, 2021, Fuller and Mate Heather McCrea asked Groeschel about the incident. (ROA.99). Groeschel initially claimed she did not recall it, but then

---

[4] Groeschel claimed she never told Forozan to fire her, but the ALJ correctly credited Forozan and the customer's complaint. (ROA.1308).

expressed it was not fair that she was going to be written up because a customer took something "out of context" and wrote a letter about it. (ROA.785-86, 514).

To determine appropriate discipline, Hancock spoke with Fuller, reviewed Groeschel's Dayforce file, and consulted with Human Resources. (ROA.313). Hancock concluded Groeschel had already been given verbal performance feedback regarding problematic behavior, including a September 2020 altercation with a customer where Groeschel verbally accosted the customer for not wearing a mask and berated the customer for saying she was medically exempt. (ROA.313, 315-16). Between the customer complaints and the prior incidents between Groeschel and coworkers noted in Dayforce, Hancock saw a "pattern of behavior out of line with what [management] expected of the Crew Members," *i.e.*, treating people in a disrespectful manner. (ROA.319, 318). Therefore, Hancock determined decided to issue a documented written warning for the October 12 incident. (ROA.310, 344). On October 25, 2021, Fuller and McCrea presented Groeschel with a written warning for failing to provide a WOW customer experience. (ROA.780-82). The warning noted further incidents may result in disciplinary action up to and including termination. *Id*.

## F.    Groeschel Responded to the Written Warning.

On November 16, 2021, Groeschel sent a statement to Hancock alleging the Incident Report was retaliatory and issued because she raised safety concerns related

to COVID-19. (ROA.1071-80). She claimed she noticed a change in Fuller's demeanor towards her and was no longer comfortable voicing her thoughts about safety issues. *Id.* Groeschel then raised additional concerns about Trader Joe's changing COVID-19 protocols related to social distancing stickers and Plexiglas. *Id.*

Hancock spoke to Fuller and Forozan about Groeschel's concerns. (ROA.1016-19, 1028-29). She also shared the letter with Human Resources and discussed it with her supervisor. (ROA.1013-15, 347-48). Hancock then spoke with Groeschel on December 1, 2021. (ROA.327-28). Hancock explained she had been involved in the Incident Report process, and she stood by the decision. (ROA.1016-19). Hancock explained Groeschel's discipline was handled consistently with Trader Joe's practice. (ROA.435). Hancock also discussed safety practices in the store and other new issues Groeschel raised. (ROA.1653-55). In closing, Hancock told Groeschel she would address each issue, and her door was always open. *Id.* Hancock then reviewed each concern Groeschel raised with Fuller. (ROA.1016-19; 1026-27; 332-35).

### G. Groeschel Received a "Does Not Meet Expectations" Performance Rating and Filed an NLRB Charge.

Trader Joe's conducts semi-annual performance reviews for Crew in the winter and the summer. (ROA.1101, 519). Crew may receive a pay increase if they are determined to meet expectations in their review, but "[t]here is no guarantee of

an increase in pay or job responsibilities." *Id*.

Following her initial complaint in June 2020, Groeschel received an overall "Meets Expectations" rating and a raise in her August 2020 review. (ROA.1059). Trader Joe's expressed appreciation for her "thoughts on process improvements" and encouraged her to "keep them coming." *Id*. Groeschel also received an overall "Meets Expectation" rating and a raise in her February 2021 review. (ROA.1060). Groeschel received an overall "Meets Expectations" on her August 2021 review, but the review noted that she needed to work on her treatment of her fellow Crew Members. (ROA.1061). Groeschel also received a "Needs Improvement" rating in the attendance-related category because she had called out or left early 8 times in the previous two months. (ROA.1061, 522). No Crew Members received raises during the August 2021 cycle. (ROA.80).

On her January 2022 review, Groeschel received an overall rating of "Does Not Meet Expectations" with "Needs Improvement" ratings in multiple categories. (ROA.961). The review explained that she had failed to actively engage her fellow Crew Members in a positive way as instructed on her prior review. *Id*. The review referenced the incident report she received for the October 12 incident, as well as another occasion when she admitted to swearing at a fellow Crew Member. *Id*. In September 2021, Groeschel called Crew Member Lynn Loosier the most "selfish bitch" she had ever known for sweeping dirt and debris in a way Groeschel did not

like. (ROA.144-45, 704, 1063-66). The review additionally stated that her attendance still needed improvement. *Id*. As a result, Groeschel was not eligible for a raise. (ROA.205, 527). Eight other Crew Members also received "Does Not Meet Expectations" ratings. (ROA.547-58).

Groeschel filed an unfair labor practice charge on February 23, 2022, alleging Trader Joe's disciplined her, gave her a poor evaluation, and failed to give her a raise in retaliation for and/or in order to discourage protected concerted activity including raising health concerns. (ROA.768-69; 120). Groeschel told multiple Crew Members about filing a charge, and based on her statements, they believed she was trying to get Fuller fired. (ROA.121-23, 600, 624-25, 696, 718, 787-99).

### H.    Crew Members Submitted Complaints Regarding Groeschel.

Crew Members then began submitting statements to Trader Joe's regarding Groeschel. On March 22, 2022, Crew Elizabeth Biddle sent Hancock an email claiming she "witnessed firsthand, Jill bullying and belittling fellow crew members, to the point of bringing them to tears." (ROA.787). She alleged Groeschel had come close to running down Crew Lynn Yambao with a pallet jack. (ROA.673, 685). She also alleged Groeschel almost hit Yambao with a stack of product on a two-wheeler. (ROA.675). Biddle stated Groeschel regularly spoke "harshly, unkind, and cruel to many crewmembers," including the instance when Groeschel called Loosier a selfish bitch. (ROA.787, 676-77). Biddle testified she wrote the email on her own accord—

14

no one asked her to write it.  (ROA.674-75).  She sent it to Hancock because she knew Hancock was her Regional Vice President.  (ROA.675).

On the same day, Crew Suzanne Salazar approached Mate Forozan and told him she felt uncomfortable about a conversation with Groeschel.  (ROA.577).  Therefore, Forozan asked her to write a statement, which she did.  (ROA.577-78, 790).  Salazar noted in the statement Groeschel told her about a claim she had filed against Fuller.  (ROA.790).  Forozan uploaded the statement to Dayforce.  (ROA.578).

