**No. 24-60367**

---

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**TRADER JOE'S COMPANY**

*Petitioner/Cross-Respondent*

**v.**

**NATIONAL LABOR RELATIONS BOARD,**

*Respondent/Cross-Petitioner*

---

**ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR
ENFORCEMENT OF AN ORDER FROM THE
NATIONAL LABOR RELATIONS BOARD**

**NLRB CASE NOS. 16-CA-291179 AND 16-CA-293143**

---

**PETITIONER/CROSS-RESPONDENT TRADER JOE'S COMPANY'S
PETITION FOR REHEARING EN BANC**

---

Arrissa K. Meyer
LITTLER MENDELSON, P.C.
2001 Ross Avenue, Suite 1500
Dallas, TX 75201
Telephone: 214-880-8180
Fax: 214-889-6100
E-mail:  akmeyer@littler.com

*Attorney for Petitioner/Cross-
Respondent Trader Joe's Company*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Petitioner Trader Joe's Company ("Trader Joe's" or the "Company") is a California corporation with its principal place of business in Monrovia, California and is a wholly owned subsidiary of T.A.C.T. Holding, Inc. T.A.C.T. Holding, Inc. is Trader Joe's parent company, and there is no publicly held corporation that owns 10% or more of Trader Joe's stock.

2. Littler Mendelson, P.C. is counsel for Trader Joe's.

3. Arrissa Meyer is counsel for Trader Joe's.

4. Respondent National Labor Relations Board ("NLRB" or the "Board") is a federal agency.

5. Ruth E. Burdick is counsel for the NLRB.

6. Jared Odessky is counsel for the NLRB.

7. Milakshmi Rajapakse is counsel for the NLRB.

8. Jill Groeschel ("Groeschel") is the Charging Party in the case.

*/s/ Arrissa K. Meyer*
Arrissa K. Meyer

ii

## RULE 40(b)(2) STATEMENT

The panel majority's decision requires Trader Joe's to not only reinstate a Crew Member (*i.e.*, employee) described by her colleagues as a toxic bully, but also to make her whole for all direct and foreseeable pecuniary harms.[1]  Rehearing en banc is warranted for the following reasons.

The panel majority's refusal to consider Trader Joe's arguments regarding *Thryv, Inc.*, 372 NLRB No. 22 (Dec. 13, 2022) flouts Fifth Circuit precedent. Although Trader Joe's excepted to the *Thryv* remedy because it was "wrongly decided," the panel majority found it lacked jurisdiction to consider the argument under Section 10(e) of the National Labor Relations Act ("NLRA").  Panel Op. 38. In doing so, the panel majority disregarded circuit guidance that an objection need only be "specific enough to place the agency on notice of the party's objections." *Int'l Bhd. of Elec. Workers, AFL-CIO, CLC, Loc. Unions 605 & 985*, 973 F.3d 451, 460 (5th Circ. 2020).

Then, in finding the "extraordinary circumstances" exception to Section 10(e) did not apply, the panel majority contravened *Harvard Maintenance, Inc. v. NLRB*, 165 F.4th 886 (5th Cir. 2026) and *Hiran Management, Inc. v. NLRB*, 157 F.4th 719 (5th Circ. 2025).  Panel Op. 38-40.  The *Harvard Maintenance* court found extraordinary circumstances excused an employer's failure to raise its *Thryv*

---

[1] A copy of the opinion is attached as Exhibit A.

argument before the Board because it would have been futile.  165 F.4th at 897.

Extraordinary circumstances also exist when the Board acts outside its authority.

The panel majority's claim that *Thryv* does not fall within this category is

irreconcilable with *Harvard Maintenance* and *Hiran Management*, which held

*Thryv* exceeds the Board's authority.  Rehearing is necessary to secure the

uniformity of the Court's decisions.

The panel majority's affirmance of the Board's order also raises a question of

exceptional importance: whether employers may act on employee complaints that

may have been prompted by protected activity.  The Crew complaints in this case

explain the "close timing" upon which the Board found animus, and they support

Trader Joe's affirmative defense.  Holding Trader Joe's could not rely on the

complaints improperly imputes employee animus to an employer and restricts

employers from taking necessary action to address legitimate workplace concerns.

*See, e.g., Long v. Eastfield Coll.*, 88 F.3d 300, 306 (5th Cir. 1996) ("wrongful intent

on the part of the ordinary employee is not properly imputable to the employer").

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS** ....................................................II

**RULE 40(B)(2) STATEMENT** ......................................................... III

**STATEMENT OF ISSUES**..................................................................1

**STATEMENT OF THE COURSE OF PROCEEDINGS**...................................1

**STATEMENT OF FACTS** .................................................................3

**I.    TRADER JOE'S PROVIDES A UNIQUE SHOPPING EXPERIENCE.** ..................................................................3

**II.   CREW SUBMITTED COMPLAINTS REGARDING GROESCHEL.** ....................................................................4

**III.  HANCOCK CONDUCTED A CLIMATE SURVEY INVESTIGATION.**.................................................................5

**IV.   TRADER JOE'S TERMINATED GROESCHEL'S EMPLOYMENT.**...................................................................6

**ARGUMENT** ................................................................................6

**I.    THE PANEL MAJORITY'S REFUSAL TO CONSIDER TRADER JOE'S *THRYV* ARGUMENT FLOUTS FIFTH CIRCUIT PRECEDENT.** ..................................................6

    **A.    Trader Joe's Sufficiently Raised the Remedy Issue.**......................6

    **B.    The Panel Majority's Failure to Find Extraordinary Circumstances Creates an Intra-Circuit Conflict.**...........................8

**II.   EMPLOYERS MUST BE PERMITTED TO ACT ON EMPLOYEE COMPLAINTS, EVEN IF THEY WERE MADE IN RESPONSE TO PROTECTED ACTIVITY.**............................................11

**CONCLUSION**...........................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3484, Inc. v. NLRB,*
  137 F.4th 1093 (10th Cir. 2025) (Eid, J., concurring in part and
  dissenting in part)..................................................................................11

*NLRB v. AllService Plumbing & Maint., Inc.,*
  138 F.4th 889 (5th Cir. 2025) .................................................................7

*Coreslab Structures (Tulsa), Inc. v. NLRB,*
  100 F.4th 1123 (10th Cir. 2024) .............................................................8

*Electrical Workers EU Local 900 v. NLRB,*
  727 F.2d 1184 (D.C. Circ. 1984) ............................................................8

*GlobeRanger Corp. v. Software AG United States of Am., Inc.,*
  836 F.3d 477 (5th Cir. 2016) .................................................................9

*Gulf States Mfg., Inc. v. NLRB,*
  704 F.2d 1390 (5th Cir. 1983) ................................................................7

*Harvard Maintenance, Inc. v. NLRB,*
  165 F.4th 886 (5th Cir. 2026) ............................................... iii, iv, 9, 10

*Hiran Management, Inc. v. NLRB,*
  157 F.4th 719 (5th Circ. 2025) .................................................. iii, iv, 10

*HTH Corp. v. NLRB,*
  823 F.3d 668 (D.C. Cir. 2016)..............................................................10

*Indep. Elec. Contractors of Hous., Inc. v. NLRB,*
  720 F.3d 543 (5th Cir. 2013) ..................................................................7

*Int'l Union of Operating Eng'rs, Stationary Eng'rs, Loc. 39 v. NLRB,*
  155 F.4th 1023 (9th Cir. 2025) ..............................................................11

*Jacobs v. Nat'l Drug Intelligence Ctr.,*
  548 F.3d 375 (5th Cir. 2008) ..................................................................9

*Lion Elastomers, LLC v. NLRB*,
    108 F.4th 252 (5th Cir. 2024) ................................................................7

*Long v. Eastfield Coll.*,
    88 F.3d 300 (5th Cir. 1996) ...........................................................iv, 13

*May Department Stores Co. v. NLRB*,
    326 U.S. 376 (1945)..........................................................................7, 8

*MJB Specialty LLC, Blockchains, Inc.*,
    No. 19-CA-266693, 2022 NLRB LEXIS 360 (NLRB Div. of
    Judges Aug. 22, 2022) ......................................................................13

*Russell v. McKinney Hosp. Venture*,
    235 F.3d 219 (5th Cir. 2000) ...........................................................13

*NLRB v. Saint-Gobain Abrasives, Inc.*,
    426 F.3d 455 (1st Cir. 2005)..............................................................10

*NLRB v. Seven-Up Bottling Co. of Miami*,
    344 U.S. 344 (1953)..............................................................................8

*NLRB v. Starbucks Corp.*,
    125 F.4th 78 (3d Cir. 2024) ...............................................................11

*NLRB v. Starbucks Corp.*,
    159 F.4th 455 (6th Cir. 2025) ...........................................................11

*Thryv, Inc.*,
    372 NLRB No. 22 (Dec. 13, 2022)...............................................*passim*

*TRW, Inc. v. NLRB*,
    654 F.2d 307 (5th Cir. 1981) ............................................................14

**Statutes**

Section 10(e) of the National Labor Relations Act ...........................*passim*

**STATEMENT OF ISSUES**

1.      Whether excepting to a Board remedy as wrongly decided sufficiently puts the Board on notice to satisfy Section 10(e) of the NLRA.

2.      Whether the Board's award of *Thryv* remedies falls within the "extraordinary circumstances" exception of Section 10(e) of the NLRA.

3.      Whether an employer may act on employee complaints made in response to protected concerted activity.

**STATEMENT OF THE COURSE OF PROCEEDINGS**

On June 21, 2022, the NLRB issued a complaint alleging Trader Joe's violated Section 8(a)(1) by issuing Groeschel a written warning, issuing her a negative performance review and denying her a raise, and Sections 8(a)(1) and (4) by suspending and discharging her in retaliation for her protected activity and for filing an NLRB charge.  (ROA.734-43).

On March 1, 2023, the Administrative Law Judge ("ALJ") concluded the written warning violated Section 8(a)(1).  (ROA.1316).  The ALJ also held Groeschel's suspension and termination violated Sections 8(a)(1) and (4).  (ROA.1316-17).  The ALJ ordered Trader Joe's to reinstate Groeschel and to make her whole for lost earnings and benefits and for any other direct or foreseeable pecuniary harms.  (ROA.1317).  Both parties filed exceptions.  (ROA.1202, 1260).

On July 9, 2024, the Board affirmed the ALJ's decision.  (ROA.1299-300).

The Board modified the order to encompass "all direct or foreseeable pecuniary harms incurred as a result of her unlawful termination," citing *Thryv*. (ROA.1309).

Trader Joe's petitioned for review on July 18, 2024. On February 18, 2026, the panel majority enforced the Board's order, holding substantial evidence supported the Board's findings. Panel Op. 2. Despite evidence Trader Joe's accommodated Groeschel's complaints for years, the panel majority concluded Trader Joe's later developed animus based on "cherry-picked snippets of evidence." Panel Op. 21-23; Dissent 57. It also relied on the close timing between Groeschel's charge and her suspension—discounting the intervening Crew complaints because they followed Groeschel discussing her charge and because Trader Joe's chosen investigation tool was a "climate survey." Panel Op. 30. The panel majority further rejected Trader Joe's affirmative defenses that it would have taken the same actions regardless of Groeschel's protected activity. Panel Op. 27, 35. The panel majority then found it could not consider Trader Joe's *Thryv* argument under Section 10(e) because Trader Joe's failed to raise the remedy before the Board and the extraordinary circumstances exception did not apply. Panel Op. 38-40.

Judge Oldham dissented, contending the panel majority improperly deferred to a decision resulting from a "non-neutral" adjudicatory process based on the "flawed" *Wright Line* standard. Dissent 45, 55. The Board "had to stick its head in the sand" to infer animus given the evidence Trader Joe's disciplined Groeschel for

2

"a mountain of reasons" based on numerous complaints of bullying and unsafe conduct. Dissent 55, 58. The panel majority further misapplied Section 10(e) because it poses a non-jurisdictional exhaustion requirement, Trader Joe's objected to the *Thryv* remedy, and its objection satisfied Section 10(e)'s equitable exception. Dissent 60. Judge Oldham specifically concluded extraordinary circumstances exist because the Board lacked authority to order the *Thryv* remedy and because it implicates "serious Seventh Amendment concerns." Dissent 66. Trader Joe's, however, does not challenge the constitutionality of *Thryv* or the NLRB's structure and states such issues are outside the scope of its appeal.

**STATEMENT OF FACTS**[2]

**I.      TRADER JOE'S PROVIDES A UNIQUE SHOPPING EXPERIENCE.**

Trader Joe's focuses on creating a "Wow" customer experience. (ROA.25, 33, 422). Trader Joe's grocery stores have a nautical theme, with the Captain leading the store. (ROA. 33). Mates are supervisors comparable to assistant managers. (ROA.33, 567). Crew are non-supervisory personnel who answer customer questions, receive products, stock shelves, and work the registers. (ROA.34-38, 598-99). Groeschel worked as Crew at store #426 in Houston, Texas. (ROA.32-33, 534).

---

[2] This brief cites the Agency Record using the prefix "ROA" followed by the page number stamped in red in the bottom left corner of the PDFs at docket numbers 17-1 – 17-15 by CM/ECF.

3

The Trader Joe's Crew Handbook lists behaviors that can result in discipline and includes "[f]ailing to treat a customer, crew member, or any other member of the public with courtesy and respect." (ROA.1087).

## II.    CREW SUBMITTED COMPLAINTS REGARDING GROESCHEL.

Groeschel filed an NLRB charge on February 23, 2022, alleging Trader Joe's disciplined her, gave her a poor evaluation, and denied her a raise because she reported COVID-related concerns.  (ROA.768-69; 120).  Groeschel told multiple Crew about her charge, and they believed she was trying to get Captain David Fuller fired.  (ROA.121-23, 600, 624-25, 696, 718, 787-99).

Crew then submitted complaints regarding Groeschel.  On March 22, 2022, Crew Elizabeth Biddle emailed Hancock, claiming Groeschel "bull[ied] and belittle[ed] fellow crew members." (ROA.787).  She alleged Groeschel had almost hit Crew Lynn Yambao with equipment.  (ROA.673, 675, 685).  She also spoke "harshly, unkind, and cruel to many crewmembers," including calling Crew Lynn Loosier a selfish bitch.  (ROA.787, 676-77).

Crew Suzanne Salazar told a Mate she felt uncomfortable about a conversation with Groeschel.  (ROA.577).  At his request, Salazar submitted a statement noting Groeschel told her she filed a claim against Fuller.  (ROA.790).

Crew Julia Garcia reported Groeschel yelled at Crew and customers, citing the Loosier incident and an incident when Groeschel yelled at a customer for not

wearing a mask. (ROA.602-03). Garcia also gave two examples of Groeschel being "rough with the pallets…caus[ing] dangerous situations." *Id*. Garcia shared Groeschel got upset with her during a recent conversation regarding a lawsuit over Trader Joe's retirement plan. *Id*. Groeschel created a "toxic environment" with "an underlying current of tension and fear that she may erupt at any time." (ROA.794).

On March 24, 2022, Crew Member Carmela Demming submitted a statement reporting two incidents in which Groeschel almost hit Yambao with a cart and made threatening statements. (ROA.792).

On March 28, 2022, Crew Rita Armstrong emailed Hancock that Groeschel's "attitude changed drastically" during the pandemic, and she became "irrational and aggressive" towards Fuller. (ROA.796, 655-56). Hancock also received a letter from Loosier describing how Groeschel called her "the most selfish bitch she'd ever known." (ROA.797).

## III. HANCOCK CONDUCTED A CLIMATE SURVEY INVESTIGATION.

The complaints suggested ongoing misconduct and unsafe behavior. (ROA.438-39). On March 29, 2022, Hancock notified Groeschel of the allegations and suspended her pending investigation. (ROA.929-32, 639-40, 441). On March 30, 2022, Groeschel filed a second charge. (ROA.750-54).

Hancock then conducted a "climate survey" investigation at store #426. (ROA.370). Hancock met with 17 Crew Members to discuss the their work

5

experience and asked open-ended questions like, "How have your interactions been with your fellow crew?," "Do you feel there is respect among the team?," and whether they had any other concerns.  (ROA.934-43, 392, 393).

Several Crew mentioned Groeschel.  Mate Joyce Snyder reported Groeschel would "slam [shopping] carts towards crew" and "whip pallets around."  (ROA.934-43, 394).  Crew Heather Provancha reported Groeschel was unfriendly and "ornery," and she would push Garcia, who would not take it.  (ROA.934-43, 395-96).  Crew Sandy Collins also mentioned Groeschel and Garcia butting heads.  (ROA.934-43, 401).  Crew Andrea Tasker mentioned Groeschel calling a Crew Member "a fucking bitch."  (ROA.934-43, 397).  Salazar noted Groeschel was "gruff" with "not good energy, very toxic."  (ROA.934-43, 399).  Crew Toni Denny stated Groeschel had "cornered people" and was "very toxic."  (ROA.934-43, 404-05).

## IV.    TRADER JOE'S TERMINATED GROESCHEL'S EMPLOYMENT.

The complaints and climate survey revealed Groeschel "had been and was still treating people disrespectfully, and [] she was also behaving unsafely."  (ROA.414, 442).  On April 8, 2022, Hancock terminated Groeschel's employment for her behavior towards fellow Crew Members.  (ROA.969-70, 946-47, 418-19).