Crew Julia Garcia also decided to submit a statement and asked Fuller if she should send her statement about Groeschel to him, and he told her to send it to Hancock.  (ROA.548, 553, 601, 626, 634-35).  Fuller did not ask her to write the statement, nor did she tell him what her statement said.  (ROA.600, 626).  In her statement, Garcia reported Groeschel yelling at Crew and customers, citing the incident between Groeschel and Loosier and the incident in September 2020 when Groeschel yelled at a customer for not wearing a mask.  (ROA.602-03).  Garcia noted Groeschel spoke about Crew Members with different political beliefs with "malice." *Id*.  Garcia claimed when Groeschel was angry, she would be "rough with the pallets, tak[ing] the ramp and corners too quickly, and caus[ing] dangerous situations for herself and other crew members."  *Id*.  Garcia cited two specific examples, including one in which Groeschel pulled a pallet down a ramp so aggressively that it almost

ran her over and another where she took a corner so quickly that the pallet fell over. *Id*. Finally, Garcia shared a recent incident in which Groeschel asked her if she knew about the Trader Joe's retirement plan overcharging on fees. *Id*. Garcia asked Groeschel questions that she could not answer and told Groeschel she would need more information before forming an opinion. (ROA.606). Groeschel then accused Garcia of "siding with Trader Joe's." *Id*. Garcia stated that she did not like working with Groeschel because she created a "toxic environment" where there was always "an underlying current of tension and fear that she may erupt at any time." (ROA.794). Garcia concluded by stating that she "hope[d] the situation with Jill gets resolved soon." *Id*. She sent her a statement to Hancock on March 23, 2022. (ROA.793).

On March 24, 2022, Crew Member Carmela Demming submitted a statement prompted by two incidents. (ROA.792). The day before, Demming and Yambao were working in the cereal aisle when Groeschel passed by them with a flat cart and almost hit Yambao with it. (ROA.792, 639, 646). Demming believed Groeschel's actions were intentional. (ROA.630, 645). Groeschel also stated "you better watch out" in a threatening tone. (ROA.792, 640-641). Demming stated Groeschel later dropped a pallet jack at the end of the aisle to block Yambao from passing. (ROA.787-99, 641, 647). Demming reported another incident that occurred on March 24, 2022, in which Groeschel told Yambao, "You better be careful."

(ROA.787-99, 641).  Demming told Mate Jelinek about the incidents, who asked her to write a statement if she felt comfortable doing so.  (ROA.801, 650).  Demming agreed and submitted a statement.  (ROA.650-51).  She concluded her statement by saying she hoped the situation would be resolved because she did not "like to see anyone go through being bullied."  (ROA.787-99).

On March 28, 2022, Crew Rita Armstrong sent Hancock an email following a conversation in which Groeschel told her she was taking legal action against Trader Joe's.  (ROA.796, 655-56).  Armstrong did not speak with Fuller, Hancock, or any other Crew Members before sending the email.  (ROA.657, 670).  Armstrong described how Groeschel's "attitude changed drastically" during the pandemic, and she became "irrational and aggressive" towards Fuller.  (ROA.657, 796).  Armstrong expressed she enjoyed working for Fuller and felt that Groeschel unfairly singled him out.  (ROA.667).

Hancock also received an undated letter from Loosier.  (ROA.787-99, 705).  After leaving her employment with Trader Joe's, Loosier visited the store as a customer and asked Fuller how he was doing.  (ROA.707).  She had heard that Groeschel had filed a charge, and she believed Fuller's character was being attacked.  (ROA.717-18).  She asked if there was anything she could do to help him, and he said she could submit a letter about her experience at Trader Joe's.  (ROA.707).  Fuller did not tell her what to write, and she did not discuss it with him.  (ROA.715).

In her statement, Loosier described how Groeschel called her "the most selfish bitch she'd ever known," and Loosier voiced her support for Fuller and Trader Joe's. (ROA.797).

## I.    Hancock Investigated by Conducting a Climate Survey.

Hancock had never received this many complaints about a Crew Member before, and she believed the complaints suggested ongoing misconduct and unsafe behavior.  (ROA.438-39).  Therefore, Hancock met with Groeschel on March 29, 2022, to notify her of the allegations and to suspend her pending investigation, consistent with Company practice.  (ROA.929-32, 639-40, 441).  Groeschel quickly became upset and claimed Hancock was harassing her.   (ROA.929-32, 415). Groeschel called the allegations ridiculous, although she admitted that she had gotten into a heated discussion recently with Garcia.  (ROA.929-32, 415-16).  Hancock told Groeschel she could submit a response in writing, but she chose not to.  (ROA.929-32, 205-06, 415-16).   On March 30, 2022, Groeschel filed a second unfair labor practice charge relating to her suspension.[5]  (ROA.750-54).

Hancock then conducted a "climate survey" at store #426 at the recommendation of Human Resources.  (ROA.370).  Over the course of two days, Hancock met one-on-one with 17 Mates and Crew to discuss how things were going in the store.  (ROA.934-43, 392).  Hancock did not ask about Groeschel directly, but

---

[5] This charge was amended to include her termination.

instead asked general questions like, "How have your interactions been with your fellow crew?," "Do you feel there is respect among the team?," and whether they had any other concerns of which she should be aware. (ROA.934-43, 393).

Several Crew brought up Groeschel unprompted. Mate Joyce Snyder reported Groeschel would "slam [shopping] carts towards crew," such that they would "have to watch out that their hand does not get caught." (ROA.934-43, 394). She reported Groeschel "can whip pallets around so much that they fall over," and she had yelled at a customer about wearing a mask. *Id*. Crew Heather Provancha reported Groeschel did not speak to her when she first came to the store, Groeschel was "ornery," and she had seen Groeschel and Garcia butt heads because Groeschel would push Garcia, and Garcia would not take it. (ROA.934-43, 395-96). Crew Sandy Collins also mentioned Groeschel and Garcia butting heads. (ROA.934-43, 401). Crew Andrea Tasker heard about Groeschel calling a Crew Member "a fucking bitch" and was surprised she had gotten away with such behavior. (ROA.934-43, 397). Salazar referenced writing a statement about Groeschel and noted she was "gruff" with "not good energy, very toxic." (ROA.934-43, 399). Crew Toni Denny also stated Groeschel had "cornered people" and was "very toxic." (ROA.934-43, 404-05). Lastly, Garcia and Biddle reiterated their prior concerns about Groeschel. (ROA. 934-43, 407-08, 632, 700).

**J.    Trader Joe's Terminated Groeschel's Employment on April 8, 2022.**

Hancock acted on the issues raised in the climate survey.  For example, Hancock issued an Incident Report to Denney for a prior negative comment about some Crew speaking Spanish as it appeared to Hancock the issue had not been appropriately documented or resolved.  (ROA.933-43, 409-10, 440-41).  Hancock also had a follow up conversation with Fuller regarding other comments she received about Crew Members not feeling valued, confusion about a Company policy, and Mates being passive-aggressive.  (ROA.412).

Additionally, Hancock, in consultation with her supervisor and Human Resources, decided to terminate Groeschel's employment based on the Crew Member complaints and climate survey.  (ROA.442).  Hancock determined Groeschel "had been and was still treating people disrespectfully, and that she was also behaving unsafely."  (ROA.414, 442).  Hancock felt termination was appropriate because previous attempts to give Groeschel feedback and to ask her to change her behavior had not been successful.  (ROA.443).  Trader Joe's could not continue to allow her to behave inappropriately and impact the workplace, her coworkers' environment, and the customer experience.  (ROA.443).  Fuller did not participate in this decision.  (ROA.414).