ARGUMENT

## I.    THE PANEL MAJORITY'S REFUSAL TO CONSIDER TRADER JOE'S *THRYV* ARGUMENT FLOUTS FIFTH CIRCUIT PRECEDENT.

### A.    Trader Joe's Sufficiently Raised the Remedy Issue.

6

Trader Joe's sufficiently put the Board on notice of its *Thryv* argument. Section 10(e) provides, "No objection that has not been urged before the Board…shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." However, "this requirement can be measured in context. The purpose of § 10(e) is to give the Board notice and an opportunity to confront objections to its rulings before it defends them in court." *Indep. Elec. Contractors of Hous., Inc. v. NLRB*, 720 F.3d 543, 550 (5th Cir. 2013). Here, Trader Joe's excepted to the ALJ's award of the *Thryv* remedy on the basis that *Thryv* was "wrongly decided." (ROA.1208). As such, the Board had notice of Trader Joe's challenge to *Thryv*—which is all that is required. *Id.*

Exceptions need not be detailed to be valid. *See Thryv*, 102 F.4th at 746 ("[Section] 10(e) does not require employers to put an issue before the [NLRB] with pristine clarity"); *see also Gulf States Mfg., Inc. v. NLRB*, 704 F.2d 1390, 1399 (5th Cir. 1983) (employer preserved issue, even if it was not "a model of clarity"). Indeed, Section 10(e) was satisfied where a party "did not explicitly mention" its specific objection to the Board but presented "substantially similar objections." *NLRB v. AllService Plumbing & Maint., Inc.*, 138 F.4th 889, 897 (5th Cir. 2025). Similarly, in *Lion Elastomers, LLC v. NLRB*, 108 F.4th 252, 258 n. 5 (5th Cir. 2024), the employer sufficiently raised an argument in its motion, despite the argument being "underdeveloped and unsupported." This is consistent with *May*

*Department Stores Co. v. NLRB*, 326 U.S. 376 (1945), in which the Supreme Court found an objection that a remedy was "not supported or justified by the record" was adequate notice of the employer's objection to the Board's remedy. *Id*. at 386 n.5.

*NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344 (1953) is distinguishable. The employer excepted to the Board's remedy as unsupported by the evidence and contrary to law. *Id*. at 350. On appeal, however, the employer argued the remedy was "oppressive" based on the seasonal nature of its business. *Id*. This is a different argument. Thus, the employer did not provide "adequate notice that the Company intend[ed] to press the specific issue." *Id*. Other circuits have not interpreted *Seven-Up* to bar arguments based on objections like Trader Joe's. *See, e.g., Coreslab Structures (Tulsa), Inc. v. NLRB*, 100 F.4th 1123, 1143-1144, n. 7 (10th Cir. 2024) (objection to remedies as "contrary to the law and substantial weight of the record" was sufficient); *Electrical Workers EU Local 900 v. NLRB*, 727 F.2d 1184, 1193 (D.C. Circ. 1984) (exception endorsing the ALJ's decision encompassed objection to retroactive application of remedies). En banc review is warranted to clarify the requirements of Section 10(e).

### B. The Panel Majority's Failure to Find Extraordinary Circumstances Creates an Intra-Circuit Conflict.

Trader Joe's also asserted the "extraordinary circumstances" exception to Section 10(e) applies because it would have been futile to argue for the reversal of

8

*Thryv* to the Board and because the Board exceeded its authority. In rejecting this argument, the panel majority contravened Fifth Circuit precedent.

First, the panel majority concluded that authority recognizing a futility exception did not support finding extraordinary circumstances in this case. Panel Op. 39. This holding conflicts with *Harvard Maintenance, Inc. v. NLRB*, 165 F.4th 886 (5th Cir. 2026). There, the employer did not raise a *Thryv* argument before the Board. Nevertheless, its failure to do so did not preclude its challenge because the futility exception to Section 10(e) applied. *Id*. at 897. The Court noted it has excused the exhaustion requirement where the Board has previously "discussed" the unexhausted issue. *Id*. The *Thryv* situation is analogous because the Board had already "considered, and rejected, dissenting board member Kaplan's position that the remedy was unlawful," so additional argument would have been futile. *Id*. Further, the Board insists *Thryv* "remains valid precedent." *Id*. *Harvard Maintenance* applies with equal force here, where the dissent argued that awarding *Thryv* damages exceeds the Board's remedial authority, just as Trader Joe's asserted. *Thryv, Inc*., 372 NLRB No. 22, slip op. at 16 (Dec. 13, 2022).

Under the rule of orderliness, one panel may not overturn another panel's decision, absent an intervening change in law. *Jacobs v. Nat'l Drug Intelligence Ctr*., 548 F.3d 375, 378 (5th Cir. 2008). "[T]o the extent there is conflict" between two opinions, "the earlier case controls." *GlobeRanger Corp. v. Software AG United*

*States of Am., Inc.*, 836 F.3d 477, 497 (5th Cir. 2016). *Harvard Maintenance* issued on February 2, 2026, and the panel applied the extraordinary circumstances exception to an unexhausted *Thrv* challenge. 165 F.4th at 897. That opinion should have controlled this case.

Second, the panel majority declined to exercise its residual jurisdiction to consider Board remedies that are patently *ultra vires*. Extraordinary circumstances exist under Section 10(e) when the Board issues remedies that exceed its authority. *NLRB v. Saint-Gobain Abrasives, Inc.*, 426 F.3d 455, 460 (1st Cir. 2005) ("courts of appeals retain residual jurisdiction to consider a first-time challenge to a remedy on the ground that the remedy is obviously beyond the Board's authority"); *HTH Corp. v. NLRB*, 823 F.3d 668, 673 (D.C. Cir. 2016). In *Hiran Management*, the Court found *Thryv* "exceeds the NLRB's authority," and the Board violates the NLRA in ordering an employer to reimburse all foreseeable costs incurred by a discharged employee. 157 F.4th at 729. Likewise, the *Harvard Maintenance* court reiterated *Hiran*'s conclusion that "the *Thryv* remedy does exceed the NLRB's statutory authority." 165 F.4th at 898.

Nevertheless, the panel majority concluded *Hiran* does not suggest the Board's *Thryv* remedy is "obviously beyond the Board's authority." Panel Op. 39 n. 18. The panel majority also cited the *Thryv* circuit split. Panel Op. 39-40. However, the Ninth Circuit is the only circuit court to uphold *Thryv* remedies, and

10

its decision is not binding precedent.[3]  Because the Fifth Circuit has unequivocally held that *Thrvv* remedies exceed the Board's authority, Trader Joe's objection falls within the extraordinary circumstances exception to Section 10(e).  *See 3484, Inc. v. NLRB*, 137 F.4th at 1116 (Eid, J., concurring in part and dissenting in part) ("Because the Board exceeded its authority, we may properly exercise jurisdiction to consider 3486's challenge to the Board's remedy").  En banc review is required to maintain the uniformity of this Court's precedents.

## II.    EMPLOYERS MUST BE PERMITTED TO ACT ON EMPLOYEE COMPLAINTS, EVEN IF THEY WERE MADE IN RESPONSE TO PROTECTED ACTIVITY.

Turning to the merits, this decision, if upheld, would prevent any employer who receives multiple employee complaints alleging serious misconduct from acting on such information if an employee's protected activity catalyzed her co-workers to bring forward their own complaints.  This decision is contrary to Fifth Circuit precedent and puts employers in an untenable position—namely, it ties their hands

---

[3] *Compare Int'l Union of Operating Eng'rs, Stationary Eng'rs, Loc. 39 v. NLRB*, 155 F.4th 1023 (9th Cir. 2025) *with NLRB v. Starbucks Corp.*, 159 F.4th 455, 459 (6th Cir. 2025) (vacating *Thryv* remedy "because the Board exceeded its statutory authority"); *3484, Inc. v. NLRB*, 137 F.4th 1093, 1127 (10th Cir. 2025) (Eid, J., concurring in part and dissenting in part) (*Thryv* remedy "exceeds the Board's statutory authority under the NLRA"); *Int'l Union of Operating Eng'rs, Stationary Eng'rs, Loc. 39*, 155 F.4th at 1055 (Bhumatay, J., dissenting in part) ("the Board exceeded its authority under § 160(c) in devising its newfound foreseeable-damages remedy"); *NLRB v. Starbucks Corp.*, 125 F.4th 78, 96 (3d Cir. 2024) ("the Board's current order exceeds its authority under the NLRA").

in addressing workplace issues based on improperly imputed animus.

Starting in March 2022, Hancock received an influx of Crew complaints alleging Groeschel was mistreating Crew and moving equipment unsafely. (ROA.438).  Because some complaints referenced Groeschel's NLRB charge,[4] the Board determined "it [was] clear on the face of most of the statements that the employees were motivated to submit them in response to Groeschel's protected conduct."  373 NLRB No. 73, slip op. at 2.  As a result, the Board concluded the complaints did not support Trader Joe's decision to suspend or discharge Groeschel. *Id*.  The panel majority agreed Trader Joe's could not rely on the Crew complaints to explain the timing of its actions or to justify discipline "[b]ecause the employee complaints…were reported in response to her protected conduct."  The wholesale dismissal of these complaints throws the baby out with the bathwater.

That Groeschel's attempt to gather Crew support may have motivated some of her non-supervisor peers to report legitimate complaints about Groeschel's conduct does not mean Trader Joe's shared the same motivation in suspending or discharging Groeschel, nor should the Crew's purported motivation be imputed.[5] This situation is unlike a "cat's paw" case in which a supervisor's animus is imputed

---

[4] Three of the six Crew complaints referenced Groeschel taking legal action against Trader Joe's.  (ROA.787-797).

[5] In fact, "there is every reason to think the co-workers' complaints were motivated not by the NLRB charge but by the fact that Groeschel terrorized her workplace and wreaked havoc on every person around her."  Dissent 56.

12

to a decision-maker who rubber stamped the supervisor's recommendation. Here, the statements leading to the suspension and investigation were made by Groeschel's peers. Neither the Board nor this Court has applied a cat's paw theory in this context. *See, e.g., Long v. Eastfield Coll*, 88 F.3d at 306 (because ordinary employees do not have control over their coworker's employment status, "wrongful intent on the part of the ordinary employee is not properly imputable to the employer"); *MJB Specialty LLC, Blockchains, Inc*., No. 19-CA-266693, 2022 NLRB LEXIS 360, *52 n.24 (NLRB Div. of Judges Aug. 22, 2022) (declining to apply cat's paw theory "because the Board has not adopted it").

Nor should this Court expand this theory to encompass ordinary Crew who "were involved in precisely zero employment decisions." Dissent 56. There is no evidence the Crew who complained "possessed leverage[] or exerted influence" over Hancock. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000) (employer may be tagged with an employee's animus if the evidence indicates the worker possessed leverage or exerted influence over the decision-maker). To the contrary, following the complaints, Hancock consulted with Human Resources, met with Groeschel, conducted the climate survey (which was intentionally open-ended so as not to focus on Groeschel), and consulted with Human Resources and her supervisor before making a decision. (ROA.370 (emphasis added), 412). *See Long*, 88 F.3d at 307 (independent investigation breaks the causal link between a

13

supervisor's allegedly retaliatory intent and the termination). Moreover, other Crew Members—who were not motivated by Groeschel's protected activity—corroborated the allegations in the climate survey. (ROA.415, 934, 936, 939-40).

Preventing employers from relying on complaints prompted by protected activity has serious implications. It immunizes employees who engage in protected activity. It denies their co-workers any recourse against their misconduct. It prevents employers with no unlawful motive from carrying out their legal obligations to address legitimate workplace concerns and taking action to protect workers who have been bullied or injured by peers. In short, it turns the NLRA into a "shield for the incompetent [and] job security for the unworthy." *TRW, Inc. v. NLRB*, 654 F.2d 307, 312 (5th Cir. 1981). The impact is especially acute here, where the result is reinstatement of an individual who "berated co-workers and customers with profanity-laden screeds, threatened the lives of her co-workers with heavy equipment, and was the focus of at least a dozen employee complaints." Dissent 41. The Court should grant review to ensure this decision does not bar employers from acting on complaints made after or in response to protected activity.

## CONCLUSION

For these reasons, the Court should grant Trader Joe's petition for rehearing en banc, vacate the Board's findings and associated remedies, and deny the Board's

14

cross-application for enforcement.

Dated:     April 3, 2026

Respectfully submitted,

/s/ *Arrissa K. Meyer*

Arrissa K. Meyer
LITTLER MENDELSON, P.C.
2001 Ross Avenue, Suite 1500
Dallas, TX 75201
Telephone: 214-880-8180
Fax: 214-889-6100
E-mail:   akmeyer@littler.com

**ATTORNEY FOR PETITIONER/
CROSS-RESPONDENT
TRADER JOE'S COMPANY**

15

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of April 2026, I electronically transmitted this document to the Clerk of the Court of the 5th Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

Ruth E. Burdick, Deputy Associate General
National Labor Relations Board
1015 Half Street, SE
Washington, D.C. 20570
appellatecourt@nlrb.gov

Jared H. Odessky, Attorney
National Labor Relations Board
1015 Half Street, SE
Washington, D.C. 20570
jared.odessky@nlrb.gov

Milakshmi Rajapakse, Attorney
National Labor Relations Board
1015 Half Street, SE
Washington, D.C. 20570
milakshmi.rajapakse@nlrb.gov

I further certify that on the 3rd day of April, 2026 the foregoing document was served via certified mail/return receipt requested upon:

Jill Groeschel
504 Pilgrim Lane
Friendswood, TX 77546
jill@nirvanacircle.com

/s/ Arrissa K. Meyer
Arrissa K. Meyer

16

## ECF CERTIFICATION

I hereby certify (i) the required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; (iii) the document has been scanned for viruses using Symantec Endpoint Protection active scan and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues, pursuant to 5th Cir. R. 25.2.9.

*/s/ Arrissa K. Meyer*
Arrissa K. Meyer

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that:

1.      This document complies with the word limit of Fed. R. App. P. 40(d)(3) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,844 words.

2.      This document complies with Fed. R. App. P. 27(d)(1)(E), the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft 365 in 14-point Times New Roman font.

*/s/ Arrissa K. Meyer*
Arrissa K. Meyer

17

# EXHIBIT A

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 18, 2026

Lyle W. Cayce
Clerk

———————

No. 24-60367

———————

TRADER JOE'S COMPANY,

*Petitioner/Cross-Respondent*,

*versus*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*.

———————————————————————

Petition for Review of an Order of
the National Labor Relations Board
Agency Nos. 16-CA-291179,
16-CA-293143

———————————————————————

No. 24-60367

Before Dennis, Oldham, and Douglas, *Circuit Judges*.

Dana M. Douglas, *Circuit Judge*:

This matter is before us on a petition for review and cross-petition for enforcement of an order of the National Labor Relations Board. For the reasons that follow, we DENY the petition for review and GRANT the cross-petition to enforce the Board's order.

I

A

Jill Groeschel began working for Trader Joe's Company in 2014 as a crewmember in Store No. 426, located in Houston, Texas. Crewmembers like Groeschel perform a variety of tasks around the store, including working the registers, answering customer questions, receiving pallets of products, and stocking shelves. Each store also has a Captain, or store manager. David Fuller has been the Captain for Store No. 426 since its opening in 2012. He reports to Regional Vice President Liz Hancock, who oversees Trader Joe's stores in Texas.

Assigned to the early morning shift, Groeschel regularly reported for duty at 5:00 a.m. and worked until midday. During the hours before the store's opening, she was responsible for unloading delivery trucks using a pallet jack, restocking inventory on store shelves, and ensuring the store's cleanliness. Once the store opened to customers, Groeschel performed various tasks, including ushering customers to the checkout stand and working as a cashier. For the better part of her tenure, Groeschel was, by most accounts,[1] an exemplary employee. She consistently earned the

---

[1] Documentation from February 11, 2017, notes a customer service issue involving Groeschel. Demonstrating accountability, Groeschel herself reported that she had overlooked a customer's request to switch to a faster cashier.

company's highest performance rating on her semiannual evaluations between January 2015 and June 2021. In particular, Groeschel's February 2021 review lauded her "amazing rapport with … customers" and "willingness to make the store a great place to shop."

But tensions between Trader Joe's and Groeschel began to grow with the emergence of the COVID-19 pandemic in early 2020. At the start of the pandemic, Trader Joe's adopted a series of health and safety protocols aimed at mitigating the risk of the virus's transmission. These measures included mandatory mask usage, social distancing, limitations on in-store customer capacity, senior-only shopping hours, the installation of plexiglass barriers at checkout stations, enhanced cleaning regimens, and flexible leave policies. Trader Joe's also adjusted its employees' duties as the safety measures changed. For instance, during the period when the store offered senior shopping hours, limited the numbers of shoppers in the store, and required mask wearing, Groeschel was often assigned to manage the flow of customers coming into the store and remind them that a mask was required. Management recognized Groeschel's positive interactions with customers and commended her for "keeping the store safe for customers and crew" during this time. The company further implemented daily COVID-19 health assessments of its employees, and it utilized a digital platform known as Dayforce to communicate workplace exposure notifications to staff.

Despite these safety protocols, employees continued to harbor significant health and safety concerns, which they discussed among themselves and raised with management. Groeschel took part in several of these conversations. On June 16, 2020, for example, Groeschel and her coworker Rita Armstrong discussed an incident involving an employee who, despite being on medical leave since May 27, had spent about ninety minutes shopping, visiting, and performing some of his usual work tasks in the store on June 14, two days before testing positive for COVID-19. Although

management had issued a Dayforce notice informing employees of the positive case, it stated only that the employee's last day in the store was May 27 and omitted any reference to the June 14 visit. Concerned by this omission, Groeschel brought the matter to the attention of an assistant manager, who relayed it to Fuller. The following day, Fuller issued an updated notice acknowledging the employee's presence in the store on June 14. One employee, deeply unsettled by the delayed notification, resigned due to his concerns with the lack of transparency.