On April 8, 2022, Hancock informed Groeschel her employment was terminated for failing to improve her behavior towards her fellow Crew Members after being warned to do so in her January 2022 review.  (ROA.969-70, 946-47, 418-

19).  Later that day, Hancock received an additional statement from Yambao, who claimed Groeschel was difficult to work with, threatening, and angry.  (ROA.787-99).

## II.    PROCEDURAL BACKGROUND

On June 21, 2022, the Regional Director issued a Consolidated Complaint and Notice of Hearing alleging Trader Joe's violated Sections 8(a)(1) by issuing Groeschel the written warning, issuing her a negative performance review and denying her a raise, and Sections 8(a)(1) and (4) by suspending and terminating her employment, purportedly in retaliation for her protected activity and for filing an NLRB charge.  (ROA.734-43).  Trader Joe's denied the allegations.  (ROA.728-33).

Following a hearing on September 12-14, 2022, the Board's Administrative Law Judge ("ALJ") concluded Trader Joe's violated Section 8(a)(1) by issuing Groeschel the written warning.  (ROA.1316).  The ALJ dismissed the Section 8(a)(1) claim based on her performance review and denial of a wage increase but held Groeschel's suspension and termination violated Sections 8(a)(1) and (4). (ROA.1316-17).  The ALJ ordered Trader Joe's to reinstate Groeschel, to remove any reference to her unlawful discipline and discharge, and to make her whole for any loss of earnings and other benefits and for any other direct or foreseeable

pecuniary harms.[6]  (ROA.1317).  Both parties filed exceptions to the ALJ's decision.  (ROA.1202, 1260).

On July 9, 2024, the Board issued its Order affirming that Trader Joe's violated Section 8(a)(1) by issuing a written warning to Groeschel and violated Sections 8(a)(1) and (4) by suspending and discharging her, although it did not adopt all the ALJ's rationale.  (ROA.1299-300).  As to remedies, the Board modified the ALJ's recommended order to encompass "all direct or foreseeable pecuniary harms incurred as a result of her unlawful termination, including reasonable search-for-work and interim employment expenses, if any, regardless of whether these expenses exceed interim earnings," citing the Board's decision in *Thryv*.  (ROA.1309).

## SUMMARY OF ARGUMENT

Trader Joe's is a national chain of grocery stores that differentiates itself by providing the highest level of customer satisfaction delivered with warmth, friendliness, fun, individual pride, and Company spirit (referred to as a "Wow" customer experience).  To this end, every Crew Member (employee) is expected to treat customers and fellow Crew Members with courtesy and respect.

Beginning in 2020, Groeschel struggled to comply with Trader Joe's reasonable expectations for treatment of its customers and Crew Members.  When

---

[6] The *Thryv* decision issued after the parties submitted their post-hearing briefs, but before the ALJ issued her decision.

22

Trader Joe's held her accountable, Groeschel responded by filing an unfair labor practice charge in February 2022, claiming Trader Joe's issued her a written warning and negative performance review because she raised COVID-19 safety complaints during the pandemic. To the contrary, Trader Joe's worked very hard during the pandemic to implement numerous measures to keep Crew Members and customers safe, to comply with applicable guidelines, and to address Crew Members' concerns.

After filing her charge, Groeschel told various Crew Members she was taking legal action against the Company. In turn, those Crew Members felt they had to take action about the *real* issue in their workplace—Groeschel's persistently offensive behavior—and they submitted statements to Trader Joe's alleging Groeschel was bullying fellow Crew Members, creating a "toxic" environment, and moving equipment unsafely. Hancock sought Groeschel's side of the story, and then suspended her pending investigation while Hancock conducted a climate survey, in which she met with 17 different Crew Members to discuss the store's environment. The climate survey corroborated the allegations against Groeschel. Trader Joe's therefore terminated her employment for her behavior toward Crew Members and for moving equipment in an unsafe way.

The Board's Order finding Trader Joe's violated Section 8(a)(1) by issuing Groeschel a written warning and Sections 8(a)(4) and (1) by suspending and discharging Groeschel is untenable for several reasons. First, the Board's

determinations are not backed by substantial evidence. The Board is required to weigh all evidence in context and reach a decision that reflects the record as a whole. But here, the Board sidestepped record evidence to find that animus—not legitimate concerns about Groeschel's behavior—motivated her written warning, suspension, and termination. For example, none of the alleged evidence of animus the Board relied on to find the written warning unlawful supports an inference that Hancock, the sole decisionmaker, bore animus towards Groeschel's protected activity. The Board also ignored countervailing evidence of Trader Joe's positive responses to Groeschel's safety complaints over a long period of time that undermine any inference of animus and key comparator evidence demonstrating Trader Joe's would have taken the same action regardless of Groeschel's complaints. The Board then held Groeschel's suspension was unlawful based on nothing more than its suspicions, despite there being no evidence the suspension was an adverse action in the first place. Finally, the Board improperly substituted its judgment for management's and ignored unrebutted evidence in (1) holding Trader Joe's failed to conduct a meaningful investigation and (2) rejecting Trader Joe's affirmative defense that it would have discharged Groeschel for her misconduct even absent her filing a charge or engaging in other purported protected concerted activity.

Second, the Board imposed a compensatory damages remedy that exceeds its authority. In December 2022, the Board announced new policy requiring

compensation of all "direct or foreseeable pecuniary harms" from unfair labor practices. *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951, at *9-10 (Dec. 13, 2022) enf. denied in part and vacated in part *Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024). It imposed that remedy in this case. However, Section 10(c) of the Act confines the Board to ordering *equitable* relief, namely, to ceasing unfair labor practices or taking "affirmative action," like reinstatement, "as will effectuate the policies of" the Act. 29 U.S.C. 160(f). The Supreme Court has long described the NLRB's authority in equitable terms. The rest of Section 10(c), other statutes, and legislative history similarly confirm compensatory damages exceed the NLRB's power. While none of Board's Order should be enforced, at a minimum, this Court should vacate the remedial portion and remand this case to the Board to consider appropriate remedies.

## STANDARD OF REVIEW

The Court will affirm the NLRB's legal conclusions "if they have a reasonable basis in the law and are not inconsistent with the [NLRA]." *Entergy Miss., Inc. v. NLRB*, 810 F.3d 287, 293 (5th Cir. 2015). The Court must review the Board's interpretations of ambiguous provisions in the NLRA using its traditional tools of statutory interpretation rather than simply deferring to the agency's interpretation of "ambiguous" provisions. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).