Still troubled by management's handling of the situation, Groeschel and coworker Rita Armstrong spoke about whether Groeschel should send a letter to Trader Joe's Human Resources Department documenting the incident. Armstrong asked Groeschel not to use her name in the letter. Groeschel then emailed her letter to Human Resources on June 25, 2020, in which she recounted the incident and stated that many store employees "did not feel safe to work" during the pandemic, were "upset" when they first learned of the inaccurate Dayforce report, and had "expressed their disappointment about the lack of transparency." Groeschel also mentioned that an employee, who "wishe[d] to remain anonymous,"[2] shared concerns about Fuller's initial handling of the incident and "the health risk presented by a delay in taking action to protect those who may have been exposed."

A Human Resources officer forwarded that message to Vice President Hancock, who contacted Groeschel by phone the following day. During their conversation, Groeschel proposed several improvements to the company's communication practices, including supplementing Dayforce notices with

---

[2] The letter indicated that the crewmember, presumably Armstrong, wished to remain anonymous due to concerns of "recrimination if their name is revealed." In her testimony during the administrative proceeding, however, Armstrong avoided disclosing why she did not want Groeschel to use her name in the letter.

text messages to ensure timely dissemination of information. Hancock relayed the suggestion to Fuller, who agreed to adopt the proposed measure.

Groeschel's efforts to advocate for stronger health and safety protections continued beyond her initial communications. Around September 2020, during the period when Trader Joe's limited the numbers of shoppers in the store and maintained an in-store mask mandate, Groeschel and several other employees encountered a maskless customer and offered her a mask. The customer claimed she was medically exempt and insisted there was "no reason to wear a mask" because she could "get COVID from [a] mask." Groeschel left the customer alone to do her shopping; however, as the customer exited the store, she approached Groeschel at close range and mocked Groeschel for attempting to enforce the mask policy. In response, Groeschel told the customer that she was not welcome in the store and called her selfish for refusing to wear a mask. Assistant Manager Shawn Forozan overheard the exchange but did not address it with Groeschel at the time. After the customer called the store to lodge a complaint, Forozan informed Fuller of the incident, and Fuller then spoke with Groeschel, advising her not to engage with maskless customers. Management took no disciplinary action against Groeschel, nor did it record the incident in the Dayforce system, although Fuller did send Hancock an email attaching a statement from Forozan detailing the incident and recounting their conversation with Groeschel. Fuller concluded the email by stating, "I do not expect this to happen again but wanted you to know about it."

Groeschel subsequently called Trader Joe's headquarters to inquire about the company's policies on medical exemptions to the mask mandate. Based on the guidance she received, Groeschel informed Fuller, around November 2020, that individual stores had discretion to deny entry to customers who refused to wear masks, even those asserting a medical exemption. Groeschel urged Fuller to adopt a uniform mask requirement,

explaining that she and other employees were upset by the presence of unmasked customers in the store. Fuller later recounted this conversation in an email to Hancock, expressly identifying Groeschel by name.

Several months later, in January 2021, Groeschel spoke with Fuller about posting signage on the store entrances informing customers of the mask policy, but Fuller declined. That same month, Fuller notified Hancock that Groeschel might circulate a petition for pandemic pay increases to be extended to assistant managers; at that time, pandemic pay had only been made available to crewmembers, like Groeschel. In response, Hancock expressed annoyance that Groeschel was "trying to turn a positive into a negative" and instructed Fuller to speak to Groeschel. Fuller replied that Groeschel "might do something like this regardless" because Groeschel "feels that her calling is to stand up and be an advocate for others who she feels are being wronged or slighted." There is no evidence Groeschel ever circulated or submitted a petition.

Beginning in May 2021, Trader Joe's began rolling back many of its pandemic-related health and safety protocols. It first scrapped its mask requirement and in-store customer limits. Then, in July, the company removed the plexiglass barriers at checkout counters, without advance notice to employees. Groeschel and other employees discussed their safety concerns about the loosening of these safety protocols. Groeschel then spoke with Fuller about the situation, and he informed Groeschel that he had not known the plexiglass was going to be removed that night either. Groeschel continued speaking with her coworkers about their shared concerns and raising safety issues with management in the months that followed. During one conversation, Groeschel told Fuller that many of the other crewmembers had "expressed deep thanks that [she] spoke up for them and expressed how they were feeling."

No. 24-60367

Although several other employees voiced safety concerns with management, only Groeschel's complaints became a recurring topic between Fuller and Hancock.[3]  On July 15, 2021, Fuller warned Hancock that she might hear from Groeschel, noting that she was "being very vocal about the plexi[glass] being removed this morning."  On July 27, Fuller again reported that Groeschel had "pushed back very hard" during a morning huddle, repeating concerns about the plexiglass and relaxing of safety protocols.

Notably, among the Store No. 426 employees who raised safety concerns to management, Groeschel was also the only one to subsequently receive a poor performance evaluation or be disciplined.  Trader Joe's evaluates its employees at the beginning and middle of the calendar year. Fuller and the assistant managers were involved in completing the rating chart for each employee.  For each of the thirteen evaluations Groeschel received between January 2015 and February 2021, she scored as meeting expectations in all assessed categories and was granted a merit-based wage increase each time.

But in the second half of 2021, Groeschel received her first less-than-exemplary semiannual evaluation.  Fuller told Groeschel that all the employees' reviews were hypercritical because Trader Joe's was not issuing merit raise increases and, thus, the reviews would not affect their raises. Contrary to Fuller's statement, only twelve employees received negative evaluations, which was comparable to other evaluation periods.  Groeschel's evaluation highlighted her positive engagements with customers and most coworkers, but Fuller encouraged Groeschel to approach all coworkers with positivity.  Groeschel contested this negative remark by stating that she

---

[3] Indeed, there is no evidence that any other employee's complaints were communicated to regional or corporate management.

respects all of her coworkers but finds the company's expectation that she react positively to racist remarks made in her presence an inappropriate expectation. Fuller also chastised Groeschel for gossiping, to which Groeschel responded that she attributed gossip in the workplace to poor communication by management.

Trader Joe's continued to remove COVID-19 safety precautions, and Groeschel continued to advocate for the health and safety of her fellow crewmembers. Shortly after her evaluation, Fuller informed Groeschel that the social distancing stickers would be removed. Despite Groeschel's encouraging Fuller to communicate this information to all crewmembers, Fuller indicated that he would inform only those who had raised the issue with him. Groeschel discussed with her fellow crewmembers their shared concerns regarding how to interact safely with customers absent the social distancing signage. Among the crewmembers Groeschel spoke to was former employee Preston, who had worked at Trader Joe's for ten years before quitting in September 2021 due to COVID-19-related health and safety concerns.

On September 7, 2021, Groeschel had a verbal altercation with coworker Lynn Loosier regarding Loosier's method of cleaning. During routine pre-opening cleaning, Loosier swept debris from the push broom she was using in front of the baler. Loosier admitted that she habitually piled debris in front of the baler; Groeschel and at least one other employee had previously asked Lynn not to do this because they need to access the baler. On this occasion, Groeschel loudly complained to Loosier that she had requested that she pile the debris elsewhere on numerous occasions and called her "a selfish b*tch." Groeschel immediately admitted to management on duty that she "lost [her] cool" and regretted her actions; she later self-reported the incident to another manager. Although the incident

was noted in Dayforce, Groeschel was not disciplined for the incident, and Groeschel apologized to Loosier, as requested by management.

On October 12, 2021, Groeschel requested to end her shift early due to stomach cramps. Assistant Manager Forozan told her that early departure would incur an attendance infraction, so Groeschel remained. Groeschel muttered something as she walked away; Forozan heard something like "just fire me." Forozan did not record the incident in Dayforce or otherwise report the comment at that time.

Starting on October 12, 2021, Trader Joe's began logging Groeschel's safety-related concerns in Dayforce. For the first time, an assistant manager recorded that Groeschel had raised concerns about the close proximity between cashiers and customers at the register. His report indicated that Groeschel said she was "disappoint[ed] that Trader Joe's doesn't care." A second Dayforce entry on that same day indicated that Groeschel had "ignored a customer in line who did not have a mask on," moving from her position at the cash register to a bagging position in a nearby lane.

The following day, on October 13, Groeschel began attending to her duties before she completed her wellness check, which was administered to all employees each day. Over an hour into her shift, Assistant Manager Jeff Jelinek approached Groeschel to conduct her mandatory wellness check. Groeschel and other employees routinely completed their wellness checks after beginning work because assistant managers were not always available prior to their shifts. Actively engaged in her work, Groeschel complained that delayed screening rendered the wellness checks ineffective but nevertheless paused her work and acquiesced to Jelinek's screening request. Although Groeschel had begun her shift on numerous occasions before participating in the health assessment without instigating a Dayforce entry, Jelinek reported this specific incident, in which she questioned the efficacy

of the delayed screening, in Dayforce. Jelinek's Dayforce entry specifically noted that Groeschel commented that it "doesn't matter because we don[']t care about keeping them . . . safe."

On October 14, Manager Fuller and an assistant manager, Ellen Castillo, requested a private conversation with Groeschel. Fuller mentioned the wellness check incident with Jelinek that occurred the day before and commented that Groeschel had failed to return Fuller's greeting that morning. Fuller questioned whether Trader Joe's was a "good fit" for Groeschel. Groeschel commented that management's handling of COVID-19 protocol caused tension, and Fuller reiterated that Groeschel should seriously consider whether she "belong[ed]" at Trader Joe's. Castillo recorded in Dayforce that Groeschel "stated that she was still feeling unsafe about our COVID protocols."

Also on October 14, VP Hancock received an email complaint from a prior job applicant regarding an unnamed female store employee.[4] Hancock forwarded the email to Fuller, who determined that the complaint arose from Groeschel's October 12 request to leave early when she purportedly muttered "just fire me." At Fuller's instruction, Forozan recorded the prior incident in Dayforce.

---

[4] The body of the email complaint stated:

I am still hoping to have a chance to work for your unique operation. Have applied so many times at that store and shop it! [sic] I am dedicated and reliable and honest and hard working and need to work.

I was in the store Tues [sic] morning and was waiting to check out when one of your lady workers was passing me and stopped to verbally attack your crew manager and shouted : [sic] then fire me over and over! Here is someone who doesn't appreciate that she is the lucky one and working! [sic] A real shame!

On October 19, Fuller discussed the customer complaint with Groeschel. Groeschel indicated that she had considered Fuller's recent request that she evaluate whether she is a "good fit" for Trader Joe's and had decided to exude a good attitude at work. Fuller reported back to VP Hancock that he had spoken with Groeschel the prior week about her attitude and that she had since improved her attitude, noting that "she may have taken [their] conversation last week to heart at least for now." Hancock, who did not routinely involve herself in mundane disputes concerning crewmembers, reviewed Groeschel's Dayforce file and concluded that Groeschel exhibited a "pattern of behavior" that "felt like it had now risen to something beyond a verbal redirection conversation." requested a call with Fuller and indicated that Groeschel should be redirected in writing.

On October 25, Fuller issued Groeschel a written warning for "act[ing] inappropriately on the sales floor." Groeschel received no other written warning prior to her termination. Three months later, in January 2022, Groeschel received her first-ever overall "Does Not Meet Expectations" performance rating.

On February 23, 2022, Groeschel filed an unfair labor practice charge with the National Labor Relations Board, alleging that Trader Joe's retaliated against her COVID-19-related safety concerns when the company issued her a written warning. Groeschel subsequently approached coworkers to request their participation in the NLRB investigation. Crewmember Elizabeth Biddle determined that Groeschel aimed to have Fuller fired, which sparked concern among several employees.

Around the same time, Groeschel discovered that another employee had filed a lawsuit alleging Trader Joe's had breached its fiduciary duties related to its 401(k) plan—a plan to which Groeschel and many of her fellow employees contributed. Surmising that the alleged 401(k)-related

malfeasance could impact many of her coworkers' financial wellbeing, Groeschel reached out to her fellow crewmates to gather further information. Specifically, Groeschel approached Julia Garcia, a long-term employee with a finance background, about the lawsuit on March 22. Garcia became "irritated" and indicated that the plaintiff-employees simply did not understand the 401(k) plan. Groeschel did not pursue further conversation with Garcia and later apologized for upsetting her.

When Groeschel began soliciting participation in the NLRB investigation, VP Hancock received a flurry of employee complaints concerning Groeschel. Hancock did not investigate any of the infractions cited in the employee complaints. On March 22, Biddle emailed Hancock alleging that Groeschel told fellow employees that she had contacted upper-level management to file complaints about Fuller to "get [him] fired." Biddle's email also mentioned the incident involving Loosier as well as a prior incident in which Groeschel allegedly came close to hitting fellow employe Lynn Yambao with a pallet jack.

On March 23, after hearing that Groeschel purportedly wanted to get Fuller fired and being told that she could advocate on Fuller's behalf, Garcia emailed Hancock detailing a series of complaints. Garcia's list of grievances included a 2019 dispute over a cookie and candy store order, Groeschel's 2020 disagreement with a maskless customer, Groeschel's cursing at Loosier, her inquiry regarding the 401(k) lawsuit, and Groeschel's carelessness with the pallet jack.

Around this time, employee Suzanne Salzar told Forozan that Groeschel had made her uncomfortable during a recent conversation. Following Forozan's instructions, Salzar wrote a statement that Forozan logged in Dayforce. The statement indicated that Groeschel had filed a claim through "some 'legal' association" with a "4 letter acronym."

12

No. 24-60367

On March 24, Assistant Manager Jelinek sent a complaint alleging that Biddle heard second-hand gossip through crewmember Carmela Demming that Groeschel made "derogatory" comments about Yambao. Jelinek pursued the allegation with Demming, who reported that Groeschel had nearly hit Yambao with a cart of groceries on March 23 and commented to her "you better watch out" and "be careful." Although Yambao was present at work the day Jelinek gathered Demming's testimony, there is no indication that Jelinek approached Yambao about the alleged incident.

On March 28, employee Armstrong—who had not worked with Groeschel for two years since their schedules changed—emailed Hancock to relay her 2020 conversations with Groeschel related to COVID-19 protocols and their recent discussion of the NLRB charge, among other things. Armstrong and Groeschel's March 10, 2022, conversation about the NLRB complaint was their only communication in the prior two years.

Finally, Loosier, who no longer worked for Trader Joe's at this point, emailed a letter to Hancock. Loosier was aware that Groeschel had filed a charge with the NLRB that might "bring Fuller down." On a recent visit to the store as a customer, Loosier inquired about Fuller's wellbeing. Fuller responded that Loosier could write a letter to Hancock supporting him. Loosier did, in fact, send a letter to Hancock and reluctantly admitted that her letter was motivated by her support for Fuller.[5]

After receiving the employee statements, Hancock contacted the company's human resources department, which encouraged Hancock to seek Groeschel's account, and discussed the employee reports with Fuller. Hancock decided to conduct a general climate survey rather than

---

[5] The ALJ accurately noted that Loosier admitted that she contacted Hancock because she wanted to offer support of Fuller only "after a series of questions."

investigating the specific allegations already collected. Hancock met with Groeschel and informed her of the complaints lodged against her; Groeschel denied her coworker's allegations. On March 29, Hancock suspended Groeschel, with pay, pending an investigation. Hancock informed Groeschel that she could submit a written statement, but Groeschel declined the offer. Groeschel then filed a second unfair labor practice complaint with the NLRB on March 30.

Hancock performed a two-day climate survey on March 29 and 30, in which she asked employees four general questions, including whether they had observed "any concerning behavior." Hancock interviewed employees who had been selected by assistant managers as well as employees who requested to speak to Hancock. While some of the employees did raise concerns about Groeschel's behavior, Hancock conceded that her climate survey did not reveal any new reports regarding Groeschel's conduct. Hancock further admitted that she did not discuss any of the allegations raised in the climate study with Groeschel.

The climate survey elicited a variety of concerns regarding other conduct, which Hancock likewise did not investigate. These concerns included interpersonal conflicts among crewmembers, bullying, and allegations of discrimination. Five employees complained of inappropriate comments directed at racial and ethnic minorities. To avoid legal ramifications, Hancock disciplined one employee for telling coworkers not to speak Spanish at work. Hancock did not pursue any other claims that surfaced in the climate survey.

Although the climate survey uncovered no new allegations of misconduct by Groeschel, Trader Joe's terminated her employment on April 8, 2022, approximately ten days after the climate survey. When Hancock read Groeschel the termination statement, Groeschel complained that the

disciplinary procedures were retaliatory. Hancock told Groeschel she could provide a written statement, and once again, Groeschel declined to do so. Groeschel amended her second NLRB charge to include termination in addition to suspension.

Later that same day, Hancock received a message from Yambao, who had not yet commented on Groeschel's conduct. While Yambao's email was overall disparaging of Groeschel, it made no reference to the alleged pallet jack incident.