25

The NLRB's findings of fact are "conclusive" if they are "supported by substantial evidence on the record considered as a whole." *STP Nuclear Operating Co. v. NLRB*, 975 F.3d 507, 513 (5th Cir. 2020). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). A reviewing court "may not reweigh the evidence . . . or substitute [its] judgment for that of the [NLRB]," but its review is not "merely a rubber stamp." *Creative Vision Res., LLC v. NLRB*, 882 F.3d 510, 515 (5th Cir. 2018). For instance, "a decision by the [NLRB] that ignores a portion of the record cannot survive review under the substantial evidence standard." *Carey Salt Co. v. NLRB*, 736 F.3d 405, 410 (5th Cir. 2013).

## ARGUMENT

## I.    THE BOARD ERRED IN HOLDING TRADER JOE'S VIOLATED SECTION 8(a)(1) BY ISSUING GROESCHEL A WRITTEN WARNING.

Applying the framework in *Wright Line*, 251 NLRB 1083 (1980), the ALJ held Trader Joe's violated Section 8(a)(1) by issuing Groeschel a written warning because she engaged in protected activity, Trader Joe's was aware of her activity, Trader Joe's held animus towards her activity, and Trader Joe's failed to show it would have issued Groeschel the written warning absent her protected activity. The ALJ's findings that Trader Joe's held animus towards Groeschel's activity in

October 2021 and that Trader Joe's failed to show it would have taken the same action regardless of Groeschel's activity are not supported by substantial evidence.

## A.    The Board Lacked Substantial Evidence to Find Animus Motivated Groeschel's Written Warning.

The Board inferred animus from Fuller's statement to Groeschel that she needed to consider whether she was still a good fit for her position, emails between Fuller and Hancock discussing Groeschel's safety complaints, and a "significant departure" in the recording detail of Dayforce notes made by Mates about Groeschel's conduct.  (ROA.1299).  While the Board may make inferences to establish unlawful motive, the inferences must be reasonable and must be supported by substantial evidence.  *NLRB v. Mini-Togs*, 980 F.2d 1027, 1035 (5th Cir. 1993). None of these bases supports a finding that Trader Joe's harbored animus as of October 2021.[7]

### 1.    Neither Fuller's Statement, Nor the Dayforce Notes Show Animus by Hancock, the Decision-Maker.

Fuller's discussion was prompted by Groeschel's admitted failure to submit to a wellness check before work and her resistance to the Mate administering it. (ROA.542, 1063-66).  Following the incident, Fuller and a Mate "had a conversation with Jill about how she was feeling in the store" and reminded her that she needed

---

[7] The ALJ found Trader Joe's did not hold animus towards Groeschel's 2020 letter raising safety concerns—apparently, it only developed animus towards her safety concerns later.

to "treat customers, crew, and supervisors with respect." (ROA.1063-66). Groeschel alleged Fuller also suggested she think about whether she was a good fit for the store. (ROA.96). However, there is no evidence of *Hancock*, the decision-maker, making any comments to or about Groeschel being "fit" for her position at this time.

The Board also inferred animus based on a "significant departure in recording details in Dayforce about Groeschel's conduct." (ROA.1299). These entries are made by Fuller and various other Mates. (ROA.1063-66). A review of Groeschel's Dayforce file shows the level of detail depends on the type of entry. For example, entries indicating Groeschel called out for a shift are short and simple (both well before and long after her complaints began), whereas entries involving a customer incident or a Crew Member confrontation are consistently and necessarily longer. (ROA.1063-66). The longest and most detailed entry recounts when Groeschel was counseled after becoming impatient with a customer in February 2017. (ROA.1063-66). Obviously, this entry predates Groeschel's complaints, so its level of detail cannot be evidence of animus. While evidence of animus may be circumstantial, inferring animus from the length of Dayforce entries made by multiple different managers is simply a bridge too far. *Mini-Togs*, 980 F.2d at 1035 ("we cannot uphold the findings if these inferences are implausible").

Even assuming Fuller's remark and Mates' Dayforce comments indicate

animus, there is no basis for imputing that animus to Hancock, the sole decision-maker for Groeschel's written warning. While Fuller assisted with the investigation and delivered the written warning, it was Hancock who "really felt…that [Trader Joe's] needed to go forward with a written warning" based on her independent review of Groeschel's record, and she worked with Human Resources to draft it. (ROA.312-13). There is no evidence Fuller or Mates influenced her such that their alleged animus can be imputed to Hancock. *Cf. Bruce Packing Co., Inc.*, 357 NLRB 1084, 1086 (2011) enf'd in pertinent part 795 F.3d 18 (D.C. Cir. 2015) (supervisor's animus imputed to decision-making official where supervisor had "direct" and "substantial" input in layoff decisions). The identified comments by Fuller or the Mates are insufficient to establish unlawful motivation for the written warning.

## 2.    Fuller's and Hancock's Emails Do Not Show Animus.

Neither the Board nor the ALJ identified any specific negative statements towards Groeschel in Fuller's or Hancock's emails, but they found the mere existence of the communications to be proof of animus.[8] The evidence, however, demonstrates Hancock liked to stay updated on the events and issues impacting her stores. For example, Hancock spends most weeks visiting her 19 stores and speaking to Crew Members and customers. (ROA.295-96). Hancock reviews Dayforce

---

[8] In two years, Fuller only communicated Groeschel's complaints to Hancock on four occasions. (ROA.1011-12, 1020-21, 1022-23, 1024-25).

"fairly often," typically when asked by Captains to help with situations in their stores.   (ROA.293).   During the pandemic, her level of communication increased, and Hancock spoke with her Captains "very frequent[ly]" to convey safety information and to ask how things were going in their stores.  (ROA.306).   Given this context, it is difficult to imagine Fuller would *not* alert Hancock to a Crew Member raising complaints about a major issue impacting the store.  Moreover, since Hancock was already familiar with Groeschel from her first complaint, it is logical for Fuller to keep Hancock updated in case Groeschel reached out to her again.   The cessation of their communications when Groeschel curtailed her safety complaints also does not demonstrate animus—rather, Fuller had nothing to keep Hancock "in the loop" about with respect to Groeschel.