## II

### A

Groeschel filed a complaint with the NLRB alleging that Trader Joe's unlawfully discriminated against her. Finding merit in Groeschel's complaint, the Regional Director of the NLRB issued a consolidated complaint and notice of hearing, alleging that Trader Joe's violated Section 8(a)(1) of the National Labor Relations Act by issuing Groeschel a written warning, a negative performance review, and denying her a raise, and violated Sections 8(a)(4) and (1) of the Act when the company suspended and terminated her employment in retaliation for her protected conduct.

After a three-day hearing in September 2022, an administrative law judge assigned to assess Groeschel's complaint determined that Trader Joe's violated Section 8(a)(1) of the Act when it issued Groeschel a written warning but not when it issued her a negative performance review or denied her a raise. The ALJ further determined that Trader Joe's violated Sections 8(a)(4) and (1) of the Act when it suspended Groeschel and later terminated her employment. The ALJ ordered Trader Joe's to reinstate Groeschel, remove the unlawful disciplinary references from her record, and compensate her for any loss of earning and other benefits as well as other direct or foreseeable pecuniary harms. Both parties filed exceptions.

Trader Joe's appealed the ALJ's decision before the Board. Upon review, the Board upheld the ALJ's determination that Trader Joe's violated Sections 8(a)(4) and (1) of the Act and issued a "modified" remedy. The Board's remedy included remuneration for "all direct or foreseeable pecuniary harms incurred as a result of [Groeschel's] unlawful termination, including reasonable search-for-work and interim employment expenses, if any, regardless of whether these expenses exceed interim earnings." In a future proceeding, an ALJ will outline the precise remedy included under the "direct or foreseeable pecuniary losses" required by the Board. Under *Thryv*, "'direct harms' are those in which an employee's 'loss was the direct result of the [employer's] illegal conduct,'" *Thryv, Inc.*, 372 NLRB No. 22, slip op. at 13 (Dec. 13, 2022), *order vacated in part on other grounds*, 102 F.4th 727 (5th Cir. 2024), and "foreseeable harms" are "those which the [employer] knew or should have known would be likely to result from its violation of the Act, regardless of its intentions," *id.*

Trader Joes's timely petitioned our court for review, and the NLRB filed a cross-application to enforce its order.

B

In our "limited and deferential review,"[6] we uphold the Board's factual findings so long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *IBEW, Loc. Unions 605 & 985 v. NLRB*, 973 F.3d 451, 457 (5th Cir. 2020) (citation modified). Substantial evidence review

---

[6] "Judicial review of NLRB decisions and orders is limited and deferential." *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018).

prohibits our court from "mak[ing] credibility determinations or reweigh[ing] the evidence." *NLRB v. Allied Aviation Fueling*, 490 F.3d 374, 378 (5th Cir. 2007); *accord Ill. Cent. R.R. Co. v. Norfolk & W. Ry. Co.*, 385 U.S. 57, 69 (1966) ("It is not for the court [on substantial evidence review] to strike down conclusions that are reasonably drawn from the evidence and findings in the case.").[7]  We review the NLRB's legal conclusions de novo. *Flex Frac Logistics, L.L.C. v. NLRB*, 746 F.3d 205, 207 (5th Cir. 2014).

## III

The Board[8] correctly held that Trader Joe's violated the NLRA by issuing Groeschel a written warning and suspending then terminating her employment.  In its determination that Trader Joe's violated Section 8(a)(1) of the Act when the company issued Groeschel a written warning and violated Sections 8(a)(4) and (1) of the Act when it suspended and discharged Groeschel, the Board found that Trader Joe's possessed animus toward Groeschel's "concerted" conduct engaged in for the "mutual aid or protection" of her fellow workers, conduct which under the Act was protected from employer retaliation.  The Board further determined that the company's affirmative defense—that it would have disciplined Groeschel in the same manner regardless of her engagement in protected conduct—was not convincing.  Trader Joe's argues on appeal that the Board erred in finding that its disciplinary actions violated the NLRA.  We disagree.

---

[7] "Only in the most rare and unusual cases will an appellate court conclude that a finding of fact made by the [NLRB] is not supported by substantial evidence." *Flex Frac Logistics, L.L.C. v. NLRB*, 746 F.3d 205, 208 (5th Cir. 2014) (quoting *Merchs. Truck Line, Inc. v. NLRB*, 577 F.2d 1011, 1014 n. 3 (5th Cir. 1978)).

[8] For readability, this opinion occasionally attributes to the Board the ALJ's findings that the Board later adopted.

To remedy the company's illegal conduct, the NLRB ordered make-whole relief, known as the *Thryv* remedy. Trader Joe's urges us to find this damages remedy unlawful, but we lack jurisdiction to determine the legality of the Board's issuance of the remedy at issue. The following paragraphs further detail the applicable rules of law, the Board's determination, and our reasoning for upholding the NLRB's decision as to Trader Joe's violations of the NLRA and our lack of authority to adjudicate the remedy issue.

A

We first analyze the Board's determination that Trader Joe's violated Section 8(a)(1) of the NLRA when it issued Groeschel a written warning following her protected conduct. Reviewing the Board's factual findings under substantial evidence review and affording legal conclusions de novo review, we find that the Board correctly determined that Trader Joe's violated Section 8(a)(1). Below, we briefly discuss the provisions of the NLRA at issue then evaluate the NLRB's application of the law, including its findings that Trader Joe's possessed animus toward Groeschel's protected conduct and that Trader Joe's unconvincingly argued that it would have issued Groeschel a written warning absent her protected activities.

1

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other *concerted activities* for the purpose of collective bargaining or other mutual aid or protection" as well as "the right to refrain from any or all of such activities . . . ." 29 U.S.C. § 157 (emphasis added). To ensure employees' Section 7 rights are not disturbed, Section 8(a)(1) considers it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [their Section 7] rights." *See id.* § 158(a)(1).

When an employer disciplines an employee for engaging in protected concerted activities, it violates Section 8(a)(1). *Reef Indus. v. NLRB*, 952 F.2d 830, 836-37 (5th Cir. 1991).

When the determination of the alleged Section 8(a)(1) violation depends on the employer's motivation for imposing disciplinary measures on an employee, as it does here, we utilize the NLRB's framework developed in *Wright Line*, 251 NLRB 1083 (1980). *See New Orleans Cold Storage & Warehouse Co. v. NLRB*, 201 F.3d 592, 600–01 (5th Cir. 2000) (citing *Wright Line*, 251 NLRB 1083 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir. 1981)); *see also NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401–04 (1983) (approving the *Wright Line* framework), *abrogated on other grounds*, *Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 114 (1994). Under the *Wright Line* framework, substantial evidence indicating the Board's determination that protected conduct was a "motivating factor" in the employer's action is sufficient. *Transp. Mgmt.*, 462 U.S. at 401-03. The employee's protected activity need not be "the sole motivating factor"; the protected conduct merely must be "a substantial or motivating factor." *Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358, 370 (5th Cir. 2017) (quoting *Transp. Mgmt.*, 462 U.S. at 401).

Circumstantial evidence can demonstrate that an employee's concerted activity was a motivating factor in an employer's adverse employment action. *Cordua Rests., Inc. v. NLRB*, 985 F.3d 415, 423 (5th Cir. 2021). Specifically, "the Board may infer a discriminatory motive where the evidence shows that: (1) the employee engaged in concerted activities protected by Section 7; (2) the employer knew of the employee's engagement in those activities; and (3) the employer harbored animus toward the employee's protected activities." *Id.*

19

A finding of unlawful motive is a question of fact that our court will "not lightly displace." *NLRB v. Brookwood Furniture, Div. of U.S. Indus.*, 701 F.2d 452, 464 (5th Cir. 1983). Provided that the Board "could reasonably infer an improper motivation," we will not overturn the Board's determination of unlawful motive even if the circumstances would support a "competing, perhaps even equal, inference of a legitimate basis for discipline." *NLRB v. McCullough Env't. Servs., Inc.*, 5 F.3d 923, 937 (5th Cir. 1993) (quoting *Brookwood Furniture*, 701 F.2d at 467).

When an ALJ or the Board finds that animus toward an employee's protected concerted activities was a motivating factor in an employer's decision to discipline an employee, an employer may obviate a determination that it violated Section 8(a)(1) only by demonstrating that it would have taken the same disciplinary measures regardless of the employee's protected conduct. *Transp. Mgmt.*, 462 U.S. at 401–02; *NLRB v. Delta Gas, Inc.*, 840 F.2d 309, 313 (5th Cir. 1988). The Board evaluates this affirmative defense objectively, not subjectively; that is, the employer must prove that it *would have* taken the same adverse action, not merely that it *could have*. *Transp. Mgmt.*, 462 U.S. at 400. The employer has the burden of proving this affirmative defense.

## 2

Trader Joe's asks us to overturn the NLRB's determination that its issuing Groeschel a written warning violated Section 8(a)(1) of the Act. Trader Joe's contends that we should reverse the Board's finding that the company held animus toward Groeschel's protected conduct and failed to prove its affirmative defense that it would have fired Groeschel regardless. Trader Joe's does not contest the Board's finding that Groeschel's advocacy constituted protected concerted activity undertaken for "common aid or mutual protection" protected under Section 7. Trader Joe's, likewise, does

not dispute the Board's determination that the company was aware of such activity. *Remington Lodging & Hosp., L.L.C. v. NLRB*, 847 F.3d 180, 186 n.24 (5th Cir. 2017) (challenges not raised in a petitioner's opening brief are waived). The ensuing analysis explains that substantial evidence supports the Board's finding of animus and rejection of the company's affirmative defense.

Substantial evidence indicates that Trader Joe's animus toward Groeschel's protected activity—advocating for the health and safety of her fellow employees—was a motivating factor in the company's decision to issue her a written warning in October 2021. The specificity of Trader Joe's Dayforce entries involving Groeschel's health- and safety-related commentary and the involvement of upper-level management in addressing a customer complaint regarding Groeschel demonstrate a departure from standard practice that belies animus toward her protected conduct. Standard practice showed that Trader Joe's issued written warnings based on an employee's repeated, contemporaneous infractions, and most of the temporally proximate infractions logged under Groeschel's file were related to her protected activity. The Board, therefore, reasonably concluded that Groeschel's Section 8(a)(1)-protected conduct contributed to Trader Joe's choice to issue her a written warning.

Trader Joe's Regional Vice President Hancock assigned Manager Fuller to investigate an "unusual"[9] customer complaint alleging that an employee later identified as Groeschel had spoken disrespectfully to a

---

[9] The ALJ observed that the complaint, which involved a disgruntled potential employee's alleged observation of a dispute between Groeschel and management, "was unusual in that the customer was upset with Respondent for not hiring [them] after multiple attempts and with Groeschel for not appreciating her job more. It was also unusual in that it came to Hancock's attention and was not made directly to the store."

manager.  Although unrelated to the complaint being investigated, Fuller reported to VP Hancock the past and ongoing safety concerns Groeschel had raised on behalf of her fellow employees and indicated that he had asked Groeschel to consider whether she was a "good fit" for Trader Joe's after her objections to the delayed wellness checks.  The Board reasonably understood this unrelated and unprompted commentary to convey an apparent frustration with Groeschel's protected conduct.  *See NLRB v. Taylor Mach. Prods., Inc.*, 136 F.3d 507, 517 (6th Cir. 1998) (finding evidence of unlawful motivation where employer questioned employee's loyalty and "fit" after protected activity).

The record indicates that Groeschel's protected activity influenced Hancock's decision to further investigate Groeschel's conduct, despite Trader Joe's suggestion otherwise.  Following Fuller's disparaging report, Hancock chose to personally involve herself in employee discipline, a practice that was not typical[10] of vice presidents like Hancock, by personally reviewing Groeschel's Dayforce file.[11]  Hancock even expressed frustration with Groeschel's advocacy related to the company's pandemic pay policy, accusing Groeschel of "turn[ing] a positive into a negative."  This direct

---

[10] Although the record supports Trader Joe's argument that Hancock reviews Dayforce entries "fairly often" when requested by a store manager as part of "an investigation or a situation," here, there is no evidence that Fuller asked Hancock to review Groeschel's Dayforce file.

[11] Trader Joe's suggests that the Dayforce entries cannot demonstrate Hancock's animus because she did not write them; however, Hancock's reliance on the entries, not the identity of the authors, is relevant here. *Cordua Rests.*, 985 F.3d at 423 ("The Board may rely on circumstantial evidence to infer that an employee's protected activity was a motivating factor" in the employer's disciplinary decision.); *Vasquez v. Express Ambulance Serv., Inc.*, 835 F.3d 267, 274–75 (2d Cir. 2016); *NLRB v. Neuhoff Bros., Packers, Inc.*, 375 F.2d 372, 375 (5th Cir. 1967).

involvement by upper-level management constituted a departure from the company's typical disciplinary procedure.

The record further shows that Fuller had previously reported to Hancock Groeschel's advocacy on numerous occasions and in each report specifically identified Groeschel's involvement while omitting names of other employees who raised safety concerns. Trader Joe's argues that its reporting tactics here mirror its typical procedure, but Trader Joe's rarely mentioned employees by name in its reports to Fuller. This abrogation of standard procedure likewise evidences animus toward Groeschel's protected activity.

Although the Board correctly determined that the company typically only issued written warnings following "repeated infractions occur[ing] in a short time," Trader Joe's, nevertheless, issued Groeschel a written warning without appropriately establishing such a pattern. For example, Trader Joe's had issued written warnings to employees who incurred at least four attendance violations in a single month, an employee who received at least four customer complaints within four months, and an employee who, within a three-month period, answered a cell phone call at the register and twice failed to place all bagged items into customer carts. All of these written warnings were prompted by multiple incidents of temporally connected misconduct that demonstrated a patten of behavior warranting discipline. Hancock determined from her somewhat unusual review of Groeschel's Dayforce file that Groeschel had displayed "a pattern of behavior" that "felt like it had now risen to something beyond a verbal redirection conversation."

Turning to Groeschel's record, Groeschel's Dayforce file showed two older infractions: the February 2017 incident in which Groeschel failed to accommodate a customer's request for a faster cashier and the September 2020 incident in which she confronted a maskless customer. Hancock could

not have reasonably believed that those two outdated incidents established a "pattern" because written warnings usually followed "repeated infractions occur[ing] in a short time." Five other incidents remain: the September 2021 incident in which Groeschel called coworker Loosier a "selfish b*tch," the October 2021 incident in which Groeschel remarked "just fire me" to supervisor Forozan, and the three October 2021 incidents regarding Groeschel's protected activity (*i.e.*, Groeschel's concern about customers congregating at the cash register, choice to switch tasks to avoid serving a maskless customer, and frustration with the delayed wellness checks). Thus, three of the five contemporaneous discipline-related entries in Groeschel's Dayforce file were connected to her protected activity. The Board pointed out that the October 2021 incidents represented a "significant departure in recording details" because managers had never before recorded Groeschel's COVID-19 safety complaints in Dayforce. Substantial evidence supports the Board's determination that Trader Joe's departure from prior procedure indicates animus toward Groeschel's protected conduct. The Board, therefore, reasonably determined that the three October 2021 reports contributed to Hancock's conclusion that Groeschel displayed a "pattern" of conduct meriting a written warning.

Accordingly, substantial evidence supports the Board's determination that Groeschel's protected activity was a motivating factor in Trader Joe's decision to issue Groeschel a written warning. *Cordua Rests.*, 985 F.3d at 423 (emphasizing that protected activity "need not be the sole motivating factor so long as the activity was a substantial or motivating factor" (quoting *Adams & Assocs.*, 871 F.3d at 370) (citation modified)).

Trader Joe's cannot avoid the Board's determination by highlighting its prior accommodation of Groeschel's safety-related requests. Trader Joe's initial attention to some of Groeschel's complaints does not contradict a finding that the company later portrayed animus toward Groeschel's

protected activity. The record indicates that, as the Board correctly observed, Trader Joe's neutrality developed into hostility as Groeschel continued to express health and safety complaints. The Act does not contain a loophole allowing for adverse action against so-called "squeaky wheels," and substantial evidence supports the Board's conclusion that Trader Joe's animus toward Groeschel's protected activity was a "motivating factor" in its decision to issue her a written warning. *McCullough Env't. Servs.*, 5 F.3d at 937 (holding that we will not disturb the Board's finding of a discriminatory motive even if the record would allow a "competing, perhaps even equal, inference of a legitimate basis for discipline," as long as the Board "could reasonably infer an improper motivation" (quoting *Brookwood Furniture*, 701 F.2d at 467)).

3

To undercut the determination that the company violated Section 8(a)(1), Trader Joe's urges us to find that the Board erred in rejecting its proposed affirmative defense that it would have issued Groeschel a written warning for reasons other than her participation in protected concerted activity. Trader Joe's uses comparator evidence in a failed attempt to demonstrate that it, nevertheless, would have issued Groeschel a written warning for remarking "just fire me." Because we find the circumstances necessitating the issuance of a written warning to the comparator incongruous to those prompting Groeschel's written warning, Trader Joe's defense is unsuccessful.

An employer may plead, as an affirmative defense, that it would have taken adverse action against an employee separately from its Section 7-protected conduct. An employer may rely on evidence that a similarly situated employee who was not involved in protected activity was disciplined in a similar manner to the employee who was involved in

protected activity, and the employer bears the burden of proving the comparator's conduct was genuinely comparable to the disciplined employee's conduct. *Tomatek, Inc.*, 333 NLRB 1350, 1364 (2001); *Fluor Daniel, Inc.*, 304 NLRB 970, 970–71 (1991), *enforced*, 980 F.2d 744 (11th Cir. 1992); *see also Remington Lodging & Hosp.*, 847 F.3d at 186 (emphasizing that comparator evidence must demonstrate truly analogous situations).