The Board also wholly ignored evidence regarding Fuller's and Hancock's responses to Groeschel's complaints that undermine any inference of animus.[9]   In evaluating "surrounding facts" that may (or may not) indicate animus, the Board must also consider "countervailing evidence in the record that the Respondent bore no animus" against protected activity.  *See Electrolux Home Prod. Inc.*, 368 NLRB No. 34, at *20 (Aug. 2, 2019); *Lord & Taylor v. NLRB*, 703 F.2d 163, 169 (5th Cir. 1983) ("We cannot say that a decision which ignores a portion of the record is

---

[9]  Other evidence showing a lack of animus includes Groeschel's "Meets Expectations" reviews in February 2021 and August 2021, *which post-date Fuller's and Hancock's communications*.  (ROA.1060-61).

supported by substantial evidence."). In each instance, Fuller and Hancock meaningfully considered Groeschel's concerns, even if they did not adopt her suggestions. For example, in the same July 27, 2021 communication where Fuller noted Groeschel "pushed back very hard about Trader Joe's doesn't care about us again," Fuller noted he investigated what other grocery stores were doing, and he asked Hancock if Trader Joe's could reinstall the Plexiglas barriers because it "would make [his] crew feel a LOT better." (ROA.1013-15). Hancock shared this feedback with her supervisor as well. (ROA.437). Fuller also tried to give Groeschel advance notice of changes so she would not be surprised by them. (ROA.87, 1020-21). Likewise, when Groeschel complained about the social distancing stickers being removed, Fuller put them back down. (ROA.494). Considering the lack of substantial evidence of animus towards Groeschel's protected activity, enforcement of the Board's Order regarding the Section 8(a)(1) claim based on the written warning must be denied.

### B.    The Board Disregarded Key Comparator Evidence.

Under the Board's *Wright Line* test, if the General Counsel establishes a *prima facie* case, the burden shifts to the employer to show the employee would have been disciplined even if the employee had not engaged in protected activity. *Mini-Togs*, 980 F.2d at 1032-33. In affirming the ALJ's conclusion Trader Joe's did not carry its burden, the Board ignored valid comparator evidence.

31

Although the ALJ found Groeschel made an unprotected remark to a Mate that prompted a customer to write a complaint, she still concluded Groeschel's behavior did not warrant a written warning based on a purported lack of comparable discipline. (ROA.1216). However, Trader Joe's produced a written warning issued to Crew Hugh Bell for an incident in which Crew Scott Hamilton asked Bell's customer to respect social distancing, and Bell "became upset and yelled at Scott." (ROA.808). There is no evidence that Bell raised safety complaints to Trader Joe's. *Id.* Despite Bell's discipline, the ALJ concluded that Trader Joe's typically only issued written warnings "after [] repeated infractions occurred in a short time." (ROA.1315). The ALJ further concluded Groeschel's written warning was unlawful because her behavior was not comparable to Bell's. (ROA.1316).

It is hard, however, to imagine situations *more* comparable. Both involved a single incident of one Crew Member mistreating another in front of customers. Bell "became upset and yelled," whereas Groeschel "verbally attacked" Forozan and "shouted." (ROA.1033, 587) (Forozan testifying Groeschel "speaks very loudly so it sounds like she's yelling"). The only differences are that Groeschel's outburst was against a manager, and it resulted in a customer complaint—two factors that, if anything, make her conduct *more severe* than Bell's.

Where cause for discipline has been established, the Board does not question management's exercise of discretion in deciding the appropriate level of

32

punishment, at least absent "blatant disparity." *Fluor Daniel, Inc*., 304 NLRB 970,

970-971 (1991) enf'd 980 F.2d 1449 (11th Cir. 1992).  A "blatant" disparity is one

of such proportion it permits "no other interpretation than that the employer bore

animus against the protected activity." *Tomatek, Inc.*, 333 NLRB 1350, 1364 (2001).

Here, Trader Joe's demonstrated cause for discipline, and there is no "blatant

disparity" in discipline.  The Board's Order finding Trader Joe's failed to meet its

burden to show it would have issued Groeschel the written warning absent her

protected activity must be vacated.  *Mini-Togs*, 980 F.2d at 1033 (no violation where

company treated union advocate no differently from other employees in same

situation).

## II.   THE BOARD ERRED IN HOLDING TRADER JOE'S VIOLATED SECTION 8(a)(4) AND (1) BY SUSPENDING AND DISCHARGING GROESCHEL.

### A.   There Is No Evidence that Groeschel's Suspension Was Unlawful.

The Board found Trader Joe's unlawfully suspended Groeschel based on the

close timing between her protected activities and suspension, its "suspicious"

reliance on Crew statements, and its failure to complete a meaningful investigation.

These findings are also not supported by substantial evidence.

As an initial matter, there is no evidence the suspension was an adverse

action—a necessary element of the General Counsel's case.  The Board claims

Trader Joe's failed to make this argument.  However, as the Board recognized,

Trader Joe's has repeatedly asserted Groeschel's suspension was "non-disciplinary" and improperly lumped in with her termination in the *Wright Line* analysis.[10] (ROA.1297).    The General Counsel understood this argument because she specifically claimed in her Answering Brief the suspension *was* "in fact an adverse employment action" because Trader Joe's "forced Groeschel to be unpaid for two weeks."  (ROA.1250).   Trader Joe's refuted this claim by responding Groeschel admitted her suspension was with pay.  (ROA.1283).   Thus, this argument has been properly preserved.  *Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024) (an issue may be considered by the reviewing court if it has been raised to the Board, its member, agent or agency).

To establish an adverse action, the General Counsel must show "the individual's prospects for employment or continued employment have been diminished or that some legally cognizable term or condition of employment has changed for the worse." *Northeast Iowa Telephone Co.*, 346 NLRB 465, 476 (2006). When a suspension is not disciplinary, and an employee is paid for the hours not worked, this burden is not met.  *See Bellagio, LLC*, 362 NLRB 1426, 1427 (2015) enf. denied 854 F.3d 703 (D.C. Cir. 2017) (finding non-disciplinary paid suspension was not adverse action).  Such is the case here.

---

[10] Contrary to the Board's assertion, Trader Joe's reference to the ALJ's analysis of the "adverse actions" (which is how the ALJ characterized the suspension and termination) against Groeschel does not undermine its position.

Regardless, Groeschel's suspension did not violate the Act. Its timing is fully explained by the timing of the Crew complaints against her.[11] Groeschel filed her initial charge on February 23, 2022. Beginning on March 22, six current and former Crew submitted statements alleging complaints against Groeschel. (ROA.787-99). As a result, Hancock suspended Groeschel on March 29 pending investigation. It was these complaints – not Groeschel's charge – that triggered the suspension and subsequent investigation. This intervening event destroys any causal connection between the Groeschel's protected activity and her suspension. *See e.g.*, *Rockwell Mining LLC*, 367 NLRB No. 39, slip op. at 10 (Nov. 29, 2018) (suspicious timing is not evidence of animus when it is explained by an intervening event); *NLRB v. Arkema, Inc*., 710 F.3d 308 (5th Cir. 2013) (timing alone is not substantial evidence of animus).

Further, Trader Joe's placed Groeschel on a non-disciplinary suspension to investigate the complaints against her without her presence in the store during the investigation. (ROA.370). Suspending an employee pending investigation is a "reasonable step" for an employer to take when faced with suspected misconduct. *In re Am. Oil Co*., 189 NLRB 3, 4, 11 (1971) (suspension pending investigation was a reasonable step unrelated to protected activity and did not violate Act); *In re Cone Mills Corp*., 168 NLRB 69, 71 (1967) (suspension prior to investigation was not

---

[11] As is the timing of her termination on April 8.

pretextual where employer investigated during suspension and followed usual practice of suspending employees pending investigation). The Board's claim Trader Joe's should have meaningfully investigated the complaints *before* suspending Groeschel makes no sense.