The Board accurately concluded that written warnings were rarely issued at this Trader Joe's location during the timeframe at issue.[12] Accordingly, the company points to only one other instance in which it provided a written warning to an employee after a singular infraction.[13] There, employee Hugh Bell's "yelling in an aggressive manner" at a coworker as he rang up a customer's groceries prompted issuance of a written warning. Trader Joe's contends that because it issued a written warning to Bell, it would have issued a written warning to Groeschel, irrespective of her concerted activity.

The Board correctly determined that Trader Joe's comparator was not similarly situated. *Remington Lodging & Hosp.*, 847 F.3d at 186 (5th Cir. 2017). First, Groeschel's misconduct involved a one-on-one dispute

---

[12] Trader Joe's immediately discharged employees involved in serious misconduct, such as theft or sexual harassment.

[13] Trader Joe's alleged other grounds justifying issuance of a written warning in its argument before the agency (*i.e.*, Groeschel's 2017 failure to acquiesce to a customer's request for another cashier, her 2020 treatment of a maskless customer, and her 2021 comment to coworker Loosier that she is a "selfish b*tch"), but we do not consider these potential justifications on appeal because the company did not raise any of these circumstances in its opening brief. *Remington Lodging & Hosp.*, 847 F.3d at 186 n.24 (challenges not raised in a petitioner's opening brief are waived). Trader Joe's seems to revive the argument about Loosier in its reply brief; however, the argument is waived. *See Dixon v. Toyota Motor Credit Corp.*, 794 F.3d 507, 508 (5th Cir. 2015) ("Arguments raised for the first time in a reply brief are waived.").

between coworkers away from the registers while Bell's misconduct occurred at the check-out line while serving Trader Joe's customers. On appeal, Trader Joe's attempts to convince us that Groeschel's comment occurred at the registers. However, the ALJ made a specific factual finding to the contrary, and Trader Joe's did not file any exception to that finding. We cannot review on appeal an issue that Trader Joe's failed to timely challenge. *See* 29 U.S.C. § 160(e). Regardless, substantial evidence supports the Board's finding.

Further, the tone of the employees' statements differed. Bell aggressively yelled at his coworker. Although Groeschel may have spoken loudly, the record reflects that her comment was uttered at her usual volume. Finally, Trader Joe's argues that the Board overemphasized minor distinctions and that any disparity between comparators must be "blatant" to erode its defense, but the jurisprudence, to the contrary, stresses that comparator evidence must be truly analogous. *Remington Lodging & Hosp.*, 847 F.3d at 186. Trader Joe's has not established the requisite level of symmetry.

Because the Board reasonably concluded that Trader Joe's failed to demonstrate sufficient congruity between Groeschel's and Bell's misconduct, we need not accept the company's contention that it would have issued Groeschel a written warning regardless of her protected activity. Substantial evidence review prohibits us from "simply re-weigh[ing] the evidence and displac[ing] those findings with which we disagree." *Remington Lodging & Hosp.*, 847 F.3d at 186. The company's affirmative defense to the finding that it violated Section 8(a)(1) thus fails.

4

We, therefore, affirm the NLRB's ruling that Trader Joe's violated Section 8(a)(1) when it issued Groeschel a written warning.

No. 24-60367

B

We next discuss whether there is substantial evidence to support the NLRB's ruling that Trader Joe's violated Sections 8(a)(4) and (1) of the Act when it suspended Groeschel and later terminated her employment. The following paragraphs demonstrate that the NLRB's ruling was supported by substantial evidence.

1

Section 8(a)(4) provides that "[i]t shall be an unfair labor practice for an employer to discharge or otherwise discriminate against an employee because [s]he has filed charges [with] or given testimony" to the NLRB. 29 U.S.C. § 158(4). Because such discrimination interferes with Section 7 rights, it automatically violates Section 8(a)(1). *Stern Produce Co., Inc. v. NLRB*, 97 F.4th 1, 11 n.3 (D.C. Cir. 2024) (holding that a violation of Section 8(a)(4) "automatically results in a derivative violation of Section 8(a)(1)").

Courts utilize the *Wright Line* framework to assess whether an employer unlawfully terminated or otherwise discriminated against an employee for filing a complaint with the Board. *Delta Gas*, 840 F.2d at 313. The legal principles discussed in Section III-A-1, *supra*, therefore, apply here as well.

2

Substantial evidence shows that Trader Joe's possessed unlawful animus toward Groeschel's protected activity when it suspended then discharged Groeschel. Trader Joe's does not dispute the ALJ's determination that Groeschel engaged in protected activity, including advocating for the health and safety of herself and her coworkers and filing an unfair labor practice charge against the company and discussing it with her

28

coworkers. The company likewise does not dispute that it was aware of such protected activity. Trader Joe's animus toward Groeschel's protected activity is evidenced by the timing of the disciplinary action and the failure to investigate allegations of Groeschel's misconduct. Trader Joe's arguments that discipline was prompted by Groeschel's coworkers' complaints and evidence from its climate survey are negated by the company's failure to investigate the misconduct alleged in the reports and survey, which was launched in response to Groeschel's protected activity. The following paragraphs demonstrate that (i) unlawful motive is demonstrated by the temporal proximity between Trader Joe's disciplinary action and Groeschel's protected conduct; (ii) the employee reports on which Trader Joe's allegedly bases its suspension and discharge of Groeschel arose out of protected conduct; and (iii) the faulty investigation of the conduct revealed in the employee reports evidences unlawful animus.

*i. Temporal Proximity.* Unlawful motive may be evidenced by temporal proximity between an employee's Section 7-protected conduct and an employer's adverse action. *See NLRB v. ADCO Elec., Inc.*, 6 F.3d 1110, 1118 n.6 (5th Cir. 1993); *see also Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 465 (5th Cir. 2001) (noting that timing is among the most persuasive forms of circumstantial evidence of animus). Here, Trader Joe's suspended Groeschel approximately one month after she filed her first claim with the NLRB and discharged her roughly ten days after she filed her second claim with the NLRB. Trader Joe's ineffectively eschews the correlation between the timing of Groeschel's protected activity and the company's disciplinary actions.

As discussed in Section I, *supra*, Trader Joe's suspended Groeschel on March 29, 2022, shortly after Groeschel filed her initial unfair labor practice charge on February 23 and subsequently asked her coworkers to interview with NLRB investigators. The day after she was suspended,

Groeschel filed a second unfair labor practice charge. Trader Joe's responded by discharging Groeschel ten days later. The timing of Trader Joe's disciplinary action strongly supports the Board's finding of an unlawful motive. *See Remington Lodging & Hosp.*, 847 F.3d at 184 (drawing inference of animus where action followed protected activity by 28 days); *Elec. Data Sys. Corp. v. NLRB*, 985 F.2d 801, 805 (5th Cir. 1993) (same, within one month).

The company's justification for the close temporal proximity fails to convince us that Groeschel's NLRB claims did not influence the company's decision to suspend and later terminate Groeschel. Trader Joe's alleges that the timing of the disciplinary actions was prompted by the timing of Groeschel's coworkers' complaints; however, as further explained in the following paragraphs, Groeschel's protected activity spurred those complaints and Trader Joe's failed to investigate the allegations cast in the complaints.

### ii. Tainted Employee Reports.

Trader Joe's alleges that the temporal proximity issue is not conclusive because the timing of its disciplinary action is attributed to the employee reports that contained negative allegations about Groeschel. The employee reports, which either detailed allegations of prior conduct tolerated by Trader Joe's or new conduct rooted in Groeschel's protected activity. In both categories, substantial evidence supports the Board's determination that Trader Joe's could not rely on the information revealed in the employee reports.

In March of 2022, VP Hancock received a swath of employee complaints involving Groeschel following her requests that her coworkers meet with NLRB investigators. Hancock could not reasonably have failed to connect Groeschel's protected conduct with the influx of reports,

especially considering that many of the reports highlighted employees' concerns that Groeschel's NLRB charges might impact Fuller. As the ALJ aptly noted, "[m]ost of these employees had worked with Groeschel for years and never made any similar complaints until she shared that she filed the charge, which they believed could negatively affect Fuller."

Further, the content of the reports revolved around allegations of past misconduct tolerated by Trader Joe's or of recent misconduct which arose from Groeschel's protected activity, neither of which form an appropriate basis to discipline Groeschel. Trader Joe's argues on appeal that Hancock could disregard any improper motive in the employee reports because they revealed allegations that were serious on their face. But the supposedly "serious allegations" involved prior incidents that Trader Joe's either had acquiesced to or addressed. *See Conley v. NLRB*, 520 F.3d 629, 643–44 (6th Cir. 2008) (animus shown where employee terminated for previously tolerated conduct). Allegations of recent misconduct were rooted in Groeschel's protected activity.

Instances of recent, or recently reported, misconduct include coworker Garcia's discomfort with Groeschel's 401(k) concerns and coworker Biddle's accusation of a near-collision with the pallet jack, both of which allegations were born of Groeschel's protected conduct. First, Garcia's complaint centered around Groeschel's inquiry regarding a lawsuit an employee filed concerning Trader Joe's 401(k) plan. Despite Trader Joe's indication to the contrary, the NLRA protects Groeschel's conduct, even though her inquiry was directed to a single coworker and involved a request for information. The Board aptly noted that conduct which appears to be individual may nevertheless be considered concerted activity for the purposes of Section 8(a)(4) if the activity is a "logical outgrowth" of prior protected activity. *See Blue Circle Cement Co. v. NLRB*, 41 F.3d 203, 207–09 (5th Cir. 1994) (enforcing Board's application of logical-outgrowth test).

Trader Joe's contends, conversely, that an employee's commentary is part of her concerted activity only if it "look[s] toward group action." Trader Joe's misunderstands the law. Fifth Circuit precedent clearly determines that a statement "involv[ing] only a speaker and a listener" can be concerted not only where it had "the object of initiating or inducing or preparing for group action," but also where it had "some relation to [earlier] group action in the interest of the employees." *Mobil Expl. & Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 238–39, 241 (5th Cir. 1999). Here, Groeschel approached Garcia about the 401(k) plan because she believed that the issue impacted the financial incentives offered to her and her fellow employees.

Similarly, reports regarding the other allegation of recent misconduct—that Groeschel had nearly hit former coworker Yambao with a pallet jack—arose from her protected conduct. The Board determined that coworker Biddle, who reported the alleged incident, expressly stated that Groeschel's NLRB charges prompted her outreach. While Assistant Manager Jelinek exerted cursory-level diligence in inquiring with another employee about the allegations, Trader Joe's made no effort to discuss the incident with the employee allegedly involved, Yambao. Trader Joe's excused its failure to follow up with Yambao by stating that she no longer worked at that franchise, but this excuse falls flat because Yambao works at a Trader Joe's store located in California, where Hancock or other management officials easily could have contacted her.

Because the employee complaints on which Trader Joe's allegedly based its decision to suspend and discharge Groeschel were reported in response to her protected conduct, the company cannot rely on them as a lawful basis for its disciplinary actions.

*iii. Flawed Investigation.* Further, Trader Joe's fails to convince us that the conduct revealed in the employee reports inspired its disciplinary action

because the company did not investigate any of the allegations of misconduct. Substantial evidence, thus, supports the Board's conclusion that Trader Joe's held discriminatory animus.

The Fifth Circuit has found that an employer's "faulty investigation" into alleged misconduct "may constitute 'significant' evidence of unlawful motive." *Cordua Rests.*, 985 F.3d at 427 (quoting *NLRB v. Esco Elevators, Inc.*, 736 F.2d 295, 299 n.5 (5th Cir. 1984)). Further, when an investigation is not "tailored to its purpose" and therefore fails to "reflect a genuine intent" to uncover evidence supporting specific allegations of employee misconduct, it is considered faulty. *Id.*[14]

Here, we agree with the Board's determination that the company's investigation was faulty because the company failed to pursue the allegations against Groeschel. Rather than following up with witnesses and alleged victims of Groeschel's misconduct, Hancock launched a so-called "climate survey," which the Board determined was not designed to elicit responses detailing Groeschel's alleged misconduct. Some of Hancock's open-ended questions did produce responses related to Groeschel; however, Hancock did not pursue the evidence uncovered through the survey. For example, the survey revealed that employees may have overheard the altercation regarding the 401(k), but Hancock did not discuss the incident with those employees. Moreover, Hancock did not contact Yambao about the alleged pallet jack incident and likewise did not question management's failure to do the same.

The record further reveals that the climate survey was not intended to attract general employee feedback because Hancock failed to pursue the

---

[14] Although a "one-sided" investigation may also be considered faulty, *id.*, the company's allowing Groeschel to respond does not foreclose a determination that the investigation is faulty, as the company contends.

numerous workplace disputes reported through the survey. Rather, Hancock issued a single unrelated incident report due to "concerns for legal ramifications" but otherwise tailored her focus to incidents involving Groeschel. The NLRB reasonably found that the climate survey was a "fishing expedition" to uncover misconduct by Groeschel.

3

Trader Joe's argues that the Board erred in finding that the company did not meet its burden in proving that it would have suspended and discharged Groeschel even without her protected conduct. As discussed, *supra*, in relation to Groeschel's written warning, *Wright Line* requires that Trader Joe's convince us that it *would have*—not merely that it *could have*— taken the same disciplinary measures absent Groeschel's protected conduct. Trader Joe's fails to so convince us.

First, as to suspension, Trader Joe's contends that "the Board disregarded unrebutted evidence [that] Groeschel's suspension pending investigation was consistent with Trader Joe's normal practice." In support, Trader Joe's cites Hancock's testimony that "it is common" for an investigation to result in suspension. The Board did not "disregard" this evidence; in fact, the Board explicitly rejected this statement, stating "[s]uch unspecific, conclusory testimony is insufficient to establish that it was common for the Respondent to suspend employees to investigate allegations of misconduct similar to Groeschel's." Trader Joe's has offered no other evidence to demonstrate that it would have suspended Groeschel absent her protected conduct.

Second, as to termination of Groeschel's employment, Trader Joe's insists that Groeschel's 401(k)-related conversation with Garcia was not protected conduct and, therefore, offered appropriate grounds to terminate Groeschel. As discussed *supra*, this conversation was sufficiently related to

Groeschel's protected conduct and is therefore not a lawful basis for her termination. *Blue Circle Cement Co.*, 41 F.3d at 207 (holding that conduct which is a "logical outgrowth" of protected activity is likewise protected).

Third, also as to termination, Trader Joe's suggests that Groeschel's alleged pallet-jack incident is sufficient to warrant discharging her. But the company's discovery of the alleged mishap spawned from Groeschel's protected conduct because employees notified the company of this incident through the tainted employee reports. Further undermining Trader Joe's argument, Hancock's failure to sufficiently investigate the incident contributes to a finding of animus for the reasons discussed above.

Regardless of whether Trader Joe's *could have* suspended and terminated Groeschel for reasons beyond her protected conduct, Trader Joe's needed to prove that it *would have* done so. Substantial evidence indicates that Trader Joe's failed to meet its burden. *Trans. Mgmt.*, 462 U.S. at 400.

4

Accordingly, we affirm the NLRB's ruling that Trader Joe's violated Sections 8(a)(4) and (1) when it suspended and discharged Groeschel.

C

The Board's "modified" remedy requires Trader Joe's to provide "make-whole relief" to Groeschel for its unlawful action against her.[15]

---

[15] The NLRB upheld the ALJ's award of "all direct or foreseeable pecuniary harms" and "modified" the award to specifically include "reasonable search-for-work and employment expenses, if any, regardless of whether these expenses exceed interim earnings" pursuant to the NLRB's *Thryv* remedy, which was first espoused in the Board's decision in *Thryv, Inc.*, 372 NLRB No. 22, slip op. at 1 (Dec. 13, 2022) (clarifying that "make-whole relief" includes compensation "for all direct or foreseeable pecuniary

No. 24-60367

Trader Joe's asks that we vacate the portion of the Board's ruling awarding Groeschel "all direct or foreseeable pecuniary harms" because, Trader Joe's contends, the Act does not authorize such "compensatory damages."[16] Because Trader Joe's failed to raise its opposition to the ALJ's award before the Board, we lack jurisdiction to address the merits of this issue on appeal.

1

The Board must be afforded adequate "notice and . . . opportunity to confront objections to its rulings . . . ." *Indep. Elec. Contractors of Hous., Inc. v. NLRB*, 720 F.3d 543, 551 (5th Cir. 2013). Specifically, Section 10(e) of the NLRA prohibits courts from considering any "objection that has not been urged before the Board, its member, agent, or agency . . . unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *see* 29 C.F.R. § 102.46(f) ("Matters not included in exceptions or cross-exceptions may not thereafter be urged before the Board, or in any further proceeding."). The Fifth Circuit considers this mandatory, jurisdictional provision to be a "'bedrock principle' that 'courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the *appropriate time*.'" *Int'l Bhd. of Elec. Workers v. NLRB*, 973 F.3d 451, 460 (5th Cir. 2020) (emphasis in original) (quoting *NLRB v. Saint-Gobain Abrasives, Inc.*, 426 F.3d 455, 458 (1st Cir. 2005)); *accord Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982).

---

harms" to affected employees), *order vacated in part on other grounds*, 102 F.4th 727 (5th Cir. 2024) (vacating the Board's order on the basis that it lacked substantial evidence for the relevant unfair labor practice finding, not reaching the Board's remedy).