The Board further implied Trader Joe's should not have acted on the complaints because Crew Members may have submitted them in response to Groeschel's NLRB charge.[12] However, the complaints claimed Groeschel was mistreating fellow Crew and acting unsafely. (ROA.438). On their face, these statements contained serious allegations warranting investigation. An employer cannot know whether allegations will be substantiated before it investigates them, so relying on unproven allegations for a suspension pending investigation is not "suspicious." In any event, the Board's suspicions are not substantial evidence. *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1408 (5th Cir. 1996) ("Mere suspicions of unlawful motivation are insufficient to establish violations of the NLRA").

Likewise, that some Crew Members may have acted in response to Groeschel's charge is not evidence of *Trader Joe's* unlawful motivation. Biddle, Garcia, Armstrong, and Loosier heard Groeschel initiated legal action against Trader

---

[12] The Board also questioned the statements because Trader Joe's leaders "suggested that some employees draft and submit their statements when those employees complained about Groeschel." (ROA.1300). It is not suspicious that an employer would ask employees to document their complaints in writing after they reported them. That does not mean Trader Joe's solicited the complaints.

Joe's, and they did not agree with her approach. (ROA.600, 624-25, 655-56). However, none of these Crew Members were involved in any employment decisions impacting Groeschel. Hancock independently investigated, and their allegations regarding Groeschel's behavior were substantiated by other Crew and Mates. There is no basis for imputing their motivations to Trader Joe's.

Finally, the Board disregarded unrebutted evidence Groeschel's suspension pending investigation was consistent with Trader Joe's normal practice. Specifically, Hancock testified that it is "common" to suspend a Crew Member when doing an investigation, and this was the approach recommended by Human Resources. (ROA.370). Thus, Trader Joe's established a legitimate basis for suspending Groeschel and that it would have taken the same action regardless of her protected activity. Accordingly, the Court should vacate the Board's finding that Groeschel's suspension violated Sections 8(a)(4) and (1).

### B. The Board Erred in Finding Groeschel's Retirement Benefits Conversation Was Concerted Activity.

With respect to the ALJ's conclusion that Trader Joe's violated Sections 8(a)(4) and (1) by suspending and discharging Groeschel, the Board declined to adopt the ALJ's rationale that Groeschel's retirement benefits discussion was "inherently concerted," but it still found the discussion to be concerted because Groeschel made "efforts to enlist the help of her coworker about employees' ongoing group concerns over their terms and conditions of employment." (ROA.1299). This

37

holding is not supported by the facts or the cited authority.

Groeschel admitted the purpose of her discussion was not to enlist Garcia's help to address group benefits concerns, but "[t]o see if [Garcia and Collins] had information, if they knew – if they knew more about it.  Curiosity."  (ROA.204). Groeschel then took no further action—she did not speak to other Crew Members, and she did not raise any concerns to Trader Joe's leadership.  *Id.*

For conversations between two employees to constitute "concerted activity," there must be "some element of collective activity or contemplation thereof." *Pioneer Natural Gas Co. v. NLRB*, 662 F.2d 408 (5th Cir. 1981). "Mere talk" is insufficient; the conversation must look toward group action.  *Adelphi Inst.*, 287 NLRB 1073, 1073-74 (1988) (employee's question about a working condition was not concerted activity).  As Groeschel admittedly had no goal other than satisfying her own curiosity, her conversation with Garcia was not concerted.

The Board's authority is not on point.  The Board relied on *Mike Yurosek & Son, Inc.*, 306 NLRB 1037 (1992), for the proposition that individual action is concerted where the evidence supports a finding the concerns expressed by the individual are logical outgrowth of the concerns expressed by the group.[13]  Indeed,

---

[13] In *Mike Yurosek*, four employees who individually refused to work overtime were engaged in concerted activity because the conduct was a logical outgrowth of an earlier group protest concerning a supervisor's reduction in their work schedule. *Id.* at 1038.

the Board has long recognized that when employees discuss working conditions, a single employee may later choose to act based on those discussions without any kind of authorization from their coworkers—but that is not what happened here. Groeschel did not engage in any action to express group concerns or to improve working conditions; she just asked a coworker a question. Likewise, *Montgomery Ward & Co.*, 156 NLRB 7 (1965), is distinguishable because the employee in that case attempted to induce group action when she asked an employee to "go [along] with her" on a petition to the Department of Labor, she talked to groups of employees about salaries, and she distributed material on the Equal Pay Act to six employees in her campaign to secure higher wages. As the Board's finding that Groeschel's discussion with Garcia was concerted is not supported by substantial evidence or consistent with Board precedent, it must be reversed.

### C.    The Board Erred in Concluding Trader Joe's Climate Survey Was Not a Meaningful Investigation.

With no other evidence of animus, the Board attacked Hancock's investigation. Certainly, if an employer routinely follows a specific investigative practice before issuing discipline, its failure to do so before disciplining an employee who engaged in protected activity could suggest an unlawful motive. *See Volvo Group North America, LLC*, 370 NLRB No. 52, slip op. at 3 (2020). Likewise, the failure to give an employee being investigated an opportunity to explain could constitute indicia of discrimination. But nothing in the Act requires an employer to

investigate, much less conduct a certain type of investigation. *Id.* The General Counsel has the burden to prove animus, and there is no evidence using a climate survey was unusual for Trader Joe's or Groeschel was treated differently.[14]

Nor does Trader Joe's method of investigation otherwise support an inference of animus. Hancock attempted to give Groeschel a chance to respond to the allegations. (ROA.929-32, 369-70, 441). Thus, this case is distinguishable from cases finding an employer did not conduct a meaningful investigation because it failed to give the alleged discriminatee an opportunity to explain. *Cf. Valmont Indus., Inc. v. NLRB*, 244 F.3d 454 (5th Cir. 2001) (employees had no chance to explain until after warnings issued); *NLRB v. Esco Elevators, Inc.*, 736 F.2d 295, 299 n. 5 ("A one-sided investigation…supplies significant evidence that disciplinary action was triggered by an unlawful motive."); *NLRB v. Big Three Indus., Inc.*, 497 F.2d 43, 50 (5th Cir. 1974) (it was of "some relevance" employee was not "afforded a reasonable opportunity to explain the full circumstances of what occurred").

Next, Hancock met one-on-one with 17 Mates and Crew over two days to discuss the environment in the store. Under these circumstances, the record does not support a conclusion that Trader Joe's failed to conduct a meaningful investigation.

---

[14] Hancock had never received complaints like this about a Crew Member before. (ROA.439). She sought advice from Human Resources, who recommended she ask Groeschel for her side and then conduct a climate survey "to gauge the environment in the store further, besides what had been raised in the e-mails." (ROA.370).