[16] Trader Joe's challenges no other portion of the remedy. *Remington Lodging & Hosp.*, 847 F.3d 180, 186 n.24 (challenges not raised in a petitioner's opening brief are waived).

No. 24-60367

The Fifth Circuit has repeatedly applied the jurisdiction-stripping provision of Section 10(e). [17] *See, e.g., Hallmark Phoenix 3, L.L.C. v. NLRB*, 820 F.3d 696, 709, 712–13 (5th Cir. 2016) (holding that an employer waived a variety of its arguments opposing an ALJ's findings because it failed to preserve them in written exceptions to the Board, even though the employer addressed each waived argument before the ALJ via record evidence, testimony, and its answer to the Board's complaint); *NLRB v. Mooney Aircraft, Inc.*, 310 F.2d 565, 566 (5th Cir. 1962) (holding that "[t]he

---

[17] The Supreme Court long ago decided that Section 10(e) is a jurisdictional bar. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982) ("[T]he Court of Appeals was without jurisdiction to consider that question. The issue was not raised during the proceedings before the Board . . . . Thus, judicial review is barred by § 10(e) of the Act . . . ."). Subsequent Fifth Circuit caselaw has held the same. In *NLRB v. Hous. Bldg. Servs., Inc.*, this court explained that, "absent extraordinary circumstances, the failure to raise an argument before the Board renders us without jurisdiction to consider that argument." 128 F.3d 860, 863 (5th Cir. 1997); *see also Gulf States Mfg. Inc. v. NLRB*, 704 F.2d 1390, 1397 (5th Cir. 1983) ("We therefore find no extraordinary circumstance to excuse the company's failure to raise the . . . issue before the Board. We consequently have no jurisdiction to consider the issue." (citing *Woelke*, 456 U.S.)).

Although the dissenting opinion quotes a contrary case, *Lion Elastomers, L.L.C. v. NLRB*, 108 F.4th 252, 258 (5th Cir. 2024) (quoting *Indep. Elec. Contractors of Houston, Inc. v. NLRB*, 702 F.3d 543, 550 (5th Cir. 2013)), the rule of orderliness dictates that "the earlier precedent controls," *United States v. Walker*, 302 F.3d 322, 325 (5th Cir. 2002). Moreover, a panel is not bound by the rule of orderliness when our court's precedent conflicts with an earlier, uncited Supreme Court opinion. *See Gahagan v. U.S. Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) (Oldham, J.) (citing *Wilson v. Taylor*, 658 F.2d 1021, 1034–35 (5th Cir. Unit B 1981)); *see also United States v. Brune*, 991 F.3d 652, 664 (5th Cir. 2021) ("The rule of orderliness has little persuasive force when the prior panel decision at issue conflicts with a Supreme Court case to which the subsequent panel decision is faithful.") (citation modified). Thus, this panel is not bound to follow *Lion Elastomers*, which directly contradicts *Woelke* without citing it.

Nor does the authority quoted in *Lion Elastomers* compel a different conclusion. *Independent Electrical Contractors of Houston, Inc. v. NLRB* did not hold that Section 10(e) is non-jurisdictional. It merely speculated in dictum that "it would be difficult to hold this requirement as 'jurisdictional' in this court because the statute itself creates an exception." 720 F.3d at 550. *Woelke* resolves that question directly.

respondent's failure to comply with the regulations requiring the filing of written exceptions with the Board . . . entitle the petitioner to summary judgment," and finding "no extraordinary circumstances to excuse respondent from the necessity of complying with the regulations").

2

Trader Joe's concedes that it failed to raise the remedy issue before the Board; nevertheless, Trader Joe's urges us to find that it properly excepted the remedy when it simply listed among its exceptions that use of *Thryv* was improper "because [*Thryv*] was wrongly decided." The company's argument is foreclosed by the Supreme Court's holding that an exception stating a remedy was "contrary to law"—a similar assertion as the company's contention here—did not satisfy the Section 10(e) requirement. *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 350 (1953). Trader Joe's did not cite to any contrary holding that would support treating its "wrongly decided" statement as an exception sufficient to satisfy the requirements of Section 10(e). We, therefore, find that Trader Joe's did not raise its objection to the *Thryv* remedy as Section 10(e) requires.

3

Trader Joe's alternatively urges us to address the remedy issue because (1) it falls under the "extraordinary circumstances" exception of the Section 10(e) requirement and (2) the remedy is "obviously beyond the Board's authority," which grants us jurisdiction to adjudicate the issue. The company's alternative arguments likewise fail to convince us that we have jurisdiction to address the *Thryv* remedy.

*First*, extraordinary circumstances do not exist here. Trader Joe's argues that raising its objection before the Board would have been futile. Although futility fits within the "extraordinary circumstance" exception to Section 10(e)'s presentment requirement, *Indep. Elec. Contractors of Hous.*,

No. 24-60367

720 F.3d at 551, Fifth Circuit precedent regarding futility does not support a finding that an extraordinary circumstance faced Trader Joe's here. Our court has held that the recent "overruling of a previously controlling" doctrine constitutes an extraordinary circumstance. *NLRB v. Robin Am. Corp.*, 667 F.2d 1170, 1171 (5th Cir. 1982) (distinguishing the impact of a case's "overruling of a previously controlling [doctrine]" from "pronounc[ing] a new doctrine"). By contrast, our court also has held that no extraordinary circumstances exist when a party fails to make "legal arguments . . . available to it from the outset." *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 351 n.5 (5th Cir. 2013) (rejecting employer's invocation of recently decided Eighth Circuit case because, even though that decision had only been recently issued, it was "not binding" and, in any event, "all the legal arguments raised in that case were available to [the employer] from the outset"). Trader Joe's does not dispute that the legal arguments addressing the *Thryv* remedy were available when it filed its written exceptions. Under *D.R. Horton, Inc.*, we find that no extraordinary circumstance existed here.

*Second*, although appellate courts do "retain residual jurisdiction to consider a first-time challenge to a remedy on the ground that the remedy is obviously beyond the Board's authority," *NLRB v. Saint-Gobain Abrasives, Inc.*, 426 F.3d 455, 460 (1st Cir. 2005), the NLRB's imposition of the *Thryv* remedy does not fall into this jurisdictional exception. The circuits are split regarding application of the *Thryv* remedy;[18] therefore, the NLRB's decision

---

[18] *Compare Macy's Inc. v. NLRB*, 127 F.4th 58 (9th Cir. 2025) (holding in favor of NLRB), *with NLRB v. Starbucks Corp.*, 125 F.4th 78 (3d Cir. 2024) (holding in favor of employer). We acknowledge that our court recently joined the Third Circuit in holding that the Board lacks statutory authority to order its *Thryv* remedy. *See Hiran Mgmt., Inc. v. NLRB*, ___ F.4th ___, 2025 WL 3041862 (5th Cir. Oct. 31, 2025). But *Hiran* neither suggests that the Board's *Thryv* remedy is "obviously beyond the Board's authority" nor diminishes the continued existence of a circuit split.

39

to award it here is not "obviously beyond the Board's authority." *Saint-Gobain Abrasives, Inc.*, 426 F.3d at 460. Accordingly, we cannot exercise "residual jurisdiction to consider" the company's challenge to the *Thryv* remedy. *Id*.

We, consequently, lack jurisdiction to consider the company's challenge to the *Thryv* remedy.

IV

For the foregoing reasons, we DENY Trader Joe's Company's petition for review and GRANT the NLRB's cross-application to enforce its order.

No. 24-60367

Andrew S. Oldham, *Circuit Judge*, dissenting:

Jill Groeschel was the sort of employee who haunts the nightmares of HR managers everywhere. She berated co-workers and customers with profanity-laden screeds, threatened the lives of her co-workers with heavy equipment, and was the focus of at least a dozen employee complaints. Her conduct obviously violated Trader Joe's at-will employment policy. Yet the National Labor Relations Board held that Groeschel's firing was unlawful— because this California-based, famously-progressive grocery chain harbored some secret animus against people who took COVID seriously? Astonishingly, the majority agrees.

I respectfully dissent.

I

There are many problems with majority's approach. Perhaps the first is the standard of review.

Start with the two NLRA provisions that the Board found Trader Joe's transgressed: sections 8(a)(1) and 8(a)(4). The first mandates that an employer not "interfere with, restrain, or coerce employees in the exercise of" protected activity. 29 U.S.C. § 158(a)(1). The second declares that "[i]t shall be an unfair labor practice for an employer . . . to discharge or otherwise discriminate against an employee because he has filed charges." *Id.* § 158(a)(4).

To review the Board's determination that an employer violated these statutory proscriptions, this court does *not* rely on the text of the NLRA. Instead, we have adopted the Board-fabricated "*Wright Line* test" to make this determination. *See NLRB v. Ryder/P.I.E. Nationwide, Inc.*, 810 F.2d 502, 507 (5th Cir. 1987) (citing *Wright Line, A Div. of Wright Line, Inc.*, 251 NLRB 1083 (1980)). The *Wright Line* test has two steps: First, the Board must show

that the employee's protected activity was a "substantial motivating factor" in the adverse employment decision. *New Orleans Cold Storage & Warehouse Co. v. NLRB*, 201 F.3d 592, 600–01 (5th Cir. 2000). If the Board successfully makes that showing, then the burden shifts to the employer to prove that it would have taken the adverse employment action absent the employee's protected activity. *Id.* at 601.

The *Wright Line* test is flawed to its core. In Part (A), I address the origins of this test. Parts (B) and (C) then explain *Wright Line*'s errors.

A

The *Wright Line* test is an undertheorized byproduct of *Chevron* deference. *See Wright Line, A Div. of Wright Line, Inc.*, 251 NLRB 1083 (1980). Before this case, circuit courts had adopted a variety of approaches to assess employer liability in so-called mixed motive cases—disputes in which employers could have harbored both lawful and unlawful motives for adverse action. *Id.* at 1085–87. Given this "intolerable confusion," the Board developed a new test. *Id.* at 1089.

In so doing, the Board drew on the Supreme Court's then-recent decision in *Mount Healthy*—a First Amendment retaliation case. *See id.* at 1083 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). In *Mount Healthy*, a teacher sued his former employer following his termination, alleging that First Amendment-protected conduct motivated his firing. 429 U.S. at 276. The Court recognized that even if the teacher's protected conduct played a part in his termination, the teacher could have been fired for legitimate reasons. *Id.* at 285. So, the Court established a two-part test to "distinguish[] between a result caused by a constitutional violation and one not so caused." *Id.* at 286. The test required the teacher first to show that his constitutionally protected conduct was a "substantial factor" or "motivating factor" in his discharge. *Id.* at 287. Then, the Court

shifted the burden to the employer to show that it would have fired the teacher regardless of his constitutionally protected activity. *Ibid.*

The Board's *Wright Line* decision transposed this First Amendment test into the context of determining an employer's liability under the NLRA. The employee would show his protected conduct motivated the adverse action, then the employer could show that it would have fired the employee anyway. *Wright Line*, 251 NLRB at 1089. The Board found the *Mount Healthy* test useful because it "accommodate[d] the legitimate competing interests inherent in dual motivation cases, while at the same time serving to effectuate the policies and objectives of" the NLRA. *Id.* at 1088–89. Notably, the Board did not try to harmonize the *Mount Healthy* test with the NLRA's text. Nor did the Board discuss potential differences between causation in the constitutional sense and causation in the realm of labor law.

Neither has the Supreme Court. In *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983), the Court used *Chevron* deference to uphold the *Wright Line* test. To the Court, the Board's interpretation of the NLRA was "at least permissible" and "entitled to deference." *Id.* at 403 (quotation omitted). The Court thought it made sense to place some burden on the employer because "[t]he employer is a wrongdoer" so "[i]t is fair that he bear the risk" of liability. *Ibid.* As to the Board's use of the *Mount Healthy* framework, all the Court said was that the analogy "was a fair one." *Ibid.*

The layers of non-analysis and logical leaps under the *Wright Line* test are evident. It's rooted in meaningless terms (like "substantial factor"), rooted in analogy (to First Amendment retaliation), and tolerable only under a deference regime (*Chevron*) that the Supreme Court discarded.

B

Given *Wright Line*'s theoretical problems, it's perhaps unsurprising that both steps of the doctrine are deeply problematic. Start with the first

step: whether the employee's protected activity was a "substantial motivating factor" in the adverse employment action. On this step, there's both (1) good news and (2) bad news.

1

The good news: *Wright Line* step one places the burden on the Board to show the employee's protected conduct was a "substantial motivating factor" in the adverse employment action. That allocation is proper for a host of reasons. First, if we zoom out, requiring the Board to bear the burden is consistent with the judiciary's supervisory role over administrative agencies. Second, assigning the burden to the Board makes sense under the NLRA itself, which mandates that the Board prove an employer engaged in an unlawful employment practice.

That the burden rests with the Board is consonant with the judiciary's role in checking administrative agencies. For better or worse, administrative agencies have the power to coerce private parties. So, nothing they do should escape scrutiny. A reviewing court cannot "abdicate the conventional judicial function" through blind deference to an administrative agency; the courts are the only thing that stand between unelected bureaucrats and the livelihoods and property of American citizens. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490 (1951). Congress thus has imposed on courts a vital "responsibility" for ensuring that administrative agencies stay within their lane. *Ibid.* Placing the burden on the agency to justify its enforcement action is consistent with courts' obligation to protect Americans from the whim of unelected bureaucrats.

What's more, Congress has evinced a unique distrust of the Board. Perhaps alone among federal agencies, the Board cannot enforce its own orders. Congress has mandated that "[t]he Board shall have the power to petition" the proper court of appeals "for the enforcement of [its] order."

44

29 U.S.C. § 160(e). This was a deliberate choice: When Congress created the NLRB and the FTC in the 1930s, Congress gave neither agency enforcement power. *Dish Network Corp. v. NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020). Following the formalization of agency proceedings in the APA, Congress opted to give the FTC enforcement authority. *Ibid.* But Congress did not give the Board such power. *Ibid.*; *see also NLRB v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887, 892–93 (7th Cir. 1990). As a result, "[t]he Board is given no power of enforcement. Compliance is not obligatory until the court, on petition of the Board or any party aggrieved, shall have entered a decree enforcing the order." *In re NLRB*, 304 U.S. 486, 495 (1938). In other words, the Board is completely powerless to lift a finger until it receives approval from a federal court. If it wants its action upheld, it must convince the court to do so. Thus, it makes sense that the Board—not the targets of its actions—should be required to carry the burden of proof.

2

Now, to the bad news: *Wright Line*'s first step is tantamount to no review at all. This is for three reasons. First, (a) the Board litigates the question of what motivated the adverse action on its home field, before its own umpires, and under a set of rules it established. As a result, the Board comes to federal court with a 20-run advantage before the first inning even starts. Second, (b) this court then rewards the Board with extreme deference to its finding of substantial motivation. And third, (c) the completely indeterminate nature of what constitutes a "substantial motivating factor" only compounds this court's lack of scrutiny.

a

Start with how the Board goes about making the "substantial motivating factor" finding. The "Board's work is widely acknowledged as politically charged." *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 778 &

n.96 (5th Cir. 2025) (collecting commentary). Indeed. An examination of the Board's internal process reveals just how heavily the odds are stacked against the employer.

Non-Neutral Administrative Law Judges

- Section 554 of the APA requires agencies to separate functions between their prosecutorial and adjudicative staff. *See* 5 U.S.C. § 554(d). But in many ways, that separation is illusory. First, despite this nominal separation, the Board's prosecuting attorney, the General Counsel, and the Board's ALJs still belong to the same entity. There is thus an "inherent conflict of interest" when an agency ALJ adjudicates a case with its parent agency on one side. *See* Richard E. Levy & Robert L. Glicksman, *Restoring ALJ Independence*, 105 Minn. L. Rev. 39, 42 (2020). Second, ALJs can't solely be neutral adjudicators. They are hired "agents of the executive whom the executive hires to enforce its rules, not simply the law." Philip Hamburger, Is Administrative Law Unlawful? 338 (2014). So even if § 554 creates some parchment barrier between the ALJ and the General Counsel, ALJs retain a "systemic interest[]" in supporting their employer—the Board. *Id.* at 235.

- ALJs are not neutral in their precommitments. Many ALJs join the government because of their personal devotion to an agency's agenda. *Id.* at 337. They are "psychologically attached" to the agency's exercise of power. *Id.* at 338. Such attachment precludes these employees from providing a neutral forum to adjudicate the lawfulness of the agency's action. *Ibid.*

- The ALJ-conflict problem is particularly acute with the Board. One study found that the majority of ALJ decisions were issued by former Board attorneys. R. Pepper Crutcher, Jr. et al., *Are the Credibility*

*Findings of National Labor Relations Board Administrative Law Judges Credible?*, 26 Fᴇᴅ. Sᴏᴄ. Rᴇᴠ. 45, 93 (2025). And none of the studied ALJs previously represented employers in Board proceedings. *Id.* at 48.