*See Park 'N Fly, Inc.*, 349 NLRB 132 (2007) (investigation did not support a finding of pretext where it was conducted over 2 days and included interviewing a substantial percentage of the work force); *Washington Fruit & Produce Co.*, 343 NLRB 1215, 1220-1221 (2004) (employer reasonably concluded employee violated work rules after investigation that including getting statements from three supervisors and six employees).

There is also no evidence the climate survey was a "fishing expedition for ammunition against Groeschel." (ROA.1317).  Hancock did not even ask employees specifically about Groeschel.  (ROA.934-43, 392).  Crew Members brought up Groeschel unprompted.  The ALJ based her "fishing expedition" statement in part on the fact Hancock did not address every issue raised in the climate survey. However, Hancock assessed Crew Members' concerns and used her judgment to determine which ones warranted further action.  (ROA.424).  For example, Hancock issued an Incident Report to Crew Denney.  (ROA.951-52, 409-10, 440-41).  There is no evidence Denney made safety complaints.  Hancock also spoke with Fuller regarding other comments she received about Crew Members not feeling valued, confusion about a Company policy, and Mates being passive-aggressive. (ROA.412).

While the Board might have conducted the investigation differently, Trader Joe's choice to conduct a climate survey is not substantial evidence of unlawful

motive. *NLRB v. McGahey*, 233 F.2d 406, 413 (5th Cir. 1956) ("[M]anagement is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision").

### D. The Board Erred in Finding Trader Joe's Had No Basis for Terminating Groeschel's Employment.

The ALJ further erred in finding Groeschel's discharge to be unlawfully motivated because Trader Joe's relied on "rehashed events," "generalized statements and secondhand perceptions." (ROA.1317). While some Crew Member statements mentioned prior events, Garcia's complaint about her recent conversation with Groeschel and Garcia's, Demming's, and Biddle's allegations about Groeschel's use of the pallet jacks and carts were new. The safety issues alone warranted action. But the statements also indicated "there was this ongoing aggressive, kind of rude demeanor that [Groeschel] had been displaying to [Crew Members]." (ROA.787, 794, 797).

Other Crew Members corroborated the allegations in the climate survey. Mate Snyder confirmed Groeschel "can whip pallets around so much that they fall over." (ROA.934). Additionally, she reported Groeschel was slamming carts toward Crew Members when ushering customers to registers. (ROA.934, 415). Crew Provancha and Collins corroborated Garcia's allegations that Groeschel and Garcia had "butted heads" the prior week, with Provancha explaining "[Groeschel] would push [Garcia] and [Garcia] would not take it from her." (ROA.936, 939).

Finally, Crew Salazar confirmed that Groeschel was "gruff, not good energy, very toxic," and Crew Denney confirmed that Groeschel had "cornered people," and she was "very toxic." (ROA.940). These Crew Members described Groeschel's behavior in the present tense—not like old issues that had been resolved.

Trader Joe's reasons for discharging Groeschel were consistent with the information from the statements and the climate survey. For example, Groeschel was not terminated for calling Loosier "a selfish bitch" in 2021, but for "continu[ing] to speak to fellow Crew Members in an unpleasant, angry, and disrespectful manner."[15] (ROA.1069-70). Groeschel was also terminated for "shov[ing] carts, pull[ing] pallets, and mov[ing] product around the floor in an aggressive manner that makes [Crew Members] feel uncomfortable and unsafe." (ROA. 1069-70). These are both legitimate, nondiscriminatory reasons for terminating an employee, supported by the evidence, and consistent with Trader Joe's policy. *See generally William Beaumont Hospital*, 363 NLRB No. 162 (2016) (upholding termination of two nurses for engaging in "mean," "nasty," "intimidating," "negative," and "bullying" behavior); *In-Terminal Services Corp.*, 309 NLRB 23 (1992) (violation

---

[15] Trader Joe's did not base Groeschel's termination on incidents for which she had already been counseled or disciplined, but they did make termination, as opposed to lesser discipline, appropriate. *Stephens Media Group*, 371 NLRB No. 11, slip op. at 4-5 (2021) (employer met *Wright Line* burden where employee engaged in multiple acts of misconduct, was counseled by the employer and given multiple chances to improve, but did not do so).

of safety rule is lawful reason for termination).

Moreover, Company policy prohibits the behavior for which Groeschel was discharged, specifically "[f]ailing to treat a customer, crew member, or any other member of the public with courtesy and respect." (ROA.1087). Bullying, belittling, and yelling at Crew Members falls into this category of prohibited behavior. The policy further prohibits "[v]iolating a company safety rule or practice," which encompasses moving pallets recklessly and attempting to hit another Crew Member—or creating that impression to threaten or intimidate. (ROA.1088). The policy warns that Crew Members whose conduct is non-compliant will be subject to disciplinary action, up to termination. (ROA.1087). Additionally, Groeschel was warned in her Incident Report further incidents may result in termination. (ROA.1067-68). For these reasons, the Board erred in concluding Groeschel's termination was unlawfully motivated and Trader Joe's failed to prove it would have discharged Groeschel even in the absence of her protected activity.

## III. THE BOARD'S DAMAGES REMEDY IS UNLAWFUL.

At a minimum, this Court should vacate the Board's award of compensatory damages. In *Thryv*, the Board asserted the newfound authority to award employees "all direct or foreseeable pecuniary harms" as a matter of course.[16]  2022 WL

---

[16] As the majority observed, "myriad … possible examples" might fit that new definition, including credit-card fees, mortgage payments, childcare bills, and medical expenses. *Id.* at *14-15 (citation omitted).

17974951, at *1.  On appeal, this Court vacated the portions of the Board's order finding the respondent's layoffs violated the NLRA and containing the "draconian" remedies associated with that violation, which included the Board's new remedy. Nevertheless, the Board still applied *Thryv* here to compel Trader Joe's to compensate Groeschel for any "direct or foreseeable pecuniary harm[] suffered as a result of the discrimination against her."  (ROA. 1208).  This remedy is unlawful and must be rejected.

### A.  The NLRA Does Not Authorize Compensatory Damages.

Compensatory damages are a remedy "intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct."  *State Farm v. Campbell*, 538 U.S. 408, 416 (2003) (citation omitted).  Section 10(c) of the NLRA authorizes the NLRB to order employers to "cease and desist from" unfair labor practices and "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the NLRA]." 29 U.S.C. § 160(c).  That language authorizes only equitable relief—not compensatory damages, which are "the classic form of *legal* relief."  *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993); *see also Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).  Thus, this Court should vacate the compensatory damages portion of the Board's Order.