- Finally, the Board, "uniquely among major federal administrative agencies, has chosen to promulgate virtually all the legal rules in its field through adjudication rather than rulemaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). Of course, the Board's choice of rulemaking or adjudication is its prerogative. *See SEC v. Chenery Corp.*, 332 U.S. 194, 201–02 (1947). But the Board's aversion to notice-and-comment rulemaking tilts the playing field against employers. Rulemaking is prospective, predictable, and requires the input of regulated parties. *See* Lisa Schultz Bressman, *Beyond Accountability: Arbitrariness and Legitimacy in the Administrative State*, 78 N.Y.U. L. Rᴇᴠ. 461, 541–44 (2003). Adjudication, by contrast, involves Board-initiated enforcement action before Board-aligned adjudicators. It's also retrospective, unpredictable, and arises in fact-bound situations. *See* Jeffrey S. Lubbers, *The Potential of Rulemaking by the NLRB*, 5 FIU L. Rᴇᴠ. 411, 414 (2010). Thus, "commentators have almost universally called for the Board to exercise its rulemaking authority more often." Charlotte Garden, *Toward Politically Stable NLRB Lawmaking: Rulemaking vs. Adjudication*, 64 Eᴍᴏʀʏ L.J. 1469, 1473 (2015).

Non-Neutral Procedural Rules

- Congress has said the Board may conduct all proceedings according to the Federal Rules of Evidence and the Federal Rules of Civil Procedure "so far as practicable." 29 U.S.C. § 160(b). So, the Board gets to decide which federal rules it may or may not follow.

No. 24-60367

- Board-created procedural rules favor the Board. For a party defending against an enforcement action, there is no right to discovery during a Board investigation; no pre-trial right to discover evidence; the General Counsel may conceal the identity and any affidavits of employee witnesses until the employee testifies; and an employer may only review an employee affidavit moments before cross-examination. Crutcher et al., *supra*, at 52. Essentially, employers face "trial by ambush." *Ibid.*

- Board-made doctrines also skew ALJs' credibility findings against the employer. One doctrine declares that the testimony of an employer's current employee which is contrary to the employer's arguments is particularly reliable. *See Covanta Bristol, Inc.*, 356 NLRB 246, 253 (2010); *Flexsteel Indus.*, 316 NLRB 745 (1995), *aff'd*, 83 F.3d 419 (5th Cir. 1996).

- ALJs also may draw a negative inference from a party's failure to call a corroborating witness, particularly its own agent. *Chipotle Servs., LLC*, 363 NLRB 336, 336 n. 1, 349 (2015), *enf'd* 849 F.3d 1161 (8th Cir. 2017); *Roosevelt Mem'l Med. Ctr.*, 348 NLRB 1016, 1022 (2006). This presumption is problematic because the employer has scant information coming into the hearing thanks to the Board's restrictive discovery rules. *See* Crutcher et al., *supra*, at 51–52. As a result, the employer is considerably more likely to have failed to call witnesses than the General Counsel. *Ibid.*

<u>Non-Neutral Board Review</u>

- On appeal, the Board does little if anything to upset an ALJ's already-slanted credibility findings. Typically, the Board inserts form language declaring that it has "carefully examined the record and find[s] no basis for reversing the findings." *Id.* at 53; *see, e.g.*, ROA.1299 n.1.

48

- Board outcomes reflect this slanted playing field. For the most recent period with available data, the General Counsel won nearly 90% of contested cases that went to Board decision. Crutcher et al., *supra*, at 54. Perhaps noticing this incriminating evidence, the Board has recently stopped disclosing its win rate. *Id.* at 54 n.29.

- The Board has unlimited authority to reopen its previous decisions until a case is filed in court. *See ExxonMobil Rsch. & Eng'g Co. v. NLRB*, 132 F.4th 337, 346 (5th Cir. 2025) (citing 29 U.S.C. § 160(d)). That power only favors employees: A prevailing employer can never petition for judicial review because it would not be a "person aggrieved" by agency action. *See ExxonMobil Rsch. & Eng'g Co. v. NLRB*, 163 F.4th 140, 144 (5th Cir. 2025) (OLDHAM, J., dissenting from denial of rehearing en banc) (citing 29 U.S.C. § 160(f)).

In sum, the National Labor Relations Board has provided ample reasons to doubt its neutrality. The Board serves as prosecutor, judge, jury, and sets the rules of its own game. It then serves as its own appellate court and revisits its own decisions as it pleases. Nothing about these procedures inspires confidence in the Board's determination of a "substantial motivating factor."

b

With that understanding of how the Board makes its "findings," consider what our court does—or fails to do—with them. Remember, *Wright Line*'s first step nominally places the burden on the Board to uphold its finding in federal court. Yet this step effectively amounts to a rubber-stamp because this court blindly defers to the Board's finding of improper motivation.

Today's majority puts it best: The Board's "finding of unlawful motive is a question of fact that our court will 'not lightly displace.'" *Ante*,

at 21 (quoting *NLRB v. Brookwood Furniture, Div. of U.S. Indus.*, 701 F.2d 452, 464 (5th Cir. 1983)). If the Board "'could reasonably infer an improper motivation,' [this court] will not overturn the Board's determination." *Ante*, at 21–22 (quoting *NLRB v. McCullough Env't. Servs., Inc.*, 5 F.3d 923, 937 (5th Cir. 1993)). The problem should be self-evident: The burden is the Board's to show an improper motivation, but our court will "not lightly displace" the Board's finding on that score.

The majority's deference is emblematic of a larger problem. Our court prides itself in its "limited and deferential" review of Board findings. *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018). We give "significant deference" to the Board's application of law to facts, *ibid.*, and we will not disturb the Board's inferences so long as they are "plausible," *Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 464 (5th Cir. 2001). "Absent extraordinary circumstances, a reviewing court does not substitute its view of credibility for that of the ALJ . . . and search for contradictory inferences." *Valmont Indus.*, 244 F.3d at 464.

All to say, our review of the Board's findings is perilously close to no review at all.

c

Finally, our toothless review is aided by the fact that "substantial motivating factor" is so capacious as to be meaningless.

What is a "substantial" factor? Apparently, it is synonymous with "motivating factor." *Transp. Mgmt. Corp.*, 462 U.S. at 401. "Substantial" also imposes a "higher bar" than "contributing" factor. *Murray v. UBS Sec., LLC*, 601 U.S. 23, 36 (2024). Yet a "substantial or motivating factor" "need not be the sole motivating factor." *Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358, 370 (5th Cir. 2017). As the Board put it in *Wright Line*, the employee

need only show that his protected conduct "played a role" in the adverse employment action. 251 NLRB at 1089.

Putting that all together, the employer's improper motivation must be more than a contributing factor in the adverse employment action, yet it need only "play[] a role" in the adverse action. *Ibid.* When is a factor substantial—as opposed to merely contributory? When is "play[ing] a role" with other factors any different from mere contribution? *Ibid.* The answers to these questions are anyone's guess. And we don't need to grapple with them because the majority simply defers to *whatever* the Board says. *See ante*, at 21–22.

C

The second *Wright Line* step fares no better. Recall that if the Board successfully shows an employer's improper motivation, then the burden shifts to the employer to show it would have taken the adverse action regardless of the employee's protected conduct.

This burden-shifting framework has a glaring problem: The Board must show an unfair labor practice by "the preponderance of the testimony." 29 U.S.C. § 160(c). Step two, however, allocates some of that burden to the employer. As the Board put it in *Wright Line*, "it is the employer which has to 'make the proof.'" 251 NLRB at 1089.

To its credit, the Board did try to harmonize the burden shift with the text of the NLRA. In the Board's view, "[t]he shifting burden merely requires the employer to make out what is actually an affirmative defense . . . to overcome the *prima facie* case of wrongful motive." *Id.* at 1083 n.11.

The Board's maneuver is both wrong as a matter of law and proves too much.

First, it's wrong to characterize step two as an affirmative defense. Affirmative defenses "bear[] no necessary relationship to the existence or nonexistence" of liability. *Mullaney v. Wilbur*, 421 U.S. 684, 706 (1975) (REHNQUIST, J., concurring). That is why criminal defendants may bear the burden to show affirmative defenses; the government has already proven the elements of the crime beyond a reasonable doubt. *See ibid.* The *Wright Line* test, however, shifts the burden on the question of causation, "which lies at the heart" of the unfair labor practices charge. *NLRB v. N.Y. Univ. Med. Ctr.*, 702 F.2d 284, 294 n.9 (2d Cir. 1983), *cert. granted, judgment vacated*, 464 U.S. 805 (1983), *and abrogated by NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983). Whether an employer would have fired the employee anyway is not the sort of ancillary issue that an affirmative defense usually entails.

Second, the Board's affirmative defense maneuver proves too much. If step two were an affirmative defense, then the Board on step one would have already proven the existence of liability. In other words, by showing that the employee's protected activity was a "substantial motivating factor" in the adverse employment decision, the Board would have shown an NLRA violation. That's absurd. The Board itself in *Wright Line* admitted that step one is a mere "*prima facie* case." 251 NLRB at 1083 n.11. And the Court in *Transportation Management* recognized that an employer "does not violate the NLRA" if its improper animus "did not contribute at all to an otherwise lawful discharge for good cause." 462 U.S. at 398.

In sum, the Board cannot seriously contend that a mere showing of improper motivation is sufficient to violate the NLRA. Because the Board bears the burden to show an NLRA violation by "the preponderance of the testimony," 29 U.S.C. § 160(c), the Board cannot require the employer to

show it would have taken the adverse action absent the employee's protected conduct.[1]

\*

The *Wright Line* test is a legal travesty. The first step places the burden on the Board to uphold its action in federal court in name only. The second step then makes up for it by misallocating the burden to the employer. The Supreme Court deferred to the Board in the old days of *Chevron*. But today is a new day. And *Wright Line* should go the same way as the deference regime that blessed it.

## II

Now, to the facts of this case. I (A) start with why Trader Joe's fired Jill Groeschel and then (B) explain the Board's demonstrably erroneous inferences.

## A

Why was Groeschel fired? Trader Joe's has an at-will employment policy: "Failing to treat a customer [or] crew member . . . with courtesy and respect" "will be subject to disciplinary action, which may range from a verbal warning to termination of employment," as "determined at the discretion of Trader Joe's management." ROA.1087.

---

[1] *Wright Line* step two also is inherently unfair: It requires the employer to prove a negative. Showing that an employer would have taken the action anyway is not readily reducible to concrete proof. True, employers may point to similarly situated employees who faced discipline. *See ante*, at 27. But if no employee has ever behaved as egregiously as the one in question, this entire framework crumbles. Worse, the majority insists that the comparator employee be "truly analogous" and "genuinely comparable." *Ante*, at 28. That is all but impossible because NLRB proceedings are so fact dependent.

No. 24-60367

Groeschel failed to treat customers and colleagues with courtesy and respect. On the contrary, she was abusive and aggressive. Groeschel once called a co-worker a "selfish bitch" because she did not like how her colleague swept the floor. ROA.1306–07; *see also* ROA.787 (co-worker reporting that "I heard [Groeschel] scream at another crewmember, 'Why are you such a Fucking Bitch!'"). Another time, Groeschel asked an assistant manager if she could leave early, but he responded that she would receive a negative attendance mark if she did. ROA.1307. Groeschel walked away and exclaimed, "why don't you [] just fire me." ROA.573. This incident prompted a customer to complain that he witnessed an employee "verbally attack" a colleague. ROA.1308. On another occasion, Groeschel "rude[ly]" refused to complete her daily COVID check. ROA.1307. She also called a maskless customer "selfish" and told her that she was not welcome even though the customer was medically exempt. ROA.147–48. The customer then called the store to complain about Groeschel's behavior. ROA.1304.

Further, Groeschel endangered her colleagues with heavy machinery. One colleague saw her try "to hit [a co-worker] with the cart full of grocer[ies] . . . Under [Groeschel's] breath, she said to [the co-worker], 'You better watch out.' It was a threat." ROA.792. This was no one-off incident. Groeschel would "purposely come very close to running crewmembers over." ROA.787. Another co-worker reported that she was "rough with the pallets, takes the ramp and corners too quickly, and causes dangerous situations for herself and other crew members." ROA.794.

Unsurprisingly, Groeschel's belligerent behavior provoked a slew of complaints from a dozen colleagues. *See* ROA.787–97; ROA.934–43. They described her as "a constant challenge," "very aggressive," ROA.934, "very toxic," ROA.937, and "a fundamentally angry person," ROA.794. They witnessed her "bullying and belittling fellow crew members, to the point of

bringing them to tears." ROA.787. In short, Groeschel was "the main problem" in the workplace. ROA.943.

Any rational observer would conclude that Groeschel did not treat customers and colleagues "with courtesy and respect." ROA.1087. As Groeschel's regional manager reported, Groeschel "had been treating people and was still treating people disrespectfully" and was "behaving unsafely." ROA.442. She had been given feedback and "ask[ed] [] to change her behaviors," but her persistent misconduct "was really impacting the workplace and the coworkers' environment." ROA.443. The company had a mountain of reasons that would justify Groeschel's at-will termination.

## B

The Board, however, is no rational observer. The Board found that "animus" towards Groeschel's COVID-related concerns motivated her firing. ROA.1298. Under any standard of review, that is wrong.

All agree that the Board's factual findings may stand only "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. §§ 160(e)–(f); *ante*, at 18. A "flawed reading of the record" does not provide substantial evidence. *Dish Network*, 953 F.3d at 376 (quotation omitted). And the Board's reading of the record in this case is *so* flawed that it beggars belief.

First, the Board relied on the "close timing" between Groeschel's protected activities and her suspension and discharge. ROA.1300. Never mind that before Trader Joe's took any adverse action against Groeschel, she had been voicing COVID-related concerns for nearly two years; had received multiple positive performance reviews; and had consistently

55

received a receptive response when she voiced concerns.[2] Starting a week before Groeschel's suspension, however, the store's regional manager received a flurry of alarming complaints that Groeschel was bullying and endangering her colleagues. Obviously, Trader Joe's took adverse action in response to the barrage of complaints.

Second, the Board ignored the complaints from Groeschel's co-workers because it inferred that Groeschel's NLRB charge motivated the complaints. That inference is baseless; Groeschel's co-workers were involved in precisely zero employment decisions. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657 (5th Cir. 2012) ("The actions of ordinary employees are not imputable to their employer." (quotation omitted)). And there is every reason to think the co-workers' complaints were motivated not by the NLRB charge but by the fact that Groeschel terrorized her workplace and wreaked havoc on every person around her.

It's also ironic that the Board sought to dismiss these complaints. Groeschel only told her co-workers about the NLRB charge at the Board's urging. Presumably the Board thought that if Trader Joe's really were a COVID-denying superspreader, Groeschel's co-workers would support her. They did not. Instead, they flooded their regional supervisor with complaints about Groeschel. The Board does not get to ignore the testimony that it itself precipitated. *See Universal Camera*, 340 U.S. at 488 (holding that

---

[2] Examples of Trader Joe's accommodations abound. When Groeschel raised concerns that Trader Joe's did not let staff know that an employee who recently tested positive was in the store, Trader Joe's developed better communication protocol. After a spat between Groeschel and a maskless customer, Groeschel's supervisors showed "compassion and kindness," ROA.148, and ensured that she felt "[]comfortable" and free to "speak out," ROA.544. Following Trader Joe's decision to remove plexiglass barriers, Groeschel complained, and her store manager asked the regional manager if the glass could be re-installed. And after Trader Joe's removed social-distancing stickers, prompting objection from Groeschel, her store manager replaced them.

the substantial-evidence standard requires the Board to "take into account whatever in the record fairly detracts from its" conclusions).

Third, the Board inferred animus from Trader Joe's supposed failure to meaningfully investigate accusations against Groeschel. Following the employee complaints, Groeschel's regional manager initiated a general "climate survey" among employees. The survey did not ask about Groeschel specifically. The Board's criticism of the climate survey is incoherent. On the one hand, the Board faulted Trader Joe's for conducting a "general climate survey instead of an investigation into any of the supposed poor actions by Groeschel." ROA.1311. But the Board also called the climate survey a "fishing expedition for ammunition against Groeschel." ROA.1317. If a "general climate survey" is insufficiently specific to investigate employee misconduct, but simultaneously too targeted because it looks for "ammunition against" an individual, how on earth is an employer supposed to investigate misconduct?

In any event, neither the NLRA nor Trader Joe's disciplinary policy required Trader Joe's to undertake an investigation. On the contrary, the company had given Groeschel several verbal warnings, a written one, and "ask[ed] her to change her behaviors." ROA.443.

Fourth, none of the Board's other cherry-picked snippets of evidence show animus. According to the Board, the following email from Groeschel's store supervisor to the regional manager reflects animus: "Just wanted to let you know that you may get a letter or call from [Groeschel] and/or others. [Groeschel] is being very vocal about the plexi[glass] being removed this morning . . . I just wanted you to know so you wouldn't be blindsided in case she phoned." ROA.1315. How does this email conceivably reflect animus? The Board does not explain. The Board seems to think that if managers relay an employee's concerns, they must harbor some animus over an employee's

views about COVID? To describe the Board's position is to demonstrate the non sequitur.

What's more, the Board relied on the varying length of entries in Groeschel's employee file because the amount of "detail" apparently indicates animus. ROA.1315. Never mind that the longest entry predated the pandemic by three years; the regional manager who made the employment decisions in question did not write these entries; and each entry related to specific, often egregious misconduct.

Finally, the Board relied on a statement from Groeschel's manager after a series of incidents with co-workers advising Groeschel that she "needed to rethink whether working for [Trader Joe's] was a good fit for her." ROA.1307. The Board's reliance on this statement is ironic. Trader Joe's had accommodated Groeschel's COVID concerns for over a year. *See supra*, at n.2. This California-based grocery chain was hardly the Sturgis motorcycle rally. But in summer of 2021, Trader Joe's moved on from the pandemic, along with the rest of America. Groeschel did not. So, after a series of incidents her supervisor reasonably asked whether she was equipped to continue serving as a front-line worker in the post-COVID world. To unearth animus here, the Board had to stick its head in the sand.

\*

So long as an employee takes some form of protected activity, he or she is immune from adverse action thanks to today's majority. With the majority's blessing, the Board has transfigured the NLRA into a "shield for the incompetent [and] job security for the unworthy." *TRW, Inc. v. NLRB*, 654 F.2d 307, 312 (5th Cir. 1981). Employees like Jill Groeschel are "privileged to be all [their colleagues] consider[] [them] to be"—abusive, toxic, and belligerent—yet blissfully "immune from discharge." *NLRB v.*

58

*Robbins Tire & Rubber Co.*, 161 F.2d 798, 805 (5th Cir. 1947) (WALLER, J., specially concurring). A ludicrous outcome, indeed.

## III

Adding insult to injury, the Board ordered a remedy that was unauthorized by statute. Yet the majority lets the Board get away with it. How? By holding that this court lacks jurisdiction to consider the remedy because Trader Joe's did not press the issue below. I (A) discuss the relevant law and (B) show why the majority is wrong.

## A

The Board's order required Trader Joe's to "make [Groeschel] whole . . . for any other direct or foreseeable pecuniary harms suffered as a result of" her termination. ROA.1317. In essence, this was an order for compensatory damages. This type of relief is often called the "*Thryv* remedy," named after the case in which the Board first asserted its authority to order it. *See Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951 at \*9–10 (Dec. 13, 2022), *enforcement denied in part and vacated in part by Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024).

The *Thryv* remedy is unlawful. The NLRA empowers the Board to force an employer "to cease and desist from [an] unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter." 29 U.S.C. § 160(c). By enabling the Board to take "affirmative action," the NLRA allows the Board only to impose equitable remedies, not legal damages. *Hiran Mgmt., Inc. v. NLRB*, 157 F.4th 719, 725–29 (5th Cir. 2025). Foreseeable pecuniary harms are a quintessential form of legal damages. *Id.*

No. 24-60367

at 728. Therefore, our court has *explicitly* held that the Board had no authority to impose the *Thryv* remedy.[3]

B

Despite the fact that the Board exceeded its statutory authority in imposing the *Thryv* remedy, the majority holds that this court cannot touch the Board's action. According to the majority, because Trader Joe's did not raise the issue below, we lack jurisdiction.

In support, the majority relies on § 10(e) of the NLRA, which permits courts to consider only "objection[s] . . . urged before the Board, its member, agent, or agency . . . unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). The majority reads this provision as a jurisdictional requirement and says that because Trader Joe's did not object below, this court lacks jurisdiction.

My esteemed colleagues' reading of § 10(e) is wrong coming, going, and coming back again. First, (1) section 10(e) poses a non-jurisdictional exhaustion requirement. Second, (2) Trader Joe's did in fact object to the *Thryv* remedy below. Third, (3) Trader Joe's objection satisfies § 10(e)'s equitable exception.

---

[3] The Fifth Circuit is in good company on this point. *See NLRB v. Starbucks Corp.*, 125 F.4th 78, 94 (3d Cir. 2024); *NLRB v. Starbucks Corp.*, 159 F.4th 455, 482 (6th Cir. 2025); *see also 3484, Inc. v. NLRB*, 137 F.4th 1093, 1125 (10th Cir. 2025) (Eid, J., concurring in part and dissenting in part); *Int'l Union of Operating Eng'rs, Stationary Eng'rs, Loc. 39 v. NLRB*, 155 F.4th 1023, 1055 (9th Cir. 2025) (Bumatay, J., dissenting in part); *id.* at 1072 (Nelson, J., dissenting from the denial of rehearing en banc). Only the Ninth Circuit sees things differently. *See Int'l Union*, 155 F.4th at 1035 (amended panel opinion); *but see* Petition for Writ of Certiorari at 27, *Macy's, Inc. v. NLRB*, (U.S. Nov. 26, 2025) (No. 25-627) ("The Ninth Circuit is thus on the short end of a lopsided circuit split.").

No. 24-60367

1

Section 10(e) imposes an exhaustion requirement, not a jurisdictional bar. A rule is jurisdictional "only if Congress 'clearly states' that it is." *Santos-Zacaria v. Garland*, 598 U.S. 411, 416 (2023) (quotation omitted). Section 10(e) says not a single word about the jurisdictional effect of an employer's failure to exhaust a claim. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."). This provision lacks the "unmistakable evidence" or "express language" required to impose a jurisdictional bar. *Santos-Zacaria*, 598 U.S. at 418.

Nor do the surrounding provisions in § 10(e) make the exhaustion provision look jurisdictional. A jurisdictional provision "sets the bounds" of an appellate court's adjudicatory authority. *Ibid.* Conveniently, a different part of § 10(e) does just that: When a party files a "petition" for review, § 10(e) says that this court "shall have jurisdiction." 29 U.S.C. § 160(e); *see Quickway Transp., Inc. v. NLRB*, 117 F.4th 789, 825 (6th Cir. 2024) (Murphy, J., concurring in the judgment) (making this same point). The exhaustion requirement in § 10(e), by contrast, "is a quintessential claim-processing rule." *Santos-Zacaria*, 598 U.S. at 417. That is, it "seek[s] to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Id.* at 416 (quotation omitted). Such a rule is "routinely treated as [a] nonjurisdictional threshold requirement." *Id.* at 417 (citation modified).

It also is incoherent to treat the exhaustion provision as jurisdictional because the provision has an equitable exception. A court may still consider unexhausted claims under "extraordinary circumstances." 29 U.S.C. § 160(e). Yet a federal court's power to hear a case never hinges on

61

"extraordinary circumstances." *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 165 (2010) ("It would be at least unusual to ascribe jurisdictional significance to a condition subject to . . . exceptions."). Section 1331, for example, does not confer jurisdiction to hear cases involving federal questions, plus other questions that are just really important. Nor does § 1332 confer jurisdiction over disputes between citizens of the same state when the case meets some "extraordinary" circumstances. Further, the Court has been adamant that jurisdictional rules are "straightforward," *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010), and present "clear boundaries," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 11 (2015). An exception for "extraordinary circumstances" does not comport with this requirement.

The majority's misunderstanding seems to stem from an old Supreme Court case, *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982). There, the Court held that an appellate court was "without jurisdiction" to consider an issue not raised before the Board. *Ibid.* However, the *Woelke* Court invoked jurisdiction without explanation. More recent Supreme Court cases have instructed lower courts to read such "drive-by jurisdictional rulings" with caution. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006); *see Wilkins v. United States*, 598 U.S. 152, 159–60 (2023) ("The mere fact that [the] Court previously described something 'without elaboration' as jurisdictional therefore *does not end the inquiry*." (quotation omitted) (emphasis added)); *see also Arbaugh*, 546 U.S. at 511 (declaring that such "unrefined dispositions . . . should be accorded '*no precedential effect*.'" (quotation omitted) (emphasis added)). *Woelke* does not dictate whether § 10(e)'s exhaustion requirement is jurisdictional.

None of this, however, gives the majority pause. It offers zero explanation before concluding that § 10(e) is a "jurisdiction-stripping" provision. *Ante*, at 39. In so doing, the majority transgresses the Supreme

Court's pellucid instruction: to "us[e] the term 'jurisdictional' only when it is apposite." *Reed Elsevier*, 559 U.S. at 161 (quotation omitted).

The majority's sole justification is that this court has "repeatedly" applied § 10(e)'s so-called jurisdiction bar. The majority's citations offer the same quantum of analysis as the majority—none. *See Hallmark Phoenix 3, L.L.C. v. NLRB*, 820 F.3d 696, 712–13 (5th Cir. 2016) ("Section 10(e)'s jurisdictional bar is implicated here."); *NLRB v. Hou. Bldg. Servs., Inc.*, 128 F.3d 860, 863 (5th Cir. 1997) (per curiam) (same); *Gulf States Mfg. Inc. v. NLRB*, 704 F.2d 1390, 1396–97 (5th Cir. 1983) (same). The majority's only other cite comes from a 1962 case, *NLRB v. Mooney Aircraft, Inc.*, 310 F.2d 565, 566 (5th Cir. 1962) (per curiam). This case neither purports to call § 10(e) jurisdictional (one searches the opinion in vain for that word) nor grapples with the Court's repeated admonition that courts must not apply the jurisdictional label lightly (how could it, since it preceded by five decades any of the relevant Court precedents like *Arbaugh*, *Reed Elsevier*, *Wilkins*, or *Santos-Zacaria*).

Not only has our court never explained that § 10(e) is jurisdictional— we have explained precisely the opposite. We have emphatically "rejected the notion that this provision of 29 U.S.C. § 160(e) is jurisdictional and instead ha[ve] characterized it as an 'exhaustion of remedies provision.'" *Lion Elastomers, L.L.C. v. NLRB*, 108 F.4th 252, 258 (5th Cir. 2024) (quoting *Indep. Elec. Contractors of Hou., Inc. v. NLRB*, 702 F.3d 543, 550 (5th Cir. 2013)). In other words, the NLRB has already made the exact argument that it makes here and that the majority now adopts. This court held in no uncertain terms that the "NLRB's argument lacks merit." *Ibid.* Under this circuit's rule of orderliness, "a panel of three judges may not unilaterally overrule or disregard the precedent that has been established by our previous

decisions." *In re Pilgrim's Pride Corp.*, 690 F.3d 650, 663 (5th Cir. 2012), *as revised* (Aug. 14, 2012). Today's majority does exactly that.[4]

In sum, as long as a party petitions for review, this court has jurisdiction. That the party did or did not raise the argument below is irrelevant to this court's power to hear the objection.

2

What's more, none of this jurisdictional handwringing is even relevant—because Trader Joe's *did* object to the *Thryv* remedy below. In its exceptions brief filed to the Board, Trader Joe's objected to "[t]he ALJ's reliance on *Thryv*" "because it was wrongly decided." ROA.1208. End of story.

Undeterred, the Board claims that Trader Joe's objection was not enough. The Board is wrong. An objection need only be "specific enough to place the agency on notice of the party's objections." *Int'l Bhd. of Elec. Workers, AFL-CIO, CLC, Loc. Unions 605 & 985 v. NLRB*, 973 F.3d 451, 460 (5th Cir. 2020); *see also Lion Elastomers*, 108 F.4th at 258. In fact, this court has found § 10(e) satisfied even when a party "did not explicitly mention" the specific objection to the Board but presented "substantially similar objections." *NLRB v. AllService Plumbing & Maint., Inc.*, 138 F.4th 889, 897 (5th Cir. 2025). Here, Trader Joe's undoubtedly told the Board that it thought that the *Thryv* remedy was unauthorized. That is objection aplenty to put the Board on notice that Trader Joe's thought the *Thryv* remedy was unauthorized.

---

[4] To some, blowing out candles is a critical part of a birthday. To others, it has talismanic powers and yields a wish. And to still more, it's a triviality that means nothing at all. So too with this circuit's varying attitude towards the rule of orderliness.

No. 24-60367

The Board then cites its own rules and regulations for the proposition that Trader Joe's didn't do enough. *See* 29 C.F.R. § 102.46(a)(1). Whatever the Board's interpretation of § 10(e), this court's understanding of the statutory text prevails. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). All Trader Joe's had to do was "urge[]" the Board, 29 U.S.C. § 160(e), and put it "on notice," *Int'l Bhd. of Elec. Workers*, 973 F.3d at 460. That's exactly what Trader Joe's did.

The majority's analysis is even less persuasive. The majority claims that "Trader Joe's concedes that it failed to raise the remedy issue before the Board." *Ante*, at 40. The majority offers no citation for this claim—nor could it. That's because Trader Joe's did not concede the point. *See* Gray Br. at 17–18 (insisting that Trader Joe's "did raise exceptions both to the ALJ's award of the remedy and to the application of *Thryv*," and that "the Board was on notice" of its objection).

Next, the majority musters a 73-year-old case for the proposition that a party cannot preserve an argument by stating the Board's remedy is "contrary to law." *Ante*, at 40 (citing *NLRB v. Seven-Up Bottling Co. of Mia.*, 344 U.S. 344, 350 (1953)). With respect, that's not what *Seven-Up Bottling* said. In *Seven-Up Bottling*, the employer argued on appeal that the Board's backpay award was "oppressive" because of the seasonal nature of its workers. 344 U.S. at 349. But the employer did not previously make an "objection . . . base[d] on the seasonal nature of its business." *Id.* at 350. Thus, the employer did not provide "adequate notice that the Company intend[ed] to press the specific issue"—that is, the seasonal nature of the business. *Ibid.* The Court nowhere announced the absurd holding that the majority now reaches: An assertion that a specific remedy is contrary to law fails to raise the argument that that specific remedy is contrary to law.

65

3

Finally, even if § 10(e) somehow imposes a jurisdictional bar, and even if Trader Joe's did not present its *Thryv* argument to the Board, this court would still be able to consider Trader Joe's argument because the *Thryv* objection poses an "extraordinary circumstance[]." *See* 29 U.S.C. § 160(e). That is because the remedy is unlawful and potentially unconstitutional.

Extraordinary circumstances exist when the Board issues remedies that "are patently *ultra vires*." *HTH Corp. v. NLRB*, 823 F.3d 668, 673 (D.C. Cir. 2016); *see also NLRB v. Saint-Gobain Abrasives, Inc.*, 426 F.3d 455, 460 (1st Cir. 2005) ("Notwithstanding the mandate of section 10(e), the court of appeals retains residual jurisdiction to consider a first-time challenge to a remedy on the ground that the remedy is obviously beyond the Board's authority."); *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311 n.10 (1979) (recognizing an exception to § 10(e) when "the Board determination at issue is patently in excess of its authority"). That's this case. The Board lacked authority to order the *Thryv* remedy. *See supra*, Part III.A.

Moreover, Trader Joe's objection poses "extraordinary circumstances" because the *Thryv* remedy implicates serious Seventh Amendment concerns. If an administrative agency "seek[s] to impose damages on a party that resemble those available in 'Suits at common law,' then the party must receive a jury trial." *Int'l Union of Operating Eng'rs, Stationary Eng'rs, Loc. 39 v. NLRB*, 155 F.4th 1023, 1063 (9th Cir. 2025) (Bumatay, J., dissenting in part) (quoting U.S. Const. amend. VII); *see also Starbucks*, 159 F.4th at 473. That looks a lot like what the Board is trying to do here: provide "the tort remedy of money damages" by compensating for foreseeable monetary harm. *Id.* at 97; *see also SEC v. Jarkesy*, 603 U.S. 109, 123 (2024) ("[M]oney damages are the prototypical common law

No. 24-60367

remedy."). If the Board was going to order the *Thryv* remedy, Trader Joe's was likely entitled to a jury trial.

These Seventh Amendment consequences are of utmost importance. The right to a jury trial "occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right has always been and should be scrutinized with the utmost care." *Jarkesy*, 603 U.S. at 121 (quotation omitted). Except by today's majority. It defies common sense, precedent, and the Constitution to find it "ordinary" that the Board has forced Trader Joe's to dole out damages absent statutory authority and in potential violation of the Seventh Amendment.

*        *        *

I respectfully dissent.

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

February 18, 2026

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

    No. 24-60367    Trader Joe's Company v. NLRB
                    Agency No. 16-CA-291179
                    Agency No. 16-CA-293143

Enclosed is a copy of the court's decision.  The court has entered judgment under Fed. R. App. P. 36.  (However, the opinion may yet contain typographical or printing errors which are subject to correction.)

Fed. R. App. P. 39 through 41, and Fed. R. App. P. 39, 40, and 41 govern costs, rehearings, and mandates.  **Fed. R. App. P. 40 require you to attach to your petition for panel rehearing or rehearing en banc an unmarked copy of the court's opinion or order.**  Please read carefully the Internal Operating Procedures (IOP's) following Fed. R. App. P. 40 for a discussion of when a rehearing may be appropriate, the legal standards applied and sanctions which may be imposed if you make a nonmeritorious petition for rehearing en banc.

Direct Criminal Appeals.  Fed. R. App. P. 41 provides that a motion for a stay of mandate under Fed. R. App. P. 41 will not be granted simply upon request.  The petition must set forth good cause for a stay or clearly demonstrate that a substantial question will be presented to the Supreme Court.  Otherwise, this court may deny the motion and issue the mandate immediately.

Pro Se Cases.  If you were unsuccessful in the district court and/or on appeal, and are considering filing a petition for certiorari in the United States Supreme Court, you do not need to file a motion for stay of mandate under Fed. R. App. P. 41.  The issuance of the mandate does not affect the time, or your right, to file with the Supreme Court.

Court Appointed Counsel.  Court appointed counsel is responsible for filing petition(s) for rehearing(s) (panel and/or en banc) and writ(s) of certiorari to the U.S. Supreme Court, unless relieved of your obligation by court order.  If it is your intention to file a motion to withdraw as counsel, you should notify your client promptly, **and advise them of the time limits for filing for rehearing and certiorari**.  Additionally, you MUST confirm that this information was given to your client, within the body of your motion to withdraw as counsel.

The judgment entered provides that Petitioner pay to Respondent the costs on appeal.  A bill of cost form is available on the court's website www.ca5.uscourts.gov.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    By: _____
                    Sean Hannan, Deputy Clerk
                    504-310-7702

Enclosure(s)

Ms. Ruth E. Burdick
Ms. Arrissa Kathryn Meyer
Mr. Jared Odessky
Ms. Milakshmi Varuni Rajapakse
Mr. Timothy L. Watson