45

The NLRA's text and longstanding precedent confirm the Board lacks power to order legal remedies, including compensatory damages.  Section 10(c) lets the Board order employers to "take . . . affirmative action," such as "reinstatement . . . with or without back pay," or to compel inaction, *i.e.*, to "cease and desist."  29 U.S.C. § 160(c).  Equitable relief "compel[s] action or inaction."  Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 553 (2016).  Courts of equity could both order "restraint of a contemplated or threatened action" and "require affirmative action."  *Ex parte Lennon*, 166 U.S. 548, 556 (1897).  "Reinstatement is an equitable remedy."  *Squires v. Bonser*, 54 F.3d 168, 171 (3d Cir. 1995) (discussing 42 U.S.C. § 1983).  The same goes for backpay. *Curtis v. Loether*, 415 U.S. 189, 197 (1974).  The NLRB's remedial powers are thus equitable and omit any reference to damages.  Along these lines, the Supreme Court recognized "Congress did not establish a general scheme authorizing the Board to award full compensatory damages for injuries caused by wrongful conduct."  *UAW-CIO v. Russell*, 356 U.S. 634, 643 (1958).

Related statutes further show Section 10(c) authorizes only equitable relief. When enacting Title VII of the Civil Rights Act in 1964, Congress "modeled" that Act's remedial provision—Section 706(g)—on Section 10(c). *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975).  Section 706(g) is expressly limited to equitable relief: a court may "enjoin [an employer] from engaging in [an] unlawful

employment practice, and order such affirmative action as may be appropriate, which may include . . . reinstatement . . . , with or without back pay . . . , or any *other equitable relief*." 42 U.S.C. § 2000e-5(g)(1) (emphasis added). That language evinces Congress's understanding that stopping employers from acting unlawfully and ordering "affirmative action" such as "reinstatement" are forms of "equitable relief."

By contrast, when Congress wants to authorize compensatory damages, it says so directly and ensures that a court—not an agency—decides the case. The Labor-Management Relations Act creates a civil cause of action against unions for certain unfair labor practices and expressly authorizes an injured party to bring a district-court suit to "recover the damages by him sustained." 29 U.S.C. § 187(b). The Migrant and Seasonal Agricultural Worker Protection Act too permits district courts to award "all appropriate relief, including rehiring or reinstatement of the worker, with back pay, *or damages*." *Id.* § 1855(b) (emphasis added). The Family and Medical Leave Act authorizes courts to award damages including "any actual monetary losses sustained." *Id.* § 2617(a)(1)(A)(i)(II). By excluding similar language from the NLRA, Congress declined to authorize compensatory damages. *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (citation omitted) ("[D]ifferences in language . . . convey differences in meaning.").

Finally, the Act's legislative history refutes the Board's newfound power. As originally drafted, the NLRA would have allowed the Board to order an employer "to take affirmative action, *or to pay damages*, or to reinstate employees." S. 2926, 73d Cong. § 205(c) (as introduced Mar. 1, 1934) (emphasis added), *reprinted in* 1 NLRB, *Legislative History of the National Labor Relations Act, 1935*, at 6-7 (1949). But business representatives raised "due process" concerns and that language was dropped—illustrating again the NLRA's omission of damages as a remedy was intentional. *See Hearing on S. 2926 Before the S. Comm on Educ. & Lab.*, 73d Cong. 362 (1934) (statement of James A. Emery, Nat'l Ass'n of Mfrs.), *reprinted in* 1 NLRB, *Legislative History*, *supra*, at 396. Thus, any compensatory damages remedy exceeds the Board's statutory authority under the NLRA.

**B.    Despite this Court's Decision, the Board Continues to Award Compensatory Damages Under *Thryv*.**

In *Thryv, Inc. v. NLRB*, 102 F.4th 727, 748 (5th Cir. 2024), this Court vacated certain paragraphs of the Board's order, including the provision containing the Board's new make-whole compensatory damages remedy. However, the Board still ordered that remedy in this case. The Board recently explained its rationale for doing so in *Airgas USA, LLC*, 373 NLRB No. 102 (Sept. 18, 2024), in which the Board held it "can and will" continue awarding such damages, regardless of the Fifth Circuit's decision. *Id.*, slip op. at *1 n.1. The Board determined its *Thryv* decision still has precedential value because this Court did not expressly hold the Board

48

lacked authority for this remedy. *Id*. Further, even if this Court had specifically rejected the Board's rationale, the Board declared its decision "would remain valid Board precedent under the Board's long-established policy of nonacquiescence in adverse appellate court decisions." *Id*. Thus, regardless of the adverse *Thryv* decision, "the Board will continue to expressly order that 'the respondent compensate affected employees for all direct or foreseeable pecuniary harms suffered as a result of the respondent's unfair labor practice.'" *Id*. As a result, Trader Joe's is forced to seek appellate relief from this novel and "draconian" remedy.

## CONCLUSION

For these reasons, the Court should grant Trader Joe's petition for review, vacate the Board's findings of unfair labor practices and associated remedies, and deny the Board's cross-application for enforcement.

Dated:     October 8, 2024                    Respectfully submitted,

                                              */s/ Arrissa K. Meyer*
                                              Arrissa K. Meyer
                                              LITTLER MENDELSON, P.C.
                                              2001 Ross Avenue, Suite 1500
                                              Dallas, TX 75201
                                              Telephone: 214-880-8180
                                              Fax: 214-889-6100
                                              E-mail:  akmeyer@littler.com

                                              **ATTORNEY FOR PETITIONER/
                                              CROSS-RESPONDENT
                                              TRADER JOE'S COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of October, 2024, I electronically transmitted this document to the Clerk of the Court of the 5th Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

Ruth E. Burdick, Deputy Associate General
National Labor Relations Board
1015 Half Street, SE
Washington, D.C. 20570
appellatecourt@nlrb.gov

Jared H. Odessky, Attorney
National Labor Relations Board
1015 Half Street, SE
Washington, D.C. 20570
jared.odessky@nlrb.gov

Milakshmi Rajapakse, Attorney
National Labor Relations Board
1015 Half Street, SE
Washington, D.C. 20570
milakshmi.rajapakse@nlrb.gov

I further certify that on the 8th day of October, 2024, the foregoing document was served via certified mail/return receipt requested upon:

Jill Groeschel
504 Pilgrim Lane
Friendswood, TX 77546
jill@nirvanacircle.com

*/s/ Arrissa K. Meyer*
Arrissa K. Meyer

## ECF CERTIFICATION

I hereby certify (i) the required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; (iii) the document has been scanned for viruses using Symantec Endpoint Protection active scan and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues, pursuant to 5th Cir. R. 25.2.9.

*/s/ Arrissa K. Meyer*
Arrissa K. Meyer

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that:

1.      This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,496 words.

2.      This document complies with Fed. R. App. P. 27(d)(1)(E), the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft 365 in 14-point Times New Roman font.

*/s/ Arrissa K. Meyer*
Arrissa K. Meyer

4887-6423-2424.6 / 071820-1